EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
FAX: (619) 233-3221

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ROSELEE BARTOLACCI, by and through its successor in interest, ROSEANN BARTOLACCI,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF SAN DIEGO; KELLY MARTINEZ; RICARDO CARLON; PAUL MATA; EVANGELINA REYNOSO; LAUREN ANDERSON; MACY GERMONO; JANINE SPARKS; DAVID CHRISTENSEN, MD; SHERRY ESQUIVEL; TERESA HURLEY; LACEY BEASTON; DIORELLA RIOVEROS; NAPHCARE CORRECTIONAL HEALTH; and DOES 1-55,<br><br>Defendants. | CASE NO. **'24 CV 1156 WQH JLB**<br><br>**COMPLAINT**<br><br>**(1) Deliberate Indifference to Serious Medical Needs (42 U.S.C. § 1983);**<br>**(2) Failure to Properly Train, Supervise, and Discipline (42 U.S.C. § 1983);**<br>**(3)** *Monell* **Municipal Liability (42 U.S.C. § 1983);**<br>**(4) Violation of the Americans with Disabilities Act;**<br>**(5) Violation of the Rehabilitation Act;**<br>**(6) Violation of California's Bane Act (Civ. Code § 52.1); and**<br>**(7) Negligence**<br><br>**JURY TRIAL DEMANDED** |

# Table of Contents

I.      INTRODUCTION ........................................................................... 1

II.     JURISDICTIONAL ALLEGATIONS ............................................. 4

III.    PARTIES ....................................................................................... 5

IV.     FACTS REGARDING THE DEATH OF ROSELEE BARTOLACCI ........ 9

V.      *MONELL* ENTITY AND SUPERVISORY LIABILITY ALLEGATIONS 27

    A.  The San Diego County Sheriff's Department's Policies are Facially
        Deficient, and there is a Custom or Practice of Jail Staff Failing to Abide
        by its Terms ............................................................................. 27

    B.  The Sheriff's Department Has a Higher Rate of In-Custody Inmate Deaths
        than Any Other Large County in California. .................................... 30

    C.  Defendants Are Aware of a Persistent and Recurring Pattern of Preventable
        Deaths and Serious Injuries Caused by the Sheriff's Department's
        Misconduct, Apathy and Neglect. ................................................. 33

    D.  The Sheriff's Department's Inadequate Screening and Intake Process Fails
        to Identify and Treat Medical Care Problems of Newly Arriving
        Incarcerated People .................................................................... 39

    E.  External Audits and Reports Warn Martinez, the County and the Sheriff's
        Department of Pervasive Failure to Adequately Supervise Subordinates ..... 40

    F.  The County Systemically Failed to Maintain Sufficient Numbers of Health
        Care Professionals, Resulting in Deficient Care ............................... 44

    G.  The County Violated California State Law on Safety Checks ................ 46

VI.     PLAINTIFF'S CAUSES OF ACTION ........................................... 50

VII.    PUNITIVE DAMAGES ............................................................... 70

VIII.   RELIEF REQUESTED ................................................................. 70

IX.     DEMAND FOR JURY TRIAL ..................................................... 71

i

COMES NOW, the ESTATE OF ROSELEE BARTOLACCI, by and through its successor-in-interest, ROSEANN BARTOLACCI, by its attorneys of record, Iredale and Yoo, APC, and allege and complain as follows:

## I.    **INTRODUCTION**

Roselee Bartolacci, who was 32 years old at the time of her death, functioned at the level of an eight-year-old and required constant care and assistance from her mother, Roseann Bartolacci. Roseann was dedicated to Roselee and diligently took care of her, including by making sure Roselee received consistent psychiatric care and medication.  Roselee was diagnosed with severe psychiatric issues as a child, including developmental disorder, attention-deficit hyperactivity disorder ("ADHD"), mild mental retardation and bipolar type schizoaffective disorder.

Roselee was admitted to hospital on a 72-hour emergency involuntary psychiatric hold in 2015. The 72-hour emergency hold was the only time Roselee had been away from her mother since she was four years old. With Roseann's love and support, and with the assistance of the San Diego Regional Center, Roselee was able to lead a happy and healthy life, one that was extraordinary for someone born with her disadvantages. That changed when Roselee was taken into the custody of the San Diego Sheriff's Department.

In early 2023, Roselee's psychiatric medications became ineffective. She was hearing voices and suffering paranoia. She experienced intermittent outbursts of anger and aggression. Roselee reported her symptoms to her psychiatrist, who adjusted her medications. Roselee struggled with the adjustment and on April 6, 2023, while suffering from psychosis and hearing voices, hit her mother with a hammer. Roseann called the police, seeking medical intervention for Roselee. Roseann specifically requested a PERT clinician but was told that none was available. When Sheriff's deputies arrived, Roseann reported Roselee's active psychosis and asked that Roselee be taken to a psychiatric hospital to be stabilized. Roseann told the deputies that she did not want to press charges against Roselee

and advised them of Roselee's extensive history of mental illness and disabilities. Roselee told the deputies that Roselee needed to go to hospital, not jail.

Rather than taking Roselee to a hospital or other facility to receive emergency psychiatric treatment, the deputies arrested Roselee and took her to the Las Colinas Detention and Reentry Facility ("Las Colinas"). At Las Colinas, the arresting officer(s) failed to communicate to medical intake staff that Roselee was presently experiencing a mental health crisis and needed emergency psychiatric treatment. Despite Roselee's presentation, known history of mental illness and inability to answer questions, medical intake staff deemed Roselee as "uncooperative" and cleared her for admission to the jail. They did so without consulting the San Diego Regional Center to ascertain whether Roselee was fit for booking. Roselee was placed in administrative segregation. Either the officers omitted the critical information that Roselee was a patient of the Regional Center or the booking staff ignored it.

Roselee quickly decompensated in Las Colinas. She refused psychiatric medications, food, and liquids. She was unable to take care of herself and languished in an isolation cell that was dirty and full of trash. Medical staff did not intervene or enter Roselee's cell to assess her medical needs. They failed to consistently take her vital signs. They failed to notify the San Diego Regional Center of Roselee's condition, as they are required to do by the County's own policy. On April 11, 2023, five days after she was booked into the jail and after being deemed gravely disabled, Roselee was placed into the Women's Psychiatric Stabilization Unit ("WPSU"). She should have been sent to an outside facility for psychiatric treatment.

Roselee continued to decline in the WPSU. She refused much of her medication, food and hydration. She was agitated and unable to interact with medical staff. She was unable to maintain minimum levels of hygiene. Medical professionals and deputies on many occasions noted her cell to be filthy,

malodorous and covered in food, urine and feces.

Despite their awareness of Roselee's rapid and continuing decline, Defendants did nothing. They made no effort to medicate or feed her through an IV; they made no effort to have her transferred to a higher level of care within the community; and failed to monitor her or consistently take vital signs. Rather than dealing with this ongoing medical emergency, Defendants adopted a "try again later" mentality.

On or around April 26, 2023, Roselee was admitted to Alvarado Hospital Medical Center ("AHMC") suffering from acute renal failure with tubular necrosis (kidney disorder that can lead to acute kidney failure); hypokalemia (low potassium); hyponatremia (low sodium levels in blood); severe-protein calorie malnutrition; sepsis; transaminitis (elevated liver enzymes); acute metabolic encephalopathy and a urinary tract infection. The admitting emergency room doctor noted that Roselee "had a high probability of imminent or life-threatening deterioration." Roselee was treated at AHMC for 14 days, during which her health vastly improved and she was discharged back to Las Colinas in a stable condition. During this time, the hospital staff medicated and fed Roselee.

Medical staff at Las Colinas were aware of Roselee's diagnosis and treatment at AHMC but made no effort to have her transferred to a facility that could provide appropriate level of care or coordinate her care with the Regional Center as they were required to. Roselee was admitted to the Medical Observation Bed ("MOB") upon her return from hospital. There, she again refused solid food, consumed minimal liquids and only intermittently took her prescribed medications.

As a result of the Jail staff's continuing neglect, Roselee was sent to the hospital twice more. Roselee received hospital treatment for the last time at AHMC on May 20, 2023. There, she was treated for hypokalemia and vomiting and given potassium chloride.

3

On May 23, 2023, Roselee was admitted to the WPSU for a second time and placed in a "Close Watch" cell. There, the staff failed to closely watch Roselee as she continued to refuse medications, food and liquids. They did not give Roselee potassium despite their specific knowledge of her hypokalemia diagnoses which they knew could be fatal. They were aware of her refusal to eat. They failed to weigh Roselee, despite their knowledge she was at high risk of malnutrition and dehydration.

On May 25, 2023, medical staff noted that Roselee refused medications, food and liquid for 48 hours. Still, medical staff failed to intervene and made no serious effort to assess her condition, render emergency medical care or have her sent to a facility that could care for her.

Late in the evening of May 28, 2023, Roselee was found cold and unresponsive in her filthy cell. She was pronounced dead at 00:12 a.m. on May 29, 2023.

## II.    <u>JURISDICTIONAL ALLEGATIONS</u>

1.    Jurisdiction is proper in the United States District Court for the Southern District of California pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3) and (4), et. Seq.

2.    Venue is proper in the Southern District of California because the acts or omissions which form the basis of the Plaintiff's claims occurred in San Diego, California, within the Southern District.

3.    At all times relevant to this complaint, decedent Roselee Bartolacci was an individual residing in San Diego County, California.

4.    At the time of her death, Roselee Bartolacci was not married. She had no children. She did not leave behind any will or other testamentary document. Roselee Bartolacci died intestate. For this reason, there is no probate proceeding pending related to Roselee Bartolacci. Because Roselee died intestate, was not married and had no children, her mother and surviving parent, Roseann Bartolacci,

is Roselee's heir and beneficiary. Thus, she is Roselee's successor-in-interest. (See Declaration of Roseann Bartolacci, attached hereto as **Exhibit A**).

5.    Plaintiff properly complied with the Government Claim Act. The claim was submitted to the County of San Diego on November 22, 2023. The County of San Diego denied the claim on January 3, 2024.

### III.    PARTIES

6.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same by reference as if fully set forth herein.

7.    Defendant County of San Diego is a public entity, duly organized and existing under the laws of the State of California. The San Diego County Sheriff's Department is an agency operating under the County of San Diego's authority. The Sheriff's Department owns, operates, and manages the Las Colinas Detention and Reentry Facility ("Las Colinas") and is, and was at all relevant times mentioned herein, responsible for the actions and/or inactions and the policies, procedures, practices/customs of Las Colinas, and its respective employees, contractors and/or agents who staff Las Colinas.

8.    Defendant Kelly Martinez (hereinafter "Martinez") was, at all times mentioned herein, the Sheriff of the County of San Diego, the highest position within the San Diego County Sheriff's Department. As Sheriff, Defendant Martinez was responsible for hiring, screening, training, retention, supervision, discipline, counseling, and control of all San Diego County Sheriff's Department custodial employees and/or agents, medical staff, contractors, and DOE Defendants.

9.    At all times relevant to this complaint, Defendant Kelly Martinez was a policy maker for the San Diego Sheriff's Department and was responsible for promulgation of policies and procedures to comply with the California state mandates and the state and federal Constitutions. Defendant Martinez was the Title 15 officer and also responsible for the noncompliance with California state law.

Having had the opportunity to comply with state law, she failed to do so. She was responsible for the supervision and control of officers who are or were employed by the Sheriff's Department, who are under her command and/or who report to her, including the Defendants to be named.

10.     Before taking office as Sheriff in January 2023, Defendant Martinez was the Undersheriff for the San Diego County Sheriff's Department, under then elected Sheriff William Gore. In her capacity as Undersheriff, Martinez was a policymaker for the Sheriff's Department and for the County on matters relating to the Sheriff's Department, the Las Colinas Facility, and its deputies, employees, and agents. She was also responsible for the County's compliance with state and federal laws and constitutions and for the training and supervision of County employees and agents.

11.     At all times relevant to this complaint, Defendant Ricardo Carlon, badge #5567, was a deputy with the San Diego County Sheriff's Department who arrested Roselee Bartolacci and, on information and belief, failed to communicate critical medical information to the Las Colinas medical and intake personnel.

12.     At all times relevant to this complaint, Defendant Paul Mata was a registered nurse employed by the County and/or a Contractor of the County responsible for the medical assessment of incoming inmates at Las Colinas and completing the medical clearance intake form prior to the inmates' admission. Mata was responsible for Roselee Bartolacci's initial screening, assessment, follow-up assessments and referrals for further treatment.

13.     At all times relevant to this complaint, Defendant Evangelina Reynoso was a mental health clinician responsible for providing psychiatric care and assessment to inmates, including Roselee Bartolacci, at Las Colinas.

14.     At all times relevant to this complaint, Defendant Lauren Anderson was psychiatrist responsible for providing psychiatric care and assessment to inmates, including Roselee Bartolacci, at Las Colinas.

6

15.    At all times relevant to this complaint, Defendant Macy Germono was a registered nurse employed by the San Diego County Sheriff's Department.

16.    At all times relevant to this complaint, Defendant Janine Sparks was a mental health clinician responsible for providing psychiatric care and assessment to inmates, including Roselee Bartolacci, at Las Colinas.

17.    At all times relevant to this complaint, David Christensen, MD, was a medical doctor employed by the County and/or a Contractor of the County.

18.    At all times relevant to this complaint, Sherry Esquivel was a registered nurse employed by the San Diego County Sheriff's Department.

19.    At all times relevant to this complaint, Teresa Hurley was a nurse practitioner employed by the County and/or a Contractor of the County.

20.    At all times relevant to this complaint, Lacey Beaston was a nurse practitioner employed by the County and/or a Contractor of the County.

21.    At all times relevant to this complaint, Diorella Rioveros, was a registered dietician employed by the County and/or a Contractor of the County.

22.    On information and belief, Naphcare Correctional Health was a third-party contractor to the San Diego County Sheriff's Department and employed, supervised, and/or trained Defendant medical professional DOES.

23.    At all times relevant to this complaint, Defendant DOE 1 was the Sheriff's deputy who responded to the call about Roselee Bartolacci and/or arrested Roselee Bartolacci on or about April 6, 2023.

24.    At all times relevant to this complaint, Defendant DOES 2-3 were the San Diego County Sheriff's personnel responsible for classification, receiving and screening Roselee Bartolacci, and identifying her serious medical needs, including her developmental disability, and assessing whether she was fit for admission to Las Colinas at the time of her arrest on or about April 6, 2023.

25.    At all times relevant to this complaint, Defendant DOES 4-6 were sworn staff (Sheriff's Department deputies), watch commanders, or other high-

ranking staff who were responsible for placing Roselee Bartolacci in administrative segregation at Las Colinas, who allowed, condoned, ordered, or required her to remain in administrative segregation between April 6 and April 10, 2023, and who monitored her while in administrative segregation but failed to intervene or place her in housing suitable for her mental health needs.

26.    At all times relevant to this complaint, Defendant DOES 7-27 were the nurses, mental health clinicians, psychiatrists, nurse practitioners, doctors, and all other medical personnel who worked at Las Colinas and who provided, or failed to provide adequate psychiatric or medical care to Roselee Bartolacci.

27.    At all times relevant to this complaint, Defendant DOES 28-40 were the deputies and/or medical providers responsible for conducting cell checks, monitoring and rendering emergency aid to Roselee Bartolacci while at Las Colinas.

28.    At all times relevant to this complaint Defendant DOES 41-55 were the supervisors, captains, commanders, and other high-ranking officials at the San Diego County Sheriff's Department or supervisors employed by Naphcare Correctional Health who were responsible for supervising, disciplining, and training subordinate individual defendants in this case and who were responsible for promulgating and approving all policies and practices in this case.

29.    Defendant Martinez and supervisory DOE Defendants 41-55 are sued in their individual capacities for their own personal actions or inactions for supervisory liability.

30.    At all times relevant to this complaint, all individual defendants and DOES 1-55 were San Diego sheriff deputies, command staff, supervisory officials, or medical and mental health personnel, duly authorized to work at the Las Colinas with the consent and permission of the County of San Diego. Individual defendants and DOES 1-55 could not work, or complete their work, at Las Colinas without the consent and permission of the County of San Diego. As such, individual defendants

and DOES 1-55 were agents of Defendant County of San Diego, including contractors or subcontractors authorized to work at Las Colinas.

31.    Plaintiff is truly ignorant of the true names and capacities of DOES 1-55, inclusive, and/or are truly ignorant of the facts giving rise to their liability. Plaintiff will amend this complaint once their identities have been ascertained as well as the facts giving rise to their liability.

32.    These defendants were agents, servants and employees of each other of the other named defendants and were acting at all times within the full course and scope of their agency and employment, with the full knowledge and consent, either express or implied, of their principal and/or employer and each of the other named defendants and each of the defendants had approved or ratified the actions of the other defendants, thereby making the currently named defendants herein liable for the acts and/or omissions of their agents, servants, and/or employees.

## IV.    FACTS REGARDING THE DEATH OF ROSELEE BARTOLACCI

### A. Roselee Bartolacci Had Severe Psychiatric Issues and Was Gravely Disabled.

33.    Roselee Bartolacci ("Roselee") suffered from severe psychiatric issues. She was diagnosed with bipolar type schizoaffective disorder as a young child. Schizoaffective disorder is marked by a combination of schizophrenia symptoms, such as hallucinations or delusions, and mood disorder symptoms, such as depression and mania. Roselee's bipolar type schizoaffective disorder was marked by periods of agitation escalating into physical aggression, auditory and visual hallucinations and behaviors that put her and others at risk of bodily harm.

34.    Roselee had a history of developmental disorder, ADHD, depression and mild mental retardation. Roselee functioned at the level of an eight-year-old, unable to care for herself independently. She required the constant care and support of her mother, Roseann Bartolacci, on whom she was entirely dependent.

9

35.    Roselee was under the care San Diego Regional Center. The San Diego Regional Center provides support and services to persons with developmental disabilities.

36.    Roselee had been under the care of an outpatient psychiatrist since at least 2012 and, with the assistance and support of her mother, Roseann Bartolacci, maintained a regular psychiatric medication regimen to manage the symptoms of her mental illness.

37.    With Roseann's love and support, and with the assistance of the San Diego Regional Center, Roselee was able to lead a healthy and happy life. She attended Palomar College and studied life skills. She participated in a work skills program during which worked in a dollar store, stocking shelves and cleaning floors. Roselee's achievements were remarkable for a person born with her disadvantages.

38.    Roselee remained calm and stable while she was properly medicated and treated. However, when psychiatrists discontinued or adjusted her medication regime, her mental function declined, her condition worsened and she required emergency psychiatric intervention.

39.    For example, in March 2015, Roselee was admitted to the Palomar Health and Behavioral Unit on a 72-hour, involuntary hold for being a danger to herself and others. During that time, Roselee had not been taking her psychiatric medications and became increasingly agitated, uncontrollable, and assaultive towards her mother. Roselee was placed on an involuntary hold after she, being an avid animal lover, became distraught after having to return a dog she had been given to play with. Roselee experienced auditory and visual hallucinations and attempted to break into a family home to retrieve the dog. On the way to the emergency department, Roselee tried to open the door on the freeway so she could exit the car.

40.     Before her arrest in 2023, the March 2015 72-hour involuntary hold was the only time since the age of four that Roselee had been away from her mother for an extended period.

41.     In approximately February 2023, Roselee reported to her psychiatrist that she was feeling paranoid that someone was watching her. She had hit her mom on the arm. Roselee's psychiatrist adjusted her medication.

42.     Roselee struggled with the medication adjustment. She had intermittent angry outbursts and suffered auditory hallucinations.

43.     On or about April 6, 2023, Roselee, while experiencing psychosis and hearing voices, hit her mother, Roseann, with a hammer.

44.     Roseann, attempting to secure emergency medical help for her daughter, called the police and asked for a PERT clinician to assess Roselee. Rosann was told that a PERT clinician was not available.

45.     Instead, two Sheriff's deputies responded to Rosann's call. On information and belief, one of the deputies was Defendant Ricardo Carlon. The other Sheriff's deputy, whose identity is currently unknown, is identified as Defendant DOE 1.

46.     Roseann told Defendant Carlon and DOE 1 that Roselee had hurt her because of her acute psychosis and because she was hearing voices. Roseann told them that she did not want to press charges against Roselee.

47.     Roseann told Defendant Carlon and DOE 1 that Roselee suffered from schizoaffective and bipolar disorders and that she needed to go to a hospital for emergency psychiatric intervention and stabilization, not to jail.

48.     On information and belief, at least one of the deputies knew Roselee and was aware of the extent of her mental health issues and her disability.

49.     Both Defendant Carlon and DOE 1 knew that Roselee needed to go to a hospital for emergency psychiatric treatment.

50.    Transferring an acutely psychotic patient under 5150 to a hospital is a service the County provides to accommodate the disabled.

51.    Rather than take Roselee to a hospital or other facility to receive emergency psychiatric treatment, Defendant Carlon and/or Defendant DOE 1 arrested Roselee and took her to Las Colinas.

**B. Roselee Bartolacci Is Booked Into Las Colinas.**

52.    Roselee was booked into Las Colinas on April 6, 2023.

53.    Defendant Carlon completed the arresting officer screening prior to Roselee's admission into the Jail.

54.    Though Defendant Carlon informed the intake nurse, Defendant Paul Mata, that Roselee had a history of schizophrenia and bipolar disorder, on information and belief, he failed to communicate to Mata and other intake staff at booking that Roselee was *currently* experiencing severe psychosis and required emergency psychiatric treatment. For example, to the question, "Are you aware of any illness or injuries?" Carlon answered, "no."

55.    To the question "Do you have any additional information to help us care for the patient's health and safety?" Carlon answered, "no."

56.    On information and belief, Carlon failed to disclose the extent of Roselee's acute psychosis and did not disclose Roselee's mother's belief that she needed immediate psychiatric care.

57.    On information and belief, Carlon failed to disclose to Defendant Mata and DOES 2-3 that the initial call was a request for the assistance of a PERT clinician and a 5150 hold.

58.    Upon information and belief, Carlon and Doe 1 failed to notify the Jail staff that Roselee was a patient of the Regional Center.

59.    In failing to transport Roselee to a hospital for a 72-hour hold and failing to communicate critical information about Roselee's present psychiatric

condition to intake staff, Defendant Carlon was deliberately indifferent to Roselee's medical needs.

60.    Roselee's medical clearance screening was completed by Defendant Mata.

61.    Defendant Mata knew that Roselee was willing but unable to sign the screening or general informed consent forms.

62.    Either the deputies failed to notify Mata that Roselee was a patient of the Regional Center or Mata chose to ignore it.

63.    Even if the deputies had failed to notify Mata of Roselee's disability, Mata could see that Roselee lacked the capacity to understand or answer the most basic questions, including whether she was a client of the regional center for the developmentally disabled and whether she was at risk of suicide.

64.    The San Diego County Sheriff's Department Medical Services Division Policy E.2.1 sets forth the standard operating procedure for completing a receiving screening. Section II.D provides that certain behaviors may necessitate further evaluation at the emergency department or at a psychiatric hospital prior to the inmate being accepted into the detention facility. Such behaviors include thought disorganization, nonsensical communication, altered mental status, confusion and psychosis.

65.    On information and belief, Roselee exhibited some or all of these behaviors at the time she was booked into Las Colinas.

66.    Based on Roselee's obvious outward presentation of grave disabilities, known history of chronic mood and psychotic disorders, inability to sign her name or answer questions, it was, or should have been, obvious to Defendant Mata and Defendant DOES 2-3 that Roselee was in severe psychiatric distress and required transfer to a psychiatric hospital.

67.     Defendant Mata and Defendant DOES 2-3 were required to investigate whether Roselee was fit to be booked into the jail or whether she required higher-level, community-based care.

68.     Defendant Mata and Defendant DOES 2-3 were required to undertake further investigation to determine whether a jail placement was appropriate for Roselee given her known severe disability and psychiatric issues, including by consulting with state and local disability service providers, including the San Diego Regional Center, to coordinate her care.

69.     Upon information and belief, Defendant Mata and Defendant DOES 2-3 failed to undertake any such referral or investigation, instead labeling Roselee as "uncooperative" and "unpredictable" and clearing her as fit to be booked into the jail. In doing so, they were deliberately indifferent to Roselee's serious medical needs.

70.     Given her presentation of her disabilities, Roselee's need for accommodation was obvious.

71.     Despite Roselee's history and presentation, she was not screened by a medical doctor at intake.

72.     Instead of accommodating Roselee's serious cognitive and psychiatric disabilities, Defendants DOES 4-6 punished Roselee by placing her in administrative segregation.

73.     On information and belief, Defendants were aware of Roselee's status as a client of the San Diego Regional Center as of April 6, 2023.

74.     Under Cal. Code Regs. Tit. 15, § 1057, "[t]he health authority or designee shall contact the regional center for any incarcerated person suspected or confirmed to have a developmental disability for the purposes of diagnosis or treatment within 24 hours of such determination, excluding holidays and weekends."

75.    Early and immediate intervention is required to prevent the type of harm which occurred in this case.  A person with limited intellectual capacity with the inability to adapt or acclimate can quickly decompensate or deteriorate.

76.    Instead of complying with the law, Defendants punished Roselee by putting her in administrative segregation, which is essentially solitary confinement, for five days between April 6 through April 10.

77.    They did so despite prior warnings by staff that patients decompensate in ad seg and it is not clinically safe.  A clinician named Jennifer Alonso had specifically faulted the staff for the death of Lester Marroquin who died by suicide on May 30, 2021 after being placed in ad seg.

78.    Ms. Alonso wrote in a sworn declaration that multiple clinicians had left the County jails because of the unbearable conditions.

79.    There is no record of any communication between a jail treatment provider and Roselee's Regional Center case manager until April 20, 2023 – 14 days after Roselee was booked into Las Colinas.

## C. Roselee's Condition Deteriorates in Administrative Segregation and She is Transferred to the Women's Psychiatric Stabilization Unit.

80.    Roselee weighed 250 pounds when she was booked into Las Colinas.

81.    Roselee refused all her prescribed medications, including psychiatric medications on April 7, 2023 and April 8, 2023.

82.    On April 9, 2023, while in administrative segregation, Roselee was seen at her cell by Defendant mental health clinician Evangelina Reynoso.

83.    Roselee was sleeping under her bed and did not respond to Reynoso.

84.    Reynoso noted in a report that Roselee was making non-sensical statements and that Roselee's cell was dirty with food on the floor.

85.    Reynoso assessed Roselee as being mentally retarded.  Reynoso knew that Roselee was a Regional Center client.  Reynoso ignored her legal obligation to contact Roselee's Regional Center case manager.

86.     Reynoso recorded Roselee's history of schizoaffective disorder and bipolar disorder and that she was suffering with delusions, hallucinations and disorganized and incoherent speech.

87.     Reynoso knew that Roselee had refused all of her prescribed medication on April 9, 2023, now third day in a row.

88.     Seeing her rapidly worsening condition, Reynoso walked away and left Roselee in her filth.

89.     Reynoso did nothing other than to schedule Roselee for a psychiatric sick call, knowing that Roselee would remain in solitary confinement. No doctor saw Roselee for another two days while Roselee languished.

90.     On or about April 10, 2023, nurse Lourdes Cua received a call from Roselee's mother, Roseann Bartolacci. Roseann informed Cua that Roselee had a learning disability and experienced difficulty with comprehension. Roseann told Cua that Roselee needed messages repeated to her three times in order for her to understand them and that she had schizophrenia and bipolar disorder. Nurse Cua documented the call in Roselee's medical charts, noting that Roselee was already scheduled for a psychiatric sick call.

91.     Roselee refused all of her prescribed medications on April 10, 2023 and was screaming in her cell.  This was Roselee's fourth day without psychiatric medication.

92.     Roselee did not see a doctor on April 10, 2023.

93.     On April 11, 2023, Roselee was seen at her cell by Defendant psychiatrist Lauren Anderson. The cell was dirty and littered with trash. Roselee was sitting naked on the floor, sucking her fingers. Her clothes were scattered around the floor and covered in feces. Roselee was mumbling to herself and did not make eye contact or answer any questions.

94.     Defendant Anderson saw Roselee again on April 12, 2023. Anderson documented that Roselee had been staring blankly, pacing, shaking, sucking her

fingers, spitting, urinating on the floor, and putting items in the toilet. Roselee was refusing her meals and psychiatric medications. Anderson observed Roselee sitting on the floor in a puddle of urine while making strange gestures and mumbling nonsensically. Anderson watched Roselee crawl towards the door after she called her name. Roselee did not make eye contact, respond to any questions and was unable to follow even simple instructions.

95.    Defendant Anderson was aware of Roselee's history of schizophrenia, bipolar disorder, PTSD and learning disability. She knew that Roselee was admitted to the Palomar Health and Behavioral Unit in 2015. She knew that Roselee was under the care of the San Diego Regional Center.

96.    There is no notation that Anderson made any effort to contact Roselee's San Diego Regional Center case manager.

97.    Rather than refer her to an outside facility better suited to Roselee's needs, Roselee was admitted to the Women's Psychiatric Stabilization Unit ("WPSU") on a 5150 hold for being gravely disabled. The admission plan directed psychiatric medication adjustments, to maintain a regular diet and to take routine vitals.

98.    Defendant nurse Macy Germono completed the WPSU Nursing Admission Assessment.

99.    Despite the admission plan, Defendant nurse Macy Germono failed to take Roselee's vital signs, including her weight, upon her admission to the WPSU.

100.    Roselee arrived at the WPSU in a wheelchair. According to Germono, Roselee was "child-like." She was sucking her fingers, babbling and could not make eye contact. Roselee was unable to cooperate and was moving around her cell. She would squat on her toilet before going back to bed. Roselee was selectively mute and did not answer questions. She charged the door and tried to cover the window with her blanket.

101.    Germono knew Roselee was refusing her psychiatric medications.

17

102.    Germono knew Roselee was a client of the San Diego Regional Center but ignored her legal obligation to contact them.

103.    Germono had access to Roselee's medical records which indicated her serious medical conditions. Germono either failed to review Roselee's medical records or ignored it.

104.    Seeing Roselee's dire situation, Germono did nothing.

105.    As of April 11, 2023, Roselee had gone five days without her psychiatric medication.

**D. Roselee's Condition Continues to Deteriorate in the Women's Psychiatric Stabilization Unit.**

106.    Roselee continued to decline between April 12, 2023 and April 26, 2023. She was consistently refusing medication, food and hydration.  She was agitated, intermittently yelling, and staring into space.  She was unable to interact with the medical staff.  Her cell was filthy, malodorous and covered in food, urine, and feces.

107.    Roselee was under the care of Defendant Anderson, Defendant mental health clinician Janine Sparks, Defendant Dr. David Christensen, Defendant Nurse Practitioner Teresa Hurley and medical professional DOES 7-27.

108.    On or about April 14, 2023, Roselee began vomiting. Defendant Christensen prescribed Zofran but there is no notation that he ever saw or examined Roselee.

109.    Defendant Sparks attempted to conduct a psychosocial assessment of Roselee on April 14 but noted Roselee "was too disorganized, nonsensical, and internally preoccupied" to participate.

110.    Sparks knew Roselee was developmentally disabled and under the care of the San Diego Regional Center. Despite this knowledge, Sparks failed to contact Roselee's Regional Center case manager for another seven days.

18

111.    Sparks called the case manager on April 21, 2023. relating only that Roselee was "not doing well."

112.    Sparks withheld the information from the Regional Center that Roselee was decompensating from the interruption of critical antipsychotic medication nor that she was living in complete filth.

113.    Sparks knew that Roseann wanted Roselee to return to home to her care.

114.    On or about April 17, 2023, Defendant dietician Diorella Rioveros reviewed Roselee's chart after Roselee's mother, Rosann, called the jail to inform them of Roselee's allergy to red dye.

115.    From her review of Roselee's chart, Rioveros knew that Roselee was not eating. She knew that no weight had been recorded for Roselee since she was admitted to Las Colinas, 11 days earlier. On information and belief, Rioveros relied solely on the weight recorded at booking.

116.    Rioveros noted that Roselee's current diet was a liquid diet and instructed staff consider a gastric diet. She did so with no weight history and no lab results.

117.    On information and belief, Rioveros did not personally see or examine Roselee prior to making this order.

118.    Despite her knowledge that Roselee was not eating, Rioveros failed to order that Roselee be weighed.

119.    Despite her knowledge that Roselee was not eating, Rioveros failed to recommend lab testing to assess Roselee's nutrition and levels of dehydration.

120.    On information and belief, despite being aware of seriousness of Roselee's condition, no one, including Defendants Sparks, Anderson, Christensen or medical professional Does 7-27, intervened to assess her medical needs at any point between April 12, 2023 and April 26, 2023.

121.    None of these defendants transferred Roselee to a higher level of psychiatric care despite their knowledge of Roselee's ongoing, serious decline in her mental and physical health.

122.    Defendants did not maintain regular communication with Roselee's mother, Rosann, regarding Roselee's condition.

123.    None of the Defendants consistently took Roselee's vital signs. Between April 12, 2023 and April 26, 2023, Roselee had her vital signs taken a total of four times. On two of those four occasions, they failed to take her temperature.

124.    These defendants were well aware that Roselee was not eating and that she was vomiting.

125.    San Diego County Sheriff's Department Medical Services Division Policy MSD.H.12 provides guidelines for the care of patients who refuse to eat. The policy provides, in pertinent part:

> **A.** The medical staff shall evaluate and assess the patient.
>   1. RN staff will do an assessment to evaluation the medical & psychiatric history. ***The assessment is to include weight and vital signs***.
>   2. The patient shall be scheduled for a psychiatric sick call. At that time, the psychiatrist with determine whether the refusal of food is based on mental illness.
>   3. The patient shall be scheduled for RNSC ***daily to monitor weight, medical condition and hydration status***. . . .

126.    Despite their repeated documentation that Roselee was refusing food, Defendants never weighed Roselee.

### E. Roselee is Admitted to Hospital and Her Condition Improves.

127.    On April 26, 2023, Roselee was transported to Alvarado Hospital Medical Center ("AHMC") suffering from weakness and dehydration. Roselee reported that she had not been eating or drinking anything.

128.    The Emergency Department doctor admitted Roselee to the hospital for ongoing acute care because she was at risk for decompensation and/or adverse event.

129.    According to the ER doctor, Roselee "had a high probability of imminent or life-threatening deterioration" which required immediate and direct attention.

130.    Roselee was diagnosed as suffering acute renal failure with tubular necrosis (kidney disorder that can lead to acute kidney failure); hypokalemia (low potassium); hyponatremia (low sodium levels in blood); severe protein-calorie malnutrition; sepsis; transaminitis (elevated liver enzymes); acute metabolic encephalopathy; and a urinary tract infection. She was immediately treated with a saline with added potassium, IV potassium, cefepime, and ordered to continue valproic acid. She was given fluids for hydration and adjustments were also made to her psychiatric medications.

131.    Roselee remained at AHMC for approximately 14 days, during which her condition gradually and markedly improved. She began to eat, was more alert and responsive and her mood stabilized.

132.    Roselee was discharged from AHMC in stable condition on May 10, 2023 and was returned to Las Colinas.

133.    Upon discharge from AHMC, Roselee weighed 217 pounds, 33 pounds less than she weighed when she was admitted to Las Colinas on April 6, 2023.

134.    On information and belief, though medical staff at Las Colinas were aware of Roselee's diagnosis and treatment at AHMC, they made no effort to have her transferred to a facility that could appropriately care for her.

**F. Roselee Bartolacci Returns to Las Colinas and Swiftly Deteriorates.**

135.    Upon her return to Las Colinas, Roselee was admitted to the Medical Observation Bed ("MOB"). Defendant nurse Sherry Esquivel noted Roselee's

discharge diagnoses of anemia; hypokalemia, hyponatremia; hypophosphatemia; folic acid deficiency; schizoaffective disorder; acute renal failure with tubular necrosis; severe protein calorie malnutrition; sepsis; transaminitis; acute metabolic encephalopathy; UTI; candida auris colonization and obesity and that she was at risk for infection.

136.    In spite of her knowledge that Roselee had been hospitalized, in part, for severe protein calorie malnutrition, Esquivel made no effort to determine Roselee's weight.

137.    In the MOB, Roselee laid on her mattress on the floor and was occasionally agitated. Roselee was not caring for herself or maintaining her hygiene. She was not eating solid foods and was only intermittently drinking fluids.

138.    On or about May 16, 2023, Defendant Anderson ordered that Roselee be weighed once a week. This order was deficient per MSD.H.12, which required that Roselee be weighed each day.

139.    Anderson never followed up to ensure that medical personnel were complying with this order.

140.    From May 16, 2023 until her death, no medical professional ever documented Roselee's weight at Las Colinas.

141.    On or about May 18, 2023, Roselee was seen in her MOB cell. There were feces on the floor and vomit near her bed. She was mumbling and incoherent and unable to provide responses to questions.

142.    Roselee was sent to Sharp Grossmont Hospital on May 18, 2023 for refusing food, drink and her medications. Roselee returned to Las Colinas the same day.

143.    As of May 20, 2023, Roselee had not eaten food or consumed any fluids for 48 hours. Her urine was dark brown and foul smelling. She was sent back to AHMC where she was diagnosed with hypokalemia and vomiting and treated with K Dur. Hypokalemia, which is low levels of potassium in the blood, is caused

by malnutrition, vomiting or kidney disease. Potassium is critical to the proper functioning of nerve and muscles cells, particularly heart muscle cells. Hypokalemia when untreated causes arrhythmia, and can cause cardiac arrest. K Dur is a common mineral supplement used to treat or prevent low potassium in the blood.

144.    Potassium levels ranging from 3.5 mmol/L to 5.5 mmol/L are considered normal for adults. Below 3.5 is hypokalemia. Roselee's level at AHMC was 3.3 mmol/L. This level was such that it was easily treatable with supplements.

145.    Defendants knew that Roselee had been treated for hypokalemia at AHMC before she returned to Las Colinas on May 21, 2023. Despite this knowledge, Defendants did not continue to treat Roselee's hypokalemia with supplements or by ensuring was eating and drinking.

146.    For example, on or about May 21, 2023, Defendant Beaston conducted a post-ER visit evaluation of Roselee. Beaston acknowledged in her medical note that Roselee was seen at AHMC and that she had been diagnosed with hypokalemia and treated with K Dur. Beaston knew that Roselee had been sent to AHMC for not eating and drinking and was at great risk of dehydration due to her mental state. When Roselee declined Beaston's offer of a sandwich, Beaston ordered that Roselee remain under close monitoring in the MOB and that medical staff should encourage her to eat and drink. Beaston did not order K Dur or any other potassium supplement despite her knowledge that Roselee was suffering from hypokalemia.

147.    On or about May 22, 2023, Roselee was admitted to the WPSU again and placed in a "Close Watch" cell.

148.    Defendant Germono once again conducted the WPSU nursing admission assessment.  Germono was aware of Roselee's ongoing, declining condition, including hypokalemia and starvation.  She did not take Roselee's vital signs and did not weigh her.  This violated the Jail's policies.

149.    Germono noted that Roselee is a client of a regional center. There is no notation that Germono contacted the regional center.

150.    While in the WPSU, Roselee was under the care of Defendants Anderson, Sparks, Christensen, Hurley and medical professional DOES 7-27.

151.    Defendant Anderson completed a Psychiatrist WPSU Admission Note on May 22, 2023. She recorded that Roselee had not been eating and drinking enough and was vomiting. She recorded that Roselee had been hospitalized with, among other things, hypokalemia between April 26, 2023 and May 10, 2023. She knew that Roselee was again treated for hypokalemia on May 20, 2023. She acknowledged that Roselee was declining in a jail setting.

152.    Defendant Anderson ordered that Roselee be monitored and encouraged to eat and drink and again that her vitals and weight be checked weekly. Anderson did not order K Dur or any other potassium supplement despite her knowledge that Roselee was suffering from hypokalemia.

153.    For some inexplicable reason, Roselee's vital signs were recorded for the last time on May 24, 2023.

154.    On May 24, 2023, Defendant Christensen went to assess Roselee but did not enter her cell. Christensen did not examine Roselee or obtain her vital signs. Christensen had access to Roselee's medical records which indicated her serious medical conditions. Christensen either failed to review Roselee's medical records or ignored it.

155.    On or about the same day, Defendant Anderson spoke with Roselee's Regional Center case manager who reported that Roselee was well cared for by her mother prior to her arrest. The case manager told Defendant Anderson that he believed returning Roselee home to be with her mother was the best placement option, but also supported a Conservatorship if she was unable to return home. Anderson asked the Regional Center case manager about the Regional Center's access to placement facilities for Roselee.

24

156.     The May 24, 2023 conversation between Defendant Anderson and the Regional Center case manager is the only documented interaction between Jail medical staff and the San Diego Regional Center in which Jail staff asked the Regional Center for assistance and outside placement options for Roselee. This conversation occurred 48 *days* after Roselee was booked into the Jail and despite Defendants' collective knowledge as of April 6, 2023 that Roselee was developmentally disabled and under the care of the Regional Center.  This reporting was 47 days too late.

157.     On or about May 25, 2023, Dietician Rioveros spoke to a nurse about Roselee's status. This was the second time she had been consulted about a patient who had stopped eating.

158.     Rioveros knew Roselee was still not eating.  She had access to Roselee's medical chart which contained critical information about Roselee's condition, including her repeat diagnoses of hypokalemia.

159.     Rioveros knew that Roselee was non-verbal. Rioveros recommended a soft diet for Roselee. On information and belief, Rioveros once again made decisions without seeing or examining Roselee.

160.     Rioveros did not recommend that blood be drawn to assess Roselee's levels of hydration or potassium.

161.     Rioveros noted that Roselee should have her weight checked to monitor nutrition and documented that no weight had ever been recorded for Roselee since she was booked into jail.  Rioveros knew or should have known that tracking weight was critical.  Despite this knowledge, she failed to go to Roselee's cell to weigh her.

162.     Rioveros' note for tracking weight was promptly ignored by all medical providers.  The only County employee to weigh Roselee after she was booked into Las Colinas was the Medical Examiner.

163. Defendants Anderson, Sparks, Christensen, Hurley and DOES 7-27 ignored Rioveros' recommendation and did not weigh Roselee.

164. As of May 25, Roselee had refused medications, food and fluids for a full 48 hours.

165. On information and belief, Roselee did not consume any solid foods for eight days, from the time of her return to Las Colinas from AHMC on or about May 21, 2023 until her death.

166. On that eighth day of Roselee's starvation, May 28, 2023, Defendant Hurley saw Roselee. Roselee was laying in her bed, covered with a blanket and was moaning and crying. There was a heavy ammonia in her room and full food trays of uneaten food on her counter. Hurley's "treatment plan," as Roselee laid there dying in her filth, was to continue to offer fluids, Ensure and favorite foods to encourage intake.

**G. Roselee Bartolacci is Found Unresponsive in Her Cell and Pronounced Dead.**

167. At approximately 11:36 p.m. on May 28, 2023, Roselee was found unresponsive in her bed, covered by a blanket.

168. At the time Roselee was found unresponsive, she was noted to already be cold to touch, indicating that she was likely deceased long before she was found.

169. On information and belief, Defendant DOES 28-40 were responsible for conducting regular cell checks and failed to do so. These defendants violated California state law on conducting safety checks of patients to ensure they are alive and not in medical distress. DOES 28-40 failed to render timely and adequate medical care.

170. Roselee was pronounced dead at 00:12 a.m. on May 29, 2023.

171. Roselee weighed 209 pounds at the time of her autopsy, 41 pounds less than she weighed when she was booked into Las Colinas.

172.    The San Diego County Sheriff's Department Critical Incident Review Board conducted a preliminary review of Roselee's death on October 11, 2023 and published an in-custody death information release on its recommendation that "collaborative medical emergency training with sworn and health staff be conducted at all detention facilities."

## V.    *MONELL* ENTITY AND SUPERVISORY LIABILITY ALLEGATIONS

### A. The San Diego County Sheriff's Department's Policies are Facially Deficient, and there is a Custom or Practice of Jail Staff Failing to Abide by its Deficient Terms

173.    Cal. Code Regs. Tit. 15 § 1057 mandates:

The facility administrator, in cooperation with the responsible physician, shall develop written policies and procedures for the identification and evaluation, appropriate classification and housing, protection, and nondiscrimination of all incarcerated persons with developmental disabilities… **The health authority or designee shall contact the regional center for any incarcerated person suspected or confirmed to have a developmental disability for the purposes of diagnosis or treatment within 24 hours of such determination**, excluding holidays and weekends.  (Emphasis added).

174.    The stated purpose of San Diego Sheriff's Department Policy M.39, titled "Disabled Incarcerated Persons," is "[t]o establish uniform procedures to identify, evaluate and house disabled incarcerated persons in the safest manner possible while ensuring the accommodation of major life activities."

175.    The San Diego Sheriff's Department Policy M.9, titled "Receiving Screening," states in relevant part:

"Persons with developmental disabilities will be **identified and reported to the San Diego Regional Center's developmental disability intake office** the next business day. All individuals who are identified as clients of the San Diego Regional Center will have the

administrative alert "RCC" applied and will be housed accordingly… All individuals who have been screened and determined to be disabled must be reasonably accommodated. Health staff shall enter patient flags into the individual's health record. The MSD "ADA" case manager or designee will routinely review the corresponding patient flag entered in the individual's health record and make additional referrals as needed for further evaluation of accommodation and/or housing in compliance with DSB.P&P M.39." (Emphasis added).

176.   Despite the requirement under Cal. Code Regs. Tit. 15 § 1057 to contact the regional center for the purposes of diagnosis or treatment, the San Diego Sheriff's Department only requires reporting to the regional center, with no mention of diagnosis or treatment.

177.   The San Diego Sheriff's Department medical providers failed to timely communicate with the San Diego Regional Center regarding Roselee Bartolacci's necessary treatment, resulting in deficiencies in her care and ultimately her death.

178.   Other counties in California mandate communication between the health authority and the regional center for the purposes of diagnosis and/or treatment for incarcerated persons suspected or confirmed to have a developmental disability to conform with the requirements of Cal. Code Regs. Tit. 15 § 1057.

179.   For example, Riverside County Sheriff's Department Correction Division Policy Manual number 508.04 reads as follows:

As mandated by section 1057, Title 15, California Administrative Code, facility medical staff shall contact the Regional Center for the Developmentally Disabled, **for the purpose of diagnosis or treatment** … this notification is to occur within 24 hours of the identification of the developmental disability by custody or medical staff. The 24-hour period does not include weekends and holidays. (Emphasis added).

180.   Alameda County Sheriff's Office Detentions and Corrections Policy and Procedure number 13.02 section (IV)(1)(b) reads as follows:

28

Inmates who have, or are suspected of having, developmental disabilities shall be separated from the general population pending assessment, to prevent their being victimized by predators. The health authority or designee shall contact the "Regional Center of the East Bay" regarding any inmate suspected or confirmed to be developmentally disabled **for diagnosis and/or treatment** within 24 hours of such determination, excluding holidays and weekends. (Emphasis added).

181. Los Angeles County Sheriff's Department Custody Division Manual number 6-06/030.00 reads as follows:

All developmentally disabled inmates shall be segregated from other inmates, when it is determined that it is necessary for the safety of the inmate. If an inmate is determined or suspected to be developmentally disabled and there is a high probability that he/she is to be held more than 24 hours, the following shall be adhered to:

- A Los Angeles County Regional Center must be contacted and advised that a developmentally disabled person is in our custody. **They will have a representative respond and act as legal guardian for the inmate** and assist him/her with arranging bail, etc.
- If the inmate will not be held more than 24 hours, it is not mandatory that a Los Angeles County Regional Center be contacted; however, they can be a valuable resource if the inmate is uncooperative or uncommunicative during the booking process.

(Emphasis added).

182. Further, San Diego Sheriff's Department Policy M.39 violates the Americans with Disabilities Act by putting the onus on developmentally disabled detainees request their own accommodations.

183. Accommodation requests under Policy M.39 are initiated only via "the incarcerated person, their family members, or an outside agency."

184. This policy proximately causes the exclusion from participation in the services, programs, and/or activities provided by the San Diego County Sheriff's department, including but not limited to: safe cell and housing assignment;

29

nutrition; access to healthcare; meaningful communication with jail staff; assistance with self-care; and daily living activities, support services, and mental health advocacy.

185.   As a result of this policy, the symptoms of Roselee's developmental disability were written off as "non-cooperative" by San Diego Sheriff's Department healthcare providers, and she received deficient treatment, services and programs up until her death.

186.   In addition to a facially deficient policy, the County was aware that housing Regional Center patients was a commonly occurring circumstance.  It is so common that all counties have written policies on how to accommodate them. Given the common occurrence, the County failed to properly train their staff on the legal requirements under California state law.  The Jail staff was so poorly trained that no one contacted the Regional Center for 47 days.

## B. The Sheriff's Department Has a Higher Rate of In-Custody Inmate Deaths than Any Other Large County in California.

187.   In 2019, the Union Tribune published a series of articles regarding its 6-month investigation of in-custody deaths at San Diego County jails entitled, *Dying Behind Bars*. Jeff McDonald, Kelly Davis, and Lauryn Schroeder, *Rate of jail inmate deaths in San Diego County far exceeds other large California counties*, THE SAN DIEGO UNION TRIBUNE, September 20, 2019, available at: https://www.sandiegouniontribune.com/news/watchdog/story/2019-09-19/dying-behind-bars-san-diego-county-jail-deaths.

188.   The article begins by observing, "At least 140 people have died in San Diego County jails since 2009, the year Bill Gore took over as sheriff. That's an average higher than one inmate per month, every month, over the past 10 years. . . A six-month investigation by The San Diego Union-Tribune shows that the county's jail mortality rate is the highest among California's largest county jail systems. The grim history shows no sign of waning."

189.   In response to the Union Tribune's series *Dying Behind Bars*, Sheriff Gore wrote an op-ed that blamed the number of in-custody deaths on the inmates. William Gore, *Sheriff Bill Gore: What U-T's coverage of jail deaths left out*, THE SAN DIEGO UNION TRIBUNE, September 27, 2019, available at: https://www.sandiegouniontribune.com/opinion/story/2019-09-27/sheriff-gore-jail-deaths-coverage.

190.   Gore wrote, "From 2009-2018, the Sheriff's Department booked over 871,000 inmates with 127 in-custody deaths. The largest contributor to jail deaths is not the actions or inactions of the sheriff, but rather a jail population in which a high percentage of inmates have serious mental illness, and a jail population that engages in extremely self-destructive behavior." *Id*.   Gore then challenged the Union Tribune's methodology in comparing statistics among counties and explained that the Union Tribune's statistics were wrong because it did not account for counties that have city lockups.

191.   In response to Gore's criticism, the Union Tribune then revisited the death rates of inmates in California using California Department of Justice statistics from 2009 to 2018 and taking into account deaths in city jails. The UT published the following statistics:

**Mortality rate with city deaths**
Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|--------|--------------------------|------------------------|------------------------|
| San Diego | 5,211.9 | 12.8 | 245.6 |
| Los Angeles | 17,060.6 | 30 | 175.8 |
| San Bernardino | 5,643.5 | 8.9 | 157.7 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 8.1 | 136.6 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

**Mortality rate without city deaths**
Deaths per 100,000 inmates

| County | Average daily population | 10-year average deaths | 10-year mortality rate |
|--------|--------------------------|------------------------|------------------------|
| San Diego | 5,211.9 | 12.7 | 243.7 |
| Los Angeles | 17,060.6 | 25.5 | 149.5 |
| San Bernardino | 5,643.5 | 8.8 | 155.9 |
| Santa Clara | 3,702.3 | 5.4 | 145.9 |
| Orange | 5,928.6 | 7 | 118.1 |
| Sacramento | 3,942.2 | 3.7 | 93.9 |

Source: California Department of Justice                                              U-T

Lauryn Schroeder, *San Diego has highest jail mortality rate among largest counties, even with new data*, THE SAN DIEGO UNION TRIBUNE, November 24, 2019, available at:

https://www.sandiegouniontribune.com/news/watchdog/story/2019-11-24/san-diego-has-highest-jail-mortality-rate-among-largest-counties-even-with-new-data.

192.    Reporter Lauryn Schroeder noted that both the method advocated both the method advocated by Gore or the method originally used by the UT showed San Diego County had the highest death rate:

> Jail mortality rates are calculated by dividing the number of deaths by the average daily population in each jail, expressed in terms of 100,000. This is the same methodology used by experts, oversight groups and state and federal government agencies such as the Bureau of Justice Statistics. The rate allows an apples-to-apples comparison of jail systems of varying size.
>
> When looking only at county jail deaths, the 10-year rate in **San Diego County was 243.7 deaths per 100,000 inmates**, compared to 155.9 in San Bernardino, 149.5 in Los Angeles, 145.9 in Santa Clara, 118.1 in Orange and 93.9 in Sacramento.
>
> Under the new review, which includes deaths in city-run jails, **San Diego County still has the highest 10-year mortality rate of 245.6 deaths per 100,000 inmates**. It's followed by Los Angeles with 175.8 deaths, San Bernardino at 157.7, Santa Clara at 145.9, Orange a 136.6 and Sacramento at 93.9.
>
> *Id*. (emphasis added).

193.    According to the state Department of Justice data, San Diego County's death rate over the past 10 years was 50 percent higher than Los Angeles County's and two-and-a-half times the Orange County rate.

194.    On October 23, 2020, the San Diego County Taxpayers Association awarded journalists Jeff McDonald and Kelly Davis the 2020 "Media Watchdog Award" for their series, *Dying Behind Bars*.

195.    On information and belief, Defendant Sheriff Martinez was aware of the exceptionally high rates of in-custody deaths even prior to her appointment as Sheriff by virtue of her previous role as Undersheriff and decades with the Sheriff's Department.

196.    In 2022, the San Diego County jail system recorded 19 deaths, suggesting that the high-mortality rate is not confined to the Gore tenure.

197.    In 2023, thirteen more people died.

### C. Defendants Are Aware of a Persistent and Recurring Pattern of Preventable Deaths and Serious Injuries Caused by the Sheriff's Department's Misconduct, Apathy and Neglect.

198.    There have been countless complaints made by inmates, family members, community members and the Jail's own staff regarding injuries caused by medical neglect and staff misconduct.

199.    At the time of Roselee Bartolacci's death, there had been a long-standing custom and practice of improper and inadequate investigations; refusals to sanction and discipline subordinate misconduct; and failures to further supervise and train both deputies and medical staff.

200.    County Defendants were aware of the following examples of failure by Jail staff at County Jails leading to inmate deaths or serious injuries, including failures to coordinate and share critical information among personnel, failures to conduct adequate cell checks and failures to provide critical treatment to inmate-patients who Jail knew suffered from serious mental health disorders and/or developmental disabilities. These examples include:

    a.  In 2014, Christopher Carroll, who was mentally ill, was placed in segregation. He was found dead with a noose around his neck. Mr. Carroll had speared blood on the wall of his cell. He had urinated on

the floor and food and feces were stuck to the ceiling. Deputies had failed to conduct proper cell checks to monitor his wellbeing despite Mr. Carroll's known condition.

b. In 2015, Ruben Nunez, a schizophrenic mental health patient transferred from Patton State Hospital, died when jail doctors failed to treat a potentially lethal condition for water intoxication. The psychiatrists treating Mr. Nunez failed to read his medical records and failed to input critical medical information in JIMS. One of the psychiatrists testified that she did not know how to use JIMS to add "alerts", meaning the most critical information regarding a patient's care. She testified that she was never trained. Despite the medical records from Patton Hospital reflecting hyponatremia, a condition caused by overconsumption of water, a nurse noted in Mr. Nunez's chart: "Informed I/P that he will be seen [sic] by psych for f/u. Exercise as tolerated and *drink plenty of water*. I/P verbalized understanding and agrees to plan." (Emphasis added). This nurse failed to document Mr. Nunez's medical records, leaving nearly the entire seven pages of an intake form blank. According to one of the nursing staff, intake nurses do not have sufficient time to read medical records or to conduct a thorough intake because of the number of inmates being booked at once. The intake nurses only have sufficient time to look to whether the Jail will book the person into jail.

c. In February of 2016, Richard Boulanger hung himself in his cell at the Central Jail. His cellmate pressed the emergency call button, but no deputy came to the cell for approximately 20 minutes. A subsequent investigation revealed that one of the deputies did not break stride or look into Mr. Boulanger's cell during a cell check. The investigation revealed that during cell checks, the deputy peered into each cell for

approximately one second in violation of policy. The investigation which followed revealed a practice in which the deputies were turning off the sound of the emergency call buttons, lowering the volume, or muting the inmate intercom system so that no sound could be heard. Call buttons in many of the housing units did not function, which made no sound when pressed. The audio for the monitor in the jail tower did not function well so that it was difficult to hear tones and sounds from the monitor even when the volume was turned to the maximum level. Deputy Dixon at the Central Jail admitted that he had failed to timely respond to multiple inmates' calls for help through the emergency intercom system because the "audio alert function of the inmate intercom system had been 'muted' and was turned all the way down in volume[.]"

d. In 2016, Heron Moriarty was arrested after having a psychotic break. Despite multiple warnings by family members, including 28 telephone calls by his wife, the Jail staff failed to communicate his condition and failed to provide him psychiatric care. On the sixth day, Mr. Moriarty was found dead in his cell, having hung himself. In August 2020, a whistleblower within the Sheriff's Department, Jeanette Werner, came forward to describe Mr. Moriarty's "howls" which filled the jail and sounded "like a wounded animal crying out for help." See Kelly Davis, Longtime Sheriff's Employee Contradicts Official Account of Jail Death, VOICE OF SAN DIEGO, September 3, 2020, https://www.voiceofsandiego.org/topics/public-safety/longtime-sheriffs-employee-contradicts-official-account-of-jail-death/. Werner confronted a sergeant, Weidenthaler, who refused to place Moriarty in a safety cell. When Werner persisted, insisting she could quickly prepare the necessary paperwork to place Moriarty in a safety cell, the

35

sergeant ordered her to "stand down." That evening, Mr. Moriarty used two t-shirts to choke himself. Later, Weidenthaler instructed Werner not to tell anyone about their conversation.

e.  In February 2018, Paul Silva died in Central Jail after deputies pepper sprayed, tased, and beat Paul to death in his cell. The Central Jail staff knew Paul suffered from schizophrenia as it was well documented in the Jail's database system. Law enforcement encountered Paul after his mother requested Paul be hospitalized because he refused to take his schizophrenia medication. Paul was obedient with police officers at all times. Jail staff classified Paul as a "book and release" meaning he was supposed to be released after 8 hours. Instead, Paul decompensated as he stayed in temporary holding cells with little food, no blankets, no bed, and with constant light and noise for almost 36 hours. The staff failed to communicate Paul's critical medical condition and failed to monitor him. After he went without food, sleep, and any medication, Paul began acting bizarrely. He could not comprehend deputies' commands and questions. A nurse practitioner did not check Paul's medical record or review his medical history to determine whether he needed psychiatric care. She did not consult a medical doctor or psychiatrist. Instead, deputies killed Paul Silva after they entered his jail cell.

f.  In May 2019, Tanya Suarez—a 23-year-old student at San Diego State University—was booked into Las Colinas. Suarez was under the influence of methamphetamine and was experiencing psychotic delusions. Although Suarez was placed in a safety cell, custody staff restrained her, cut her acrylic nails after she attempted to gouge out one of her eyes, and placed her naked into a safety cell. According to Suarez's civil lawsuit, surveillance video from the Jail shows that on

36

rounds, a deputy went to the window of Suarez's safety cell. That deputy used her personal cell phone to record video of Suarez, who was naked and gesturing toward her eyes. That deputy walked away without intervening. A few minutes later, another deputy came to the cell window and saw that Suarez was attempting to remove her right eyeball. The deputy did not intervene, even after watching Suarez in fact remove her right eyeball. Then, the deputy walked away and returned with other deputies a full two minutes later, by which time Suarez had removed her other eye. Jail defendants recently agreed to pay Suarez $4.35 million to settle her lawsuit.

g. In August 2019, Jose Sevilla was discovered in his cell, unresponsive after overdosing. By the time they discovered Mr. Sevilla, rigor mortis had already set in with ants on his body.

h. In 2021, Lonnie Rupard died in the San Diego Central Jail. From the time Mr. Rupard was taken into custody until his death, he suffered a 60 pound weight loss, or 36% of his total body weight. Mr. Rupard's cell was covered in trash and feces, and jail staff failed to intervene and assess Mr. Rupard's medical needs. Mr. Rupard continuously refused prescription medications which were ultimately canceled due to his repeated refusals. Medical staff repeatedly postponed Mr. Rupard's care due to time constraints or for Mr. Rupard's refusal. Mr. Rupard's cause of death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia.

i. In August 2022, Matthew Settles died in the custody of the San Diego Sheriff's Department. Matthew suffered from schizophrenia, and he was on a permanent conservatorship due to his inability to make medical decisions for himself. Matthew also did not have the capacity to take care of himself; while he was housed in the PSU, Matthew's

cell was scattered with trash, and he refused to shower or change his clothes. The jail failed to contact Matthew's conservator to determine his proper course of treatment, yet Matthew's status as a permanent conservatee was prominently noted in his medical records. Jail personnel repeatedly allowed Matthew to dictate the bounds of his own treatment and refuse psychiatric care. As a result, Matthew's mental health continued to deteriorate while he was incarcerated, culminating in his suicide by hanging.

County Defendants were aware of the following examples of failure by Jail staff at County Jails to weigh inmates suffering from serious medical conditions. These examples include:

   a. In February 2019, Michael Wilson collapsed in his cell and passed away. Mr. Wilson suffered from hypertrophic cardiomyopathy and regularly took medication that allowed him to live. Without the medication, Mr. Wilson's lungs would fill with fluids. Jail staff did not give Mr. Wilson his medication. Despite their knowledge that Mr. Wilson was not receiving his medication and despite weight increase being an indicator of lungs filling with fluid, jail staff failed to weigh Mr. Wilson.

   b. In November 2019, Elisa Serna died in Las Colinas. She has suffered from withdrawal and continued to vomit for days. She was placed on the standard nursing protocol for dehydration, which required Elisa to be weighed regularly. Jail staff did not weigh Elisa.

   c. Lonnie Rupard died on March 17, 2022. Mr. Rupard's weight was recorded when he was booked into jail on December 19, 2021. Mr. Rupard's weight was not recorded at any point following December 19, 2021, despite his deteriorating condition and multiple sick calls.

From the time Mr. Rupard was taken into custody until his death, he suffered a 60 pound weight loss, or 36% of his total body weight.

### D. The Sheriff's Department's Inadequate Screening and Intake Process Fails to Identify and Treat Medical Care Problems of Newly Arriving Incarcerated People

201.    By policy and practice, the Sheriff's Department fails to adequately identify and treat the medical issues of newly arriving incarcerated people during the screening and intake process and fails to adequately train or supervise intake staff to do the same. These policies and practices place incarcerated people at risk of serious harm or death. The 2022 State Audit Report studied 30 recent in-custody deaths and found that at least eight individuals "had serious medical or mental health needs that health staff did not identify or communicate to detention staff at intake." Several of those people died within days of entering the Jail. In one instance, the intake nurse identified possible symptoms of drug withdrawal in an arriving person, but failed to communicate the conclusion to other staff, and the individual died a day later from complications of overdose— without ever receiving medical care.

202.    For example, in *Dunsmore et al. v. San Diego County Sheriff's Department*, case number 3:20-cv-00406-AJB-DDL, Michael Taylor was booked into Jail custody in 2017, and he was recovering from surgery for a compound fracture in his hand and a painful hernia. Despite Taylor's requests for medical treatment, the Sheriff's Department did not take him to any follow up care from the hand surgery or refer him for surgery for the hernia Medical staff provided Taylor only with Motrin and Tylenol.

203.    In the same case, plaintiff Lisa Landers arrived at the Jail, she informed medical staff that she had gout and neuropathy, and that she had been taking medications for each, including gabapentin for pain. For three weeks, Landers did not receive adequate pain relief because the Jail did not order the

required medications. She was also denied her assistive device to help with her mobility. Despite Landers' ongoing suffering, she was not even referred to the medical unit until her lawyers intervened.

204.    The Sheriff's Department lacks adequate policies and practices for reviewing arriving incarcerated people's medical history. The Sheriff's Department fails to ensure continuity of medical care for the many incarcerated people receiving care through other County agencies or community providers. The Sheriff's Department does not adequately train or supervise intake staff to review an incarcerated person's prior medical records. As a result, Jail intake staff fail to conduct adequate reviews of prior booking information, which contributes to the Sheriff's Department's failure to identify current medical needs and to treat them.

### E. External Audits and Reports Warn Martinez, the County and the Sheriff's Department of Pervasive Failure to Adequately Supervise Subordinates.

205.    On November 8, 2016, the San Diego Sheriff's Department contracted with National Commission on Correctional Health Care ("NCCHC") for assistance regarding compliance with Standards for Health Services in Jails. This was to receive NCCHC accreditation.

206.    In January 2017, the NCCHC provided a report to the San Diego Sheriff's Department after reviewing the practices of its Jails.

207.    The County of San Diego paid $100,000 to the national commission, which sent four consultants to the county's four largest jails to study what medical staff were doing well and suggest ways they could do better.

208.    The technical assistance report included 139 pages of findings and dozens of recommendations Gore and his command staff need to implement before the jails can be accredited.

209.    The report included a detailed recommendations for improving practices at Las Colinas.

210.    According to the 2017 report, Las Colinas had 40 essential NCCHC standards applicable to the facility. One hundred percent of the applicable essential standards must be met in order to attain NCCHC accreditation.

211.    Las Colinas failed to meet 28 essential standards.

212.    Las Colinas failed to meet essential standards on continuous quality improvement program, emergency response plan, health training for correctional officers, *medication administration training*, information on health services, *receiving screening*, *initial health assessment*, *mental health screening and evaluation*, *basic mental health services* and emergency psychotropic medication.

213.    NCCHC found a backlog of 150 inmate/patient requests for health care during its visit to Las Colinas.

214.    NCCHC found that the responsible health authority ("RHA") is the full-time medical administrator, who is normally in the administrative offices and rarely at the facilities. There was no specifically designated, on site responsible physician as the on-site physicians are contract employees. NCCHC recommended that RHA be on sit at Las Colinas at least weekly.

215.    NCCHC found that Jails were failing to review inmates' deaths in a timely manner, including at Las Colinas.

216.    Health care providers were not being informed of any results of death reviews.

217.    Nurses were improperly using nurse's protocols to administer medication instead of a pharmacist or provider, which led to a lack of accountability and absence of inventory control practices.

218.    Mental health staff received fewer than 50% of the results when lab tests were ordered.

219.    There was no evidence that deviations from standards of practice and treatment plans were documented or discussed with patients at Las Colinas.

41

220. There was no system to ensure the time of mental health professionals was utilized to appropriately meet the needs of the mentally ill.

221. Inmates at Las Colinas did not have their requests or referrals for mental health services responded to in a timely manner.

222. ***There was no screening for intellectual disability or other issues as required by NCCHC standards***.

223. Mental health did not provide adequate individual counseling or group counseling, and did not coordinate mental health, medical and substance abuse treatment.

224. In October of 2019, three years after the County paid NCCHC $100,000 for the study, the Union Tribune reported that it would be difficult to win accreditation by 2020, the timeline Jail officials had outlined.

225. As the UT noted, one of the gross deficiencies outlined by NCCHC was that "mentally ill inmates were kept in isolation, with little evidence of monitoring for mental condition, hygiene, orientation or how they were adjusting." This was known to Kelly Martinez and the detention policy makers four years before the Jail staff placed Roselee in administrative segregation then left her to die in a filthy cell.

226. Indeed, as of today's date, there has never been accreditation.

227. In February 2022, the California State Auditor said in a scathing report that San Diego County jails are so unsafe and deficient that state lawmakers should intervene by forcing the Sheriff's Department to change course.

228. After the state of California performed an audit of 815 deaths in County Jails, Michael Tilden, acting state auditor, wrote: "Our review identified deficiencies with how the Sheriff's Department provides care for a protects incarcerated individuals, which likely contributed to in-custody deaths."

229.   "These deficiencies related to its provision of medical and mental health care and its performance of visual checks to ensure the safety and health of individuals in its custody.

230.   Mirroring what the community members and experts have repeatedly told the Sheriff's Department over the past decade, the Auditor wrote: "The high rate of deaths in San Diego County's jails (as) compared to other counties raised concerns about underlying systemic issues with the Sheriff's Departments' policies and practices."

231.   The audit said that the Sheriff's Department "did not consistently follow up with" inmates who needed medical and mental health services, and concluded the lack of attention may have contributed to their deaths.

232.   The report noted that when deputies did check up on inmates, these "safety checks" often amounted to inadequate glances that sometimes missed inmates in distress.

233.   "In our review of 30 in-custody deaths. . .  based on our review of video recordings, we observed multiple instances in which staff spent no more than one second glancing into the individuals' cells, sometimes without breaking stride, as they walked through the housing module," the audit said. "When staff members eventually checked more closely, they found that some of these individuals showed signs of having been dead for several hours."

234.   The auditors said San Diego County jails can only be fixed by legislation requiring the Sheriff's Department to implement a series of recommendations spelled out in the 126-page report.

235.   "In fact, our review identified deficiencies with how the sheriff's department provides care for and protects incarcerated individuals (that) likely contributed to in-custody deaths…"

43

236.    State auditors found that the department has yet to meaningfully implement recommendations made by independent experts over the last several years.

237.    "Given the ongoing risk to the safety of incarcerated individuals, the Sheriff's Department's inadequate response to deaths and the lack of effective independent oversight, we believe the Legislature must take action to ensure that the Sheriff's Department implements meaningful changes," the report said.

238.    Despite their awareness of the need to take concrete actions to address a crisis of soaring jails deaths in San Diego County facilities, Martinez, her predecessor William Gore, and the County have avoided responsibility; resisted transparency refused to conduct transparent investigations to determine wrongdoing; refused to hold individual deputies and medical staff accountable; and refused to discipline these individual staff members who commit misconduct that kills inmates. This has created a culture of apathy and impunity at the Sheriff's Department. Because it is impossible for any individual Sheriff's Department subordinate to suffer discipline, there is a custom of encouraging neglect and abuse of seriously ill and vulnerable inmates, and Jail staff are permitted to act with

239.    Tribune's Editorial Board noted reflected the attitude of his subordinates has spilled over onto Defendant Martinez's tenure and she has failed to address the issues or make meaningful changes. Thus, the failure to investigate and discipline subordinates was the moving force that caused the ultimate injury to decedent Roselee Bartolacci.

**F. The County Systemically Failed to Maintain Sufficient Numbers of Health Care Professionals, Resulting in Deficient Care**

240.    Jail Defendants maintain insufficient numbers of health care professionals to provide minimally adequate care to the approximately 4,000 incarcerated people in the Jail. As of June 2022, the Sheriff's Department had 523 budgeted positions in its jail medical staff but just 324 employees, including mental

44

health clinicians, nurses, social workers, X-ray technicians and others. Further, even though the County had 23 full-time psychiatrists under contract, there was as few as eight available during the period from July 2019 to May 2022. There are not sufficient health care staff to timely respond to incarcerated people's requests for medical care, to adequately screen, monitor, and provide follow-up care to incarcerated people who have serious and chronic illnesses, or to treat incarcerated people when medical emergencies occur. Jail Defendants have long been aware that the Jail's medical staffing is deficient and jeopardizes patient safety.

241. The NCCHC Report found that medical understaffing may be contributing to untimely medical care at the Jail. *NCCHC Report* at 40. After the NCCHC Report, the Sheriff's Department publicly acknowledged that it needed to hire more medical staff to provide adequate care and comply with NCCHC standards. Jeff McDonald, Kelly Davis, *Sheriff has a ways to go to meet 'gold standard' of jail accreditation*, SAN DIEGO UNION-TRIBUNE, Oct. 13, 2019, https://www.sandiegouniontribune.com/news/watchdog/story/2019-10-13/sheriffs-quest-for-jail-accreditation-to-take-time-money-and-culture-shift.

242. Understaffing of health care professionals translates to dangerous conditions and inadequate medical care for incarcerated people. In December 2020, understaffing prompted nursing staff at Vista to write a desperate plea to Jail command staff for "any kind of help we can get." The nurses' letter explained that during certain shifts, Vista had only two registered nurses available—one permanently stationed at intake—for the 600 people incarcerated at the facility. As a result, the nurses wrote, "this environment for patient care is not even close to standard," and "[p]atients are being neglected and not being given the care that they need and deserve." The nurses implored command staff to "understand that people's lives are put at risk" by the dangerous understaffing at the Jail.

243. Due to understaffing, the Sheriff's Department improperly allows untrained nurses to perform mental health evaluation gatekeeping functions. Many

nurses are uncomfortable being asked to serve this role. An October 2021 letter from the Service Employees International Union ("SEIU") Local 221, which represents Jail health care workers, to the Citizens Law Enforcement Review Board ("CLERB") explained that understaffing created "dangerous and inhumane" conditions for incarcerated people and medical staff alike.

### G. The County Violated California State Law on Safety Checks

244.   On July 20, 2021, Saxon Rodriguez, an incarcerated person at the San Diego Central Jail, was found unresponsive by deputies during a "hard count." Saxon died from an overdose of fentanyl and methamphetamine which he acquired in Jail. During the investigation, CLERB found that 65 minutes and 28 seconds elapsed between the last uneventful direct visualization by Jail staff and the direct visualization during which he was determined to be unresponsive.

245.   CLERB found misconduct by the Jail for its violation of Title 15, Section 1027.5 for permitting a more than 60-minute lapse between safety checks. CLERB found that the County's practice was to start safety checks within the 60-minute time period but not necessarily to directly visualize each incarcerated person within that time-period, "thus resulting in innumerable instances where incarcerated persons are not directly visually observed within statutorily mandated time-periods." CLERB wrote, "a sustained finding will not be recommended against the involved deputies following the standard practice but, instead, against the SDSD itself for knowingly allowing practices that routinely violate Title 15 and its own policy and procedures."

246.   The County of San Diego had a mandatory duty to ensure that the minimum standards under Title 15 were met. Title 15 imposes a mandatory duty on the County of San Diego and the elected Sheriff.

247.   Defendant Kelly Martinez was a policy-maker for the San Diego Sheriff's Department and was responsible for promulgation of policies and procedures to comply with the California state mandates and the state and federal

Constitutions. Martinez is the facility administrator under Title 15. She was responsible for the supervision and control of officers who are or were employed by the Sheriff's, who are under her command and/or who report to her, including the Defendants who failed to conduct proper cell checks in this case.

248. "Safety checks" is defined as "direct, visual observation performed at random intervals within timeframes prescribed in these regulations to provide for the health and welfare of inmates."

249. Title 15 requires that a safety check be conducted hourly and requires a written plan that includes the documentation of routine safety checks.

250. This statute was intended to protect against the kind of risk suffered by Roselee Bartolacci. Title 15 § 1027.5 was implemented for the "safety and well-being of individuals" in custody.

251. The County failed to implement "a written plan that includes the documentation of all safety checks. Documentation shall include: (1) the actual time at which each individual safety check occurred; (2) the location where each individual safety check occurred, such as a cell, module, or dormitory number…"

252. The County failed to implement a system in which roving deputies would be notified in case of disturbances or disruptions during the safety check rounds.

253. By contrast, the County of Los Angeles Safety checks are performed to see if an inmate needs any medical treatment, to ensure that inmates do not pass away, and to check on their well-being, including their health/signs of life/breathing. By way of these safety checks, deputies are to visually inspect each inmate's body for signs of life – breathing, talking, movement – even when inmates are sleeping.

254. Section 1027.5 of the California Code of Regulations requires safety checks at least hourly. According to LASD policy, however, safety checks for inmates in Los Angeles are to be conducted every thirty (30) minutes.

255.    In Los Angeles, there is also a specific sergeant assigned on each shift to ensure that deputies comply with Title 15 and LASD safety-check policy. This "Title 15 Sergeant" monitors the electronic system that logs every safety check performed by deputies.

256.    In Los Angeles, each safety check is tracked and logged electronically by recording scanned-barcodes.  When performing a safety check, a deputy scans a barcode located at each cell with a handheld device to log the exact time the deputy checked on the welfare of each inmate.

257.    The County of San Diego has none of these safeguards.

258.    There is no such thing as a Title 15 officer at the San Diego County jails.

259.    In January of 2021, Omar Moreno died in his cell when deputies failed to conduct cell checks for two hours.

260.    In the 12 months before Omar's death, deputies at the Central Jail self-reported over 600 times in which they failed to start the cell check of the floor late or failed to properly log in their start time. These are only the self-reported violations of state law.  These involved *374* separate instances in which deputies self-reported that they violated California state law by not starting their cell check rounds of the floor on time.

261.    In the San Diego Sheriff's Department as a whole, there is no tracking of failures to check specific cells within the required 60 minutes.

262.    There is no tracking of failures to conduct random checks.

263.    There is no tracking of when deputies left or quit before completing the cell checks.

264.    There is no way to track whether supervisors were themselves reviewing the logs or whether they were entering them into the spreadsheet.

265.    There is no requirement that a commander or anyone up the chain of command review the supervisors' compliance.

48

266.   There is no independent verification process to check for when deputies were falsifying records.

267.   There is no tracking of any remedial action for deputies who failed the cell checks.

268.   There is no tracking of the names of deputies who failed the cell checks.

269.   The log only maintains the names of the supervisors who input the information, not the deputies who failed.

270.   There is no mechanism to track how many times a deputy failed to conduct proper checks or if they falsified records.

271.   The County has no requirement that supervisors independently verify that cell checks were properly conducted despite the fact that deputies were referring to safety checks as "powerwalks" or "flybys".

272.   There is no requirement that deputies report incomplete round of cell checks.  So long as they log into JIMS that they started to walk the floor, there was no obligation to self-report that they failed to complete the check.

273.   The County maintains a policy in which the deputies log in the start time of the safety check they conduct on the floor.  They keep no log of the time of the check of separate cells or each inmate.

274.   Sometime between 2015 and 2021, the County changed their policy so that deputies no longer logged into JIMS the time they finished the round of cell checks.  The supervisors can no longer track whether deputies were properly conducting their safety checks.

275.   There is no mechanism to check whether deputies were actually checking each cell within 60 minutes or whether they were checking the cells at all other than to watch the videos.

276.   The jails in San Diego allows each deputy to choose whatever method they want to keep time.  There is no policy on how or when to conduct random

checks at varying intervals, which is why nearly all cell checks are done at the same time each day. Because they use an ad hoc system of using random timekeeping such as a watch, a cell phone, or a clock, in twelve months, there were hundreds of failures to start the safety checks on time because of mechanical failure or human error in resetting the clock.

277. There is no written requirement that supervisors conduct random audits of cell checks.

278. CLERB has repeatedly notified Martinez and the County that they are violating California state law and recommended changes. To date, nothing has changed.

279. The County and Sheriff Kelly Martinez are still continuing to violate California state law, which has caused needless deaths of more people in their custody. This is despite the fact that courts have expressed the obviousness of failing to actually observe the inmate during safety checks.

## VI.    PLAINTIFF'S CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the Fourteenth Amendment (42 U.S.C. § 1983)**
**Deliberate Indifference to Roselee Bartolacci's Serious Medical Needs**
**[By the Estate of Roselee Bartolacci against Defendants Carlon, Mata, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Beaston, Rioveros and DOES 1-40]**

280. Plaintiff realleges all prior paragraphs of this complaint and incorporates the same by reference as if fully set forth herein.

281. Defendants, and each of them, violated Roselee Bartolacci's Fourteenth Amendment right to medical care.

282. Defendant Carlon and DOE 1, who were the arresting officers, knew that the initial call was for a PERT clinician for a 5150 hold, and that Roselee was suffering from acute psychosis and was hearing voices, but failed to render aid or transfer her to a psychiatric facility for a 72-hour hold.

283.   These defendants knew that Roselee suffered from schizoaffective and bipolar disorders and that she needed to go to a hospital for psychiatric intervention and stabilization.

284.   Defendant Carlon was required to give complete and truthful information to the booking staff, including Defendant Mata and DOES 2-3 at intake. He was under the obligation to tell the truth, that the initial call from Roseann Bartolacci was a 5150 and that she believed Roselee needed immediate psychiatric care. He had an obligation to report to booking staff that Roselee was suffering acute psychosis. He had an obligation to report to booking staff that Roselee was hearing voices. Instead, Carlon did nothing and denied this information to booking staff.

285.   Defendant Mata, the intake nurse, and DOES 2-3 were required to make further inquiry into whether Roselee was fit to be booked into jail. These Defendants knew that Roselee lacked capacity to sign of the consent forms at booking. They knew that she lacked the ability to answer questions about her medical conditions and whether she was a client of the regional center. These defendants knew that Roselee suffered chronic mood and psychotic disorders. A reasonable nurse would have identified that Roselee, who functioned at the level of an eight year old, was presenting with thought disorganization, nonsensical communication, altered mental status, altered mental status, confusion and psychosis.

286.   Any reasonable nurse confronted with an individual like Roselee, who was in severe and acute psychiatric distress, would have undertaken further investigation to establish whether she was fit to be booked into the jail as they are required to do.

287.   Any reasonable nurse would have sent Roselee for further evaluation at the emergency department or a psychiatric hospital, in accordance with Department policy, of which they were familiar.

288.   Any reasonable nurse would have known that Roselee should not be placed into custody because of her presentation, medical history and grave disability.

289.   A reasonable nurse would have initiated the process for contacting the Regional Center.

290.   Defendant Mata and DOES 2-3 did nothing. These Defendants ignored the obvious signs of Roselee's acute psychosis, denied her vital medical care and instead labeled her "uncooperative" and "unpredictable" before admitting her to the Jail.

291.   Defendant DOES 4-6 failed to properly classify Roselee and failed to contact the Regional Center.  They failed to accommodate Roselee's obvious needs for her disabilities. They placed Roselee in administrative segregation, and let her languish there for approximately six days. These defendants knew Roselee was refusing her medications and that she was not functioning. Instead of intervening and placing her in housing suitable for her medical needs, Defendant DOES did nothing.

292.   Defendant Reynoso, a mental health clinician, knew that Roselee was a client of the Regional Center. Reynoso knew, or should have known, that she was required to regularly and thoroughly consult with the San Diego Regional Center to coordinate Roselee's placement, care and to ensure her health, safety and well-being. Despite this knowledge, and despite documenting that Roselee was making non-sensical statements and was mentally retarded, Reynoso did not contact the San Diego Regional Center.  Reynoso ignored Roselee's symptoms and failed to treat them.   Reynoso left Roselee in administrative segregation to further decompensate.

293.   Defendants Anderson, Sparks, Christensen, Hurley, Beaston and DOES 7-27 failed to properly monitor and treat Roselee's serious medical

condition despite knowing she was refusing her medications and was frequently refusing food and liquids.

294. Defendants Anderson, Sparks, Christensen, Hurley, Beaston, Germono and DOES 7-27 knew they were required to regularly and thoroughly consult with the San Diego Regional Center to coordinate Roselee's placement, care and to ensure her health, safety and well-being. These Defendants knew, or should have known that Roselee was unable to advocate for herself and required a guardian or representative to advocate for her. Despite this knowledge Defendants Christensen, Hurley, Beaston and DOES 7-27 never contacted the San Diego Regional Center.

295. Though Defendants Anderson and Sparks contacted the San Diego Regional Center, the first call was made by Sparks two weeks after Roselee was admitted to Las Colinas. No meaningful discussion about Roselee's status and an alternate placement occurred until Defendant Anderson's call on May 25, 2023, 48 days after Roselee was admitted to Las Colinas, despite Defendants collective knowledge that Roselee was a Regional Center client as of April 6, 2023.

296. Defendants Anderson, Sparks, Christensen, Hurley, Beaston and DOES 7-27 failed to properly monitor and treat Roselee's serious medical condition even after her return from the hospital and documented diagnoses of hypokalemia. A reasonable doctor or nurse practitioner with the knowledge that Roselee was suffering from hypokalemia would have ordered K-Dur or other potassium supplement to treat her.

297. The hospital had specifically warned the Jail of the need to address the underlying psychiatric condition which had caused multiple trips to the hospital. No one heeded this warning.

298. Defendants Anderson, Sparks, Christensen, Hurley, Beaston, Germono, Esquivel and DOES 7-27 knew that Department policy required them to

closely monitor Roselee, who was not eating, and weigh her, assess her medical condition and hydration status on a daily basis, even if she refused.

299.    Defendant Rioveros knew that no weight had been recorded for Roselee since she was admitted to the jail when she first looked at Roselee's records on April 17, 2023. Rioveros knew that Roselee needed to be weighed but failed to order it until May 25, 2023, four days before Roselee died. Knowing that she was not eating, Rioveros should have ordered that Roselee be weighed on April 17.

300.    Despite Rioveros' knowledge of the severe health risks posed to Roselee by her failure to eat, she twice chose not to personally speak to and examine Roselee, instead relying on the reporting of nurses. Rioveros failed to order labs to assess Roselee's condition despite her knowledge of Roselee's risk of hypokalemia. At no point did Rioveros make a recommendation for an IV to deliver hydration and nutrition. Rioveros never considered total parenteral nutrition (TPN) or discussed this option with the medical staff when she knew that no significant nutrition was being obtained by other routes.

301.    All defendants, including DOES, knew that Roselee needed to be weighed and medicated for her schizophrenia. Defendants were well aware of her diagnosis for hypokalemia, which left untreated, could become fatal.    These defendants ignored Roselee's continuing deterioration occurring in front of their eyes.

302.    Defendants Anderson, Sparks, Christensen, Hurley, Beaston and DOES 7-27 knew that Roselee was not functioning in a jail setting. Any reasonable medical professional would have ordered that Roselee be immediately transferred out to a psychiatric hospital or to another community-based provider which could have provided Roselee a higher level of emergency care.

303.    These defendants had the capacity and the obligation to seek intervention to medicate and feed Roselee when her refusal was causing serious health conditions.

304. By failing to properly treat and monitor Roselee's condition despite knowing she was not eating and drinking, Defendants were deliberately indifferent to Roselee's serious medical needs.

305. By failing to properly treat and monitor Roselee's condition despite knowing that she was not consistently taking her medications, Defendants were deliberately indifferent to Roselee's serious medical needs.

306. By failing to properly treat and monitor Roselee's serious medical conditions, including hypokalemia, Defendants were deliberately indifferent to Roselee's serious medical needs.

307. By failing to timely and meaningfully liaise with the San Diego Regional Center and ensure placement options outside the jail, Defendants were deliberately indifferent to Roselee's serious medical needs.

308. As a direct consequence of these failures, Roselee's serious medical condition was ignored by jail staff. As a result, Roselee was not properly fed, hydrated, medicated, treated or monitored.

309. Defendant DOES 28-40 violated California Code of Regulation Title 15 by failing to conduct cell checks within 60 minutes of the last round prior to Roselee being found unresponsive in her cell on or about May 28, 2023.

310. They violated Roselee's due process right to an adequate safety check as a pretrial detainee. Their failure to conduct regular safety checks as stated in 15 C.C.R. § 1027 posed substantial risk to inmates, including Roselee Bartolacci.

311. As a direct and proximate result of Defendants' deliberate indifference to Roselee's serious medical condition, she experienced physical pain, severe emotional distress, and prolonged mental anguish, as well as the loss of her life and other damages as alleged herein.

312. The conduct alleged herein caused Roselee Bartolacci to be deprived of her civil rights that are protected under the United States Constitution which has also legally, proximately, foreseeably and actually caused Roselee Bartolacci to

suffer emotional distress, pain and suffering and death and further damages all in an amount to be shown according to proof at the time of trial.

313.   The conduct as alleged herein was done in deliberate or reckless disregard of decedent Roselee Bartolacci's constitutionally protected rights; justifying the award of exemplary damages against defendants in an amount to be shown according to proof at the time of trial in order to deter the defendants from engaging in similar conduct and to make an example by way of monetary punishment.

314.   Plaintiff is also entitled to an award of attorney's fees and costs of suit herein.

## SECOND CAUSE OF ACTION
### Failure to Properly Train, Supervise and Discipline (42 U.S.C. § 1983)
### [By the Estate of Roselee Bartolacci against Defendant Martinez and Supervisory DOE Defendants 41-55]

315.   Plaintiff realleges all prior paragraphs of this complaint and incorporates the same by reference as if fully set forth herein.

316.   Defendant Martinez and DOES 41-55 failed to properly train and supervise their subordinates with regard to: (1) the need to communicate critical medical information, including between Jail staff and outside agencies where needed, including the San Diego Regional Center; (2) the need to document observations regarding critically ill or mentally ill inmates; (3) the need to appropriately classify and house seriously ill inmates; (4) the need to accommodate the needs of the disabled; and (5) the need to provide adequate care and monitoring of seriously ill inmates through frequent and regular cell checks and monitoring of vital signs, particularly for those suffering with severe psychiatric issues.

317.   Defendant Martinez and DOES 41-55 failed to provide adequate training, supervision, and discipline to medical staff who are required to render medical care to meet the standards of the Constitution. Defendants failed to provide adequate training, supervision and discipline to the medical staff who are required

to accurately assess critical and emergency medical conditions. They failed to provide adequate supervision and discipline to the medical staff on when to refer a patient to a hospital or other community-based facility when the patient has critical conditions requiring higher levels of care beyond what can be rendered in a jail setting.

318.    Defendant Martinez and DOES 41-55 failed to provide adequate training, supervision and discipline to staff with regard to proper monitoring of inmates who are required to be watched and accommodated due to grave disabilities.

319.    Defendant Martinez and DOES 41-55 failed to train on dealing with developmentally disabled individuals.

320.    Defendant Martinez and DOES 41-55 failed to train on dealing with vulnerable inmates who are frequently refusing required medications.

321.    Defendant Martinez and DOES 41-55 failed to train on dealing with inmates suffering from dehydration and malnutrition.

322.    These supervisory defendants knew that dealing with developmentally disabled or people with deficient nutrition or hydration was a commonly occurring event at the jail.  They nevertheless failed to train their staff.

323.    Defendant Martinez and DOES 41-55 failed to properly handle misconduct and the violation of citizens' civil rights by correctional officers and medical staff by investigating and discipling them.

324.    Though Defendant Martinez and DOES 41-55 were aware of previous instances of untimely and wrongful deaths in San Diego County Jails related to inadequate provision of medical care, they failed to properly supervise and discipline their employees or agents. Defendants have a widespread history of ratifying employee misconduct by failing to conduct appropriate investigations.

325.    Defendants refused to investigate misconduct and/or took no remedial steps or action against correctional officers and medical staff.

326.    Upon information and belief, supervising officers were made aware of the misconduct or witnessed the Constitutional violations committed by the deputies and medical staff but failed to supervise or discipline them. There has been an official policy of acquiescence in the wrongful conduct. Defendants failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

327.    Defendants condoned and acquiesced in the abusive behavior of their subordinates by refusing to retrain them, discipline them, or correct their abusive behavior.

328.    Defendants were, or should have been, aware that the policy regarding supervision and discipline of staff that violated the civil rights of inmates or citizens was so inadequate that it was obvious that a failure to correct it would result in further incidents of dangerous and lawless conduct perpetrated by their subordinates.

329.    As a result of all Defendants' historical failure to properly supervise and discipline deputies, Defendants were deliberately indifferent to the needs of Roselee Bartolacci. The failure to supervise and discipline was the moving force behind the misconduct of the deputies, the denial of medical care to Roselee Bartolacci, and her resulting pain, suffering, and death.

### THIRD CAUSE OF ACTION
### *Monell* **Municipal Liability Civil Rights Action (42 U.S.C. § 1983)**
### [By the Estate of Roselee Bartolacci against Defendant County of San Diego and Naphcare Correctional Health]

330.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same by reference as if fully set forth herein.

331.    There were longstanding and systemic deficiencies in San Diego jails' treatment of inmates. Deficiencies included:

　　a.  Failure to render medical care;

　　b.  Failure to identify critical and obvious medical and mental health

needs at intake;

c. Failure to comply with the law requiring contact with the Regional Centers when dealing with developmentally disabled inmates;

d. Failure to screen for immediate medical needs and monitor vital signs, including failure to weigh inmates;

e. Failure to house critically ill inmates in appropriate housing where they could be monitored and receive necessary care;

f. Improper cell checks;

g. Improper hygiene and sanitation checks;

h. Inadequate staffing, lack of required training on screening;

i. Lack communication of necessary and critical medical information among staff for continuity of care; and

j. Non-compliant medical policies and procedures.

332. The County maintained a deficient policy on contacting Regional Centers when developmentally disabled individuals are booked into jail. Upon information and belief, the policy requiring jail staff to report those identified as developmentally disabled to the San Diego Regional Center's developmental disability intake office the next business day was deficient. The written policy is deficient in its failure to specify in accordance with Cal. Code Regs. Tit. 15 § 1057, that the contact with the Regional Center shall be made **for the purposes of diagnosis or treatment** within 24 hours of such determination.

333. The written policy instead requires only that jail staff **report** a developmentally disabled person's presence in jail custody.

334. The written policy is deficient on its face because it fails to specify that jail staff are supposed to consult with the San Diego Regional Center in order to diagnose and treat developmentally disabled individuals while they are in jail custody.

335. Further, the County maintained a deficient policy under the Americans

59

with Disabilities Act by putting the onus on developmentally disabled detainees to request their own accommodations, rather than requiring jail staff to provide accommodations to individuals they know suffer from grave developmental disabilities and are unable to advocate for themselves.

336.    There was a *de facto* custom of allowing staff to fail to render care to patients suffering acute psychiatric conditions and ignoring the obvious symptoms and risk factors.

337.    There was a *de facto* custom of not properly screening inmates for medical care or treatment, and not identifying or treating those with severe developmental disabilities.

338.    There was a *de facto* custom of understaffing medical and mental health positions, forcing existing personnel to shoulder overwhelming caseloads and preventing clinicians from providing adequate care and monitoring of seriously ill inmates.

339.    There was a *de facto* custom of allowing gravely and developmentally disabled inmate-patients to make medical decisions for themselves, and to dictate their own medical care and food and water intake, even when they obviously lacked the capacity to do so. This custom caused gravely and developmentally disabled inmate-patents to forego required medication, nutrition and treatment to effectively manage serious medical and mental health conditions.

340.    There was a *de facto* custom of ignoring critical medical information not properly checking on the welfare of patients, even those known to have serious medical and/or mental health needs.

341.    There was a *de facto* custom of not taking vital signs and weighing those in obvious medical distress.

342.    There was a *de facto* custom of not ensuring that deputies follow the policy and procedures with respect to emergency within the Jails.

343.    There was a *de facto* custom of failing to conduct proper cell checks

60

or monitoring, as required by Title 15 and by the County's own written policies.

344.    There was a *de facto* custom of failing to conduct proper hygiene and sanitation checks of inmate's cells.

345.    There was a *de facto* custom of dieticians employed by the Jail making recommendations about an inmate's diet without personally communicating with or examining the inmate. There was a custom of dieticians making recommendations without lab results or weight history.

346.    Defendant's failure to train its sworn and medical staff gives the inference of a municipal custom that authorized or condoned staff misconduct.

347.    There has been a longstanding pattern of failing to provide adequate medical care, causing a series of preventable and tragic deaths that placed these defendants on notice.

348.    The County is further liable because the cumulative and persistent failures and misdeeds of the entire Sheriff's Department at Las Colinas caused the ultimate suffered by decedent Roselee Bartolacci.

349.    Roselee Bartolacci's constitutional deprivations were not only caused by the conduct of individual staff, but also resulted from the collective inaction of the San Diego Sheriff's Department. Plaintiff's constitutional deprivations were further caused by the subordinates' adherence to customs and practices, as alleged herein. *See Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002); *see also Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 604 (9th Cir. 2019).

350.    There has been a custom and practice of acquiescence in the wrongful conduct of Sheriff's Department's subordinates. Defendant County of San Diego failed to promulgate corrective policies and regulations in the face of repeated Constitutional violations.

351.    Defendant County condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors. The County ratified the actions of the individual defendants by

failing to take any corrective or remedial action after Roselee Bartolacci's death.

352.   As set forth in the preceding paragraphs of Plaintiff's complaint, which are incorporated herein by reference, Defendant County knew of these unconstitutional practices and customs inflicting grievous injury to vulnerable inmates who were dependent on the County for their care. The County knew its program regarding supervision and discipline of subordinates, who violated the civil rights of inmates or citizens, was so inadequate that it was obvious that a failure to correct it would result in further incidents or dangerous or lawless conduct perpetrated by their subordinates.

353.   As a result of all Defendant' historical failure to properly supervise and discipline staff, and its adoption and ratification of constitutionally deficient customs and practices related to the care of seriously ill inmates, Defendant County of San Diego and each of its subordinates were deliberately indifferent to the needs to Roselee Bartolacci. These systemic failures and unconstitutional practices were the moving force behind the misconduct of jail staff, the denial of adequate medical care to Roselee Bartolacci, including prolonged pain and suffering to Roselee and causing her death.

**FOURTH CAUSE OF ACTION**
**Violation of the Americans with Disability Act of 1990 (42 U.S.C. 12101, *et seq.*)**
**[By the Estate of Roselee Bartolacci against the County of San Diego]**

354.   Plaintiff realleges all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

355.   Roselee Bartolacci was a gravely disabled person whose major life activity was substantially limited by her bipolar type schizoaffective disorder, developmental disorder, attention-deficit hyperactivity disorder ("ADHD") and mild mental retardation.  Roselee Bartolacci was a qualified individual under the ADA.

356.   Pursuant to 42 U.S.C. § 12132, "Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

357.   Under Title II of the Americans with Disability Act, public entities are required to make reasonable modifications to avoid discrimination on the basis of disability. The ADA sets an affirmative requirement to act appropriately with respect to prisoners with disabilities. The County of San Diego is subject to Title II of the ADA.

358.   The ADA creates an affirmative duty in some circumstances to provide special, preferred treatment, or "reasonable accommodation."

359.   Facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced.

360.   Discrimination includes a defendant's failure to make reasonable accommodations to the needs of a disabled person based on her mental or physical health.  These accommodations include training on specialized training of jail staff, heightened level of medical care, and diligent surveillance.

361.   The County of San Diego has failed its duties under the ADA by failing to provide Roselee Bartolacci with reasonable accommodations, including but not limited to: meaningful access to prisoner grievance procedures, assistance with self-care and daily living activities, access to prison programs, services, and activities, adaptive support for developmental disabilities, coordination with a mental healthcare advocate who could ensure Roselee's successful treatment, diligent surveillance, and proper tracking of key health indicators.

362.   A service or program available to all inmates in custody of the Jails includes access to a clean cell, basic hygiene and proper monitoring for their health and safety.

363. Defendant County denied Roselee Bartolacci the benefits of the services, programs or activities which it provides to all other inmates. It violated Roselee's clearly established rights under the ADA with deliberate indifference by failing to provide necessary and intervention when it was abundantly clear that Roselee could not take care of herself, advocate for her own accommodations, or survive without necessary healthcare intervention.

364. Defendant San Diego County had knowledge of their obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of Roselee Bartolacci.

365. As a direct and proximate result of the Defendant's conduct as herein described, Roselee Bartolacci suffered in the amount to be determined at the time of trial.

## FIFTH CAUSE OF ACTION
### Violation of the Rehabilitation Act 29 U.S.C. § 794(a))
### [By Estate of Roselee Bartolacci against the County of San Diego]

366. Plaintiff realleges all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

367. The Rehabilitation Act of 1973 ("Section 504") states in pertinent part, that "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance …" 29 U.S.C. § 794(a).

368. Defendant County of San Diego is a program that receives federal financial assistance as defined in 29 U.S.C. § 794(b).

369. Roselee Bartolacci was a "qualified individual with a disability" under the Rehabilitation Act.

370. Defendant violated the Rehabilitation Act by failing to make reasonable accommodations to the needs of Roselee Bartolacci, a disabled person.

Roselee needed an accommodation to assist in self-care, provide meaningful access to a grievance procedure, obtain necessary healthcare intervention, and to advocate on her behalf due to her serious disability and her inability to request necessary jail services, programs, and activities.

371.    Defendant County of San Diego fails to provide effective mental health screening services to detainees with developmental disabilities, while providing such services to detainees without developmental disabilities.

372.    Employees of Defendant County of San Diego were deliberately indifferent to Roselee Bartolacci's serious medical condition.  Defendants knew of the substantial risk of harm to Roselee Bartolacci from her serious, diagnosed condition and they responded with deliberate indifference by allowing her to make her own healthcare decisions, to toil away in a filthy cell, to refuse medication, food, and water, and to decompensate over a period of months.

373.    As a direct and proximate result of the Defendants' conduct as herein described, Roselee Bartolacci suffered in the amount to be determined at the time of trial.

### SIXTH CAUSE OF ACTION
**Violation of Cal. Civil Code § 52.1 (Bane Act) – Survival Claim**
**[By the Estate of Roselee Bartolacci against Defendants Carlon, Mata, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Beaston, Rioveros, DOES 1-40 and the County of San Diego]**

374.    Plaintiff realleges all prior paragraphs of this complaint and incorporates the same by reference as if fully set forth herein.

375.    Plaintiff the Estate of Roselee Bartolacci brings the claims in this cause of action as survival claims permissible under California law, including Cal. Code of Civil Procedure, § 377.20, *et seq*.

376.    By their acts, omissions, customs and policies, Defendants Carlon, Mata, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Rioveros, Beaston, and DOES 1-40, acting in concert/conspiracy, by threat,

intimidation, and/or coercion, interfered with, attempted to interfere with, and violated Roselee Bartolacci's rights under California Civil Code § 52.1 and under the United States and California Constitutions as follows:

    a. The right to be free from objectively unreasonable treatment and deliberate indifference to Roselee Bartolacci's medical needs while in custody as a pre-trial detainee, as secured by the Fourth and/or Fourteenth Amendment to the United States Constitution and by California Constitution, Article 1, §§ 7 and 13.

    b. The right to enjoy and defend life and liberty; acquire, possess, and protect property, and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1;

    c. The right to protection from bodily restraint, harm, or personal insult as secured by California Civil Code § 43;

    d. The right to emergency medical care as required by California Government Code § 845.6; and

    e. The right to safety pursuant to Title 15.

377. These acts herein were coercive because they occurred while Roselee Bartolacci was in the custody of the San Diego County Sheriff's Department, an inherently coercive setting.

378. All Defendants' violations of decedent Roselee Bartolacci's due process rights with deliberate indifference, in and of themselves constitute violations of the Bane Act.

379. All of Defendants' violations of duties and rights, and coercive conduct described herein were volitional acts; none was accidental or merely negligent.

380. Further, each Defendant violated decedent Roselee Bartolacci's rights with the specific intent and purpose to deprive her of her enjoyment of those rights

and of the interests protected by those rights. Each defendant acted with reckless disregard for Roselee Bartolacci's rights.

381.   Under California Government Code Section 845.6, the public entity is liable if its employee knows or has reason to know that the prisoner is in need of immediate medical care and fails to take reasonable action to summon such medical care.

382.   Defendant County of San Diego is also vicariously liable for the violations of rights by their employees and agents. Defendant County of San Diego is vicariously liable pursuant to California Government Code § 815.2.

383.   As a direct and proximate result of Defendants' violation of California Civil Code § 52.1 and of decedent Roselee Bartolacci's rights under the United States and California Constitutions, Plaintiff sustained injuries and damages. Against each and every Defendant, Plaintiff is entitled to relief as set forth above, including punitive damages against all individual defendants, and all damages allowed by California Civil Code §§ 52 and 52.1 and California law, not limited to costs, attorneys' fees, treble damages and civil penalties.

## SEVENTH CAUSE OF ACTION
### Negligence Survival Claim (CCP § 377.30)
### [By the Estate of Roselee Bartolacci against All Defendants]

384.   Plaintiff realleges all prior paragraphs of this complaint and incorporate the same by reference as if fully set forth herein.

385.   Defendants had a duty to Roselee Bartolacci to act with ordinary care and prudence so as not to cause harm or injury to another.

386.   Per Gov. Code § 820, except as provided by statute, a public employee is liable for injury caused by his/her act or omission to the same extent as a private person, and said liability is subject to any defenses that would be available to a public employee if he/she were a private person.

387.   Cal. Gov't Code § 846.5 requires that "a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care." Roselee was in need of immediate medical care.

388.   Defendants failed to provide adequate medical care for Roselee's serious psychiatric needs.  At the time of her arrest, Roselee was in acute psychosis in which she was hallucinating and hearing voices.  This was a medical emergency requiring intervention. Carlon and Doe 1 knew that Roselee was in psychiatric distress and experiencing active psychosis. They knew Roseann Bartolacci had specifically asked for a PERT clinician in her initial call. In failing to transport her to a hospital or psychiatric facility, Carlon and DOE 1 failed to provide adequate medical care to Roselee Bartolacci.

389.   In evaluating, assessing and handling Roselee Bartolacci's medical condition, Defendants failed to comply with professional and legal standards.

390.   Defendants improperly, negligently, wrongfully, and recklessly failed to communicate Roselee's serious medical need to each other and all jail staff.

391.   Defendants improperly, negligently, wrongfully, and recklessly failed to provide adequate medical care for Roselee's serious psychiatric needs.

392.   Defendants improperly, negligently, wrongfully, and recklessly failed to provide adequate nourishment to Roselee, who was unable to provide such nourishment for herself.

393.   Defendants improperly, negligently, wrongfully, and recklessly failed to take appropriate action to render medical care to Roselee Bartolacci who was in obvious physical distress and in acute need of medical care and intervention.

394.   Roselee's medical condition was so dire that emergency room staff admitted her to the hospital for two weeks.  When Roselee's condition subsequently

deteriorated to even more dire levels, defendants failed to render medical care and basic nutrition.

395.    Supervisory Defendants improperly, negligently, wrongfully, and recklessly failed to supervise and train regarding the monitoring of psychiatric patients, communication of an inmate's deteriorating condition between medical personnel, and transportation of inmates suffering from a life-threatening medical condition to a hospital.

396.    By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Roselee Bartolacci.

397.    Defendant Martinez, as the Sheriff, owes the inmates/patients in her care a duty to protect them from foreseeable harm, whether stated specifically in terms of a "special relationship" or otherwise. *See Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 252 (2008). California law recognized that jailers owe a duty of care to the prisoner, who is deprived of the normal opportunity to protect himself from harm inflicted by others.

398.    The County, Martinez, and the other supervisory defendants are liable for their own negligent conduct pursuant to California Govt. Code § 845.6, which permits claims against officials for negligent supervision and training as to when to summon medical care.

399.    Defendant Naphcare Correctional Health improperly, negligently, wrongfully and recklessly failed to set forth policies regarding medical treatment of inmates suffering from serious mental health conditions.

400.    Defendant Naphcare Correctional Health improperly, negligently, wrongfully and recklessly failed to set forth policies regarding proper screening, evaluation, treatment, transportation and transfer of inmates suffering from a serious mental health condition.

401.    Defendant Naphcare Correctional Health are vicariously responsible for the acts of its individual agents and employees, including DOE Defendants.

402.   By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Roselee Bartolacci.

403.   The County of San Diego is responsible for the acts of individuals and DOE Defendants under the theory of *respondeat superior.*

404.   By engaging in the acts alleged herein, all defendants failed to act with ordinary care and breached their duty of care owed to Roselee Bartolacci.

405.   As a direct and proximate result of the Defendants' negligent conduct as described herein, Roselee Bartolacci died.

## VII.   PUNITIVE DAMAGES

The conduct of all individual defendants and Naphcare Correctional Health as alleged herein was malicious, oppressive, fraudulent, and in reckless disregard of Roselee Bartolacci's federally guaranteed rights. Plaintiff seeks punitive damages to punish and deter such conduct, as alleged in this complaint.

## VIII.  RELIEF REQUESTED

Plaintiff prays for judgment as follows:

(1) For compensatory general and special damages in an amount in accordance with proof.

(2) For punitive and exemplary damages as permitted by law against individual defendants and Naphcare.

(3) For expenses and costs of suit as permitted by law.

(4) For any other relief that is just and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

70

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff hereby demands a jury trial of this action.

DATED: July 3, 2024                     Respectfully Submitted,

**IREDALE AND YOO, APC**

*s/ Sarah Musumeci*
**EUGENE IREDALE**
**JULIA YOO**
**SARAH MUSUMECI**
Attorneys for Plaintiff THE ESTATE OF ROSELEE BARTOLACCI