EUGENE G. IREDALE: SBN 75292
JULIA YOO: SBN 231163
SARAH MUSUMECI: SBN 328306
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
TEL: (619) 233-1525
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE ESTATE OF ROSELEE BARTOLACCI, by and through its successor in interest, ROSEANN BARTOLACCI,<br><br>                Plaintiff,<br>v.<br><br>COUNTY OF SAN DIEGO, *et al.*,<br><br>                Defendants. | CASE NO. 24-cv-01156-WQH-JLB<br><br>**PLAINTIFF'S OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>Hon. William Q. Hayes<br><br>Date: September 29, 2025<br><br>**NO ORAL ARGUMENT UNLESS REQUESTED BY THE COURT** |

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................1

II.    LEGAL STANDARD ................................................................................2

III.   FACTUAL BACKGROUND......................................................................2

  A.   Roselee Bartolacci Was Gravely Disabled.......................................2

  B.   Roselee's Condition Continues to Deteriorate in the PSU...............5

  C.   Roselee is Admitted to the Hospital where Her Dire Condition Significantly Improves. .................................................................................................6

  D.   Roselee Returns to Las Colinas and Swiftly Deteriorates................7

IV.   ARGUMENT.............................................................................................9

  A.   Plaintiff Has Sufficiently Alleged a Deliberate Indifference Claim. .............9

    1.   Carlon, Crawford, Walters and Taylor...................................9

    2.   Paul Mata and Jeffrey Monti.................................................12

    3.   Evangelina Reynoso..............................................................13

    4.   Macy Germono and Sherry Esquivel. ...................................14

    5.   Janine Sparks.........................................................................16

    6.   Diorella Rioveros. .................................................................17

    7.   Cell Check and Hygiene Check Defendants...........................17

  B.   Plaintiff Has Alleged Sufficient Facts Against DOES 7-27 and 44-55. .......19

  C.   Plaintiff Has Sufficiently Alleged a 1983 Claim for Failure to Train, Supervise and Discipline. ....................................................................20

  D.   Plaintiff Has Sufficiently Alleged a *Monell* Claim against the County. .......20

  E.   Plaintiff Has Properly Alleged a Bane Act Claim.......................................23

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

F.    Plaintiff Has Sufficiently Alleged a Negligence Claim. ...............................25

V.    CONCLUSION...............................................................................................25

Case No. 24-cv-01156-WQH-JLB
OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

# TABLE OF AUTHORITIES

## Cases

*Ames v. Cnty. of San Bernardino*, No. ED-CV-181362-JGB-JEMx, 2020 WL 5875012 (C.D. Cal. July 30, 2020) ...................................................................10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .......................................................2

*Chaudry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) .............................14

*City of Canton, Ohio v. Harris*, 489 U.S. 378 (198922

*Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002) .....................................................12

*Conn v. City of Reno*, 572 F.3d 1047 (9th Cir. 2009) ...............................................11

*Cornell v. City & Cnty. Of Sacramento*, 17 Cal. App. 5th 766 (2017) ...................24

*Dalton v. County of San Diego*, No. 21-CV-2143 W (WVG), 2022 WL 1214438 (S.D. Cal. Apr. 25, 2022) ....................................................................................23

*Enyart v. Cnty. of San Bernardino*, No. 5:23-CV-00540-RGK-SHK, 2024 WL 2104489 (C.D. Cal. Apr. 22, 2024) .....................................................................11

*Est. of Cornejo ex rel Solis v. City of Los Angeles*, 618 Fed. App'x 917 (9th Cir. 2015) ....................................................................................................................10

*Est. of Serna v. County of San Diego*, No. 20CV2096-LAB-MSB, 2022 WL 827123 (S.D. Cal. Mar. 18, 2022) .....................................................................24

*Est. of Wilson by & through Jackson*, No. 20-cv-00457-RBM-DEB, 2023 WL 8360718 (S.D. Cal. Dec. 1, 2023) .....................................................................21

*Gant v. County of Los Angeles*, 772 F.3d 608 (9th Cir. 2014) ................................25

*Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980) ..................................................19

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) ......................................9

*Greer v. Cnty. of San Diego*, 726 F.Supp.3d 1058 (S.D. Cal. 2023) .......................25

*Greer v. County of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2021 WL 615046 (S.D. Cal. Feb. 17, 2021) ...............................................................................23, 24

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

*Greer v. Cnty. of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2020 WL 1864640 (S.D. Cal. Apr. 14, 2020) ........................................................................25

*Hernandez v. San Bernardino Cnty.*, No. EDCV-22-1101-JGB-SPx, 2023 WL 3432206 (C.D. Cal. Jan. 26, 2023)..................................................19

*Hunt v. Dental Dep't*, 865 F.2d 198 (9th Cir. 1989).................................................12

*Hunter v. County of Sacramento*, 652 F.3d 1225 (9th Cir. 2011) ...........................22

*Hutchinson v. United States*, 838 F.2d 390 (9th Cir. 1988)....................................13

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006) .........................................................12

*Johnson v. Schwarzenegger*, 366 F. App'x 767 (9th Cir. 2010) ..............................16

*Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183 (E.D. Cal. 2018)..................................................................................................24

*Lawson v. Superior Court*, 180 Cal. App. 4th 1372 (2010) ....................................25

*M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889 (N.D. Cal. 2013).............................24

*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) .............................24

*Richards v. County of San Bernardino, et al.*, 39 F.4th 562 (9th Cir. 2022)...........23

*Sandoval v. County of San Diego*, 985 F.3d 657 (9th Cir. 2021) .................... 12, 21

*Scalia v. Cty. of Kern*, 308 F. Supp. 3d 1064 (E.D. Cal. 2018).............................24

*Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) .........................................................18

*Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090 (9th Cir. 2006) ...........10

*Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168 (N.D. Cal. 2017) ..............25

**Statutes**

Government Code § 845.6 ........................................................................................25

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

## I. INTRODUCTION

Roselee Bartolacci was a developmentally disabled woman with an extensive history of mental illness, which had been managed successfully by her mother, Roseann. For 32 years, Roselee lived a remarkably full life surrounded by love and attention. Roselee lived at home with her mother rather than being institutionalized.

On April 6, 2023, after a new adjustment with her medication, Roselee suffered sudden, acute psychosis. Breaking from reality and hearing voices, Roselee hit Roseann with a hammer. Roseann called the police to get emergency medical care and asked for a PERT clinician. When deputies arrived, Roseann reported Roselee's active psychosis and asked that they take her to a psychiatric hospital to be stabilized. Roseann told the deputies about Roselee's extensive history of mental illness and cognitive disability and asked for help with this medical emergency.

Rather than taking Roselee to be treated for her active psychosis and hallucinations, the deputies arrested Roselee and took her to Las Colinas Jail, then failed to communicate to intake staff that Roselee was experiencing an acute mental health crisis and needed emergency psychiatric treatment. Despite Roselee's presentation of psychosis, history of mental illness and inability to answer a single question during screening, intake staff decided Roselee was just being "uncooperative" and cleared her for admission. They failed to consult the San Diego Regional Center as required to ascertain whether Roselee was fit for booking.

At Las Colinas, Roselee quickly decompensated. She was thrown in solitary confinement for her first five days where she continued to spiral out of control, screaming. She refused psychiatric medications, food, and fluids. Unable to take care of even the most basic needs, she languished in cells that were full of trash, urine and feces. Despite their awareness of Roselee's rapid and continuing decline, Defendants did nothing. They made no effort to medicate or feed her through an IV; they made no effort to have her transferred to a facility that could provide basic care; they failed to consult with the San Diego Regional Center as required by

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

California law and County policy; and they failed to monitor her or take her vital signs. Even after Roselee returned to Las Colinas after being treated in the hospital for life threatening conditions, Jail staff did nothing, causing Roselee to immediately and rapidly decline once again. They failed to treat her for hypokalemia, a potentially lethal condition that is easily treated with cheap, common supplements. They knew Roselee stopped eating. Yet they failed to weigh her. They sat idly by as Roselee lost over 40 pounds. On May 28, 2023, Roselee was found dead in her filthy cell, already cold to the touch.

## II.   LEGAL STANDARD

"Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). The test is whether the complaint alleged "enough facts to state a claim to relief that is plausible on its face." *Id*. at 547. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At the pleadings stage, litigants can plead alternative theories of liability. Fed. R. Civ. P. 8(d)(2).

## III.   FACTUAL BACKGROUND

### A. Roselee Bartolacci Was Gravely Disabled.

Roselee Bartolacci suffered from bipolar type schizoaffective disorder, developmental disorder, ADHD, depression and mild mental retardation. (ECF No. 57, FAC at ¶¶ 35-36.) She functioned like an eight-year-old, unable to care for herself and entirely dependent on her mother, Roseann. *Id*. Roselee was under the care of the San Diego Regional Center ("SDRC") which provides support and services to persons with developmental disabilities. *Id*. ¶ 37. On April 6, 2023, Roselee, while experiencing psychosis and hearing voices, hit Roseann with a hammer. *Id*. ¶ 45. Roseann called the police to ask for a PERT clinician. *Id*. ¶ 46. Defendant deputies Carlon, Crawford, Walters and Taylor responded. *Id*. ¶¶ 47, 52.

Roseann told the deputies that Roselee had hurt her because she was hearing voices and experiencing acute psychosis. *Id*. ¶ 48. Roseann reported the following: (1) Roselee suffered from schizoaffective and bipolar disorders and she needed emergency psychiatric treatment; (2) Roselee was experiencing hallucinations and hearing voices; (3) Roselee lacked the capacity to understand what was happening due to her severe cognitive impairment; and (4) Roselee was a SDRC client. *Id*. ¶ 49, 51, 53. This information was shared with all four deputies. *Id*. ¶¶ 49-53. At least one of them already knew Roselee and the extent of her mental health issues and disability. *Id*. ¶ 50. They all knew that Roselee needed emergency psychiatric treatment. *Id*. ¶ 54. Instead, they took her to Las Colinas to be booked. *Id*. ¶¶ 56-57.

At intake, Carlon failed to communicate that Roselee was experiencing severe psychosis and required emergency psychiatric treatment. *Id*. ¶ 59. Carlon answered "no" to both intake questions, "Are you aware of any illness or injuries?" and "Do you have any additional information to help us care for the patient's health and safety?"" *Id*. ¶¶ 59-60. Carlon failed to disclose the extent of Roselee's acute psychosis and that the initial call to 911 was a request for a PERT clinician and a 5150 hold. *Id*. ¶¶ 61-62. The deputies failed to notify the Jail staff that Roselee was a patient of the SDRC and made no efforts to contact the SDRC. *Id*. ¶ 63.

Defendant Mata completed Roselee's medical clearance screening. *Id*. ¶ 65. Mata knew Roselee was unable to sign the informed consent forms. *Id*. ¶ 66. Either the deputies failed to notify Mata that Roselee was a patient of SDRC or Mata chose to ignore it. *Id*. ¶ 67. Mata could see that Roselee lacked the capacity to understand or answer the most basic questions. *Id*. ¶ 68. Sheriff's Department Policy E.2.1 provides that certain behaviors, such as thought disorganization, nonsensical communication, altered mental status, confusion and psychosis, may necessitate further evaluation at the emergency department or a psychiatric hospital prior to the inmate being accepted into the jail. *Id*. ¶ 69. It was readily apparent to Mata and Defendant Monti, who was responsible for classification, receiving and screening

Roselee, that she exhibited some or all of these behaviors. *Id*. ¶¶ 70-71. Monti was responsible for assessing whether she was fit for admission into Las Colinas. *Id*. Given Roselee's presentation of grave disabilities, history of chronic mood disorders, inability to sign her name or answer questions, it was obvious to Mata and Monti that Roselee was in severe psychiatric distress and required transfer to a psychiatric hospital per policy. *Id*. ¶ 72. Rather than undertaking the required investigation into whether Roselee was fit for booking, Mata and Monti labeled her as "uncooperative" and "unpredictable" and booked her into the jail. *Id*. ¶¶ 73-75.

Under Cal. Code Regs. Tit. 15 ("Title 15"), § 1057, the Regional Center shall be contacted "for any incarcerated person suspected or confirmed to have a developmental disability for the purposes of diagnosis or treatment within 24 hours of such determination, excluding holidays and weekends." *Id*. ¶ 81. Given Roselee's disabilities, her need for accommodation was obvious. *Id*. ¶ 76. No one called Roselee's SDRC case manager until April 20, 2023 — two weeks after her arrest. *Id*. ¶ 86.

Because they had failed to conduct adequate screening, Defendants Monti, Maraia and Banuelos interpreted Roselee's symptoms as intransigence and punished her by placing her into administrative segregation, which is solitary confinement, for five days. *Id*. ¶¶ 78, 83. This was despite prior warnings by staff that patients decompensate in solitary and it is not clinically safe. *Id*. ¶¶ 83-85. This caused the downward spiral of Roselee's condition, resulting in her death. *Id*. ¶ 79.

Roselee refused all her prescribed medications while in solitary from April 7-11. *Id*. ¶¶ 88, 94, 98, 112. On April 9, Roselee was seen at her cell by Defendant Reynoso. *Id*. ¶ 89. Roselee did not respond to Reynoso and was making nonsensical statements in a dirty cell with food on the floor. *Id*. ¶ 90, 91. Reynoso assessed Roselee as being mentally retarded but ignored her obligation to contact SDRC. *Id*. ¶ 92. Reynoso recorded Roselee's schizoaffective disorder, bipolar disorder, delusions, hallucinations and disorganized and incoherent speech. *Id*. ¶ 93. Reynoso

knew that Roselee had refused all of her prescribed medication for three days. *Id.* ¶ 94. Seeing her rapidly worsening condition, Reynoso scheduled Roselee for a psychiatric sick call which would not occur for another two days, and left Roselee in solitary to further decompensate. *Id.* ¶¶ 95-96.

On April 12, Roselee was admitted to the Women's Psychiatric Stabilization Unit ("WPSU"). *Id.* ¶ 104. The admission plan directed staff to take routine vitals. *Id.* In conducting the Admission Assessment, defendant Germono ignored the plan and failed to take Roselee's vitals, including weight. *Id.* ¶¶ 105-106. Germono noted Roselee was "child-like," sucking her fingers, babbling, could not make eye contact and unable to cooperate. *Id.* ¶ 107. Germono knew Roselee was refusing her medications and that she was a client of the SDRC but did not contact them. *Id.* ¶¶ 108-109. Seeing Roselee's dire situation, Germono did nothing. *Id.* ¶ 111.

From April 6 to April 11, Defendants Sanoni, Reyes, Ellsworth, Montoy, Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho and Hadley (collectively, "Ad-Seg Deputies") conducted checks of Roselee's cell. *Id.* ¶ 113. They each saw that Roselee's cell was dirty and littered with trash. *Id.* They saw Roselee sitting naked on the floor, sucking her fingers and covered in urine and feces. *Id.* They saw her putting items in the toilet, mumbling to herself and refusing to eat her meals for days. *Id.* Their cell checks were untimely and insufficient to monitor Roselee's well-being. *Id.* ¶ 114. They conducted flyby checks, only glancing into the cell without checking the welfare of inmates. *Id.* They failed to comply with Title 15's requirement for timely cell checks. *Id.* ¶ 116. They did not notify anyone regarding Roselee's condition or the condition of her cell. *Id.* They failed to initiate the required protocol for inmates refusing to eat. *Id.*

**B. Roselee's Condition Continues to Deteriorate in the PSU.**

Roselee continued to decline between April 12 and April 26. *Id.* ¶ 117. She refused medication, food and hydration. *Id.* She was incapable of interacting with medical staff. *Id.* Her cell was filthy, malodorous and covered in food, urine and

feces. *Id*. On April 14, Sparks reported Roselee was not even able to participate in an assessment. *Id*. ¶ 120. Sparks knew Roselee was developmentally disabled and under the care of the SDRC yet failed to contact Roselee's case manager until April 21, relating only that Roselee was "not doing well." *Id*. ¶¶ 121-122. Sparks failed to relay that Roselee was decompensating from the interruption of critical antipsychotic medication or that she was living in complete filth. *Id*. ¶ 123.

On April 17, Defendant dietician Rioveros reviewed Roselee's chart and knew Roselee was not eating. *Id*. ¶¶ 125-126. She knew that Roselee's weight had not been recorded since she was admitted and relied only on her weight at booking. *Id*. Rioveros instructed staff to consider a gastric diet without examining Roselee and with no weight history. *Id*. ¶¶ 127-128. Though she knew that Roselee was not eating, Rioveros did not order that Roselee be weighed and did not recommend lab testing to assess Roselee's nutrition and levels of dehydration. *Id*. ¶¶ 129-130.

Despite being aware of the seriousness of Roselee's condition, no one intervened to assess her medical needs at any point between April 12 and April 26. *Id*. ¶ 131.  They failed to consistently take Roselee's vitals. *Id*. ¶ 134. Sheriff's Department Policy MSD.H.12 requires that the RN staff conduct an assessment of patients who refuse to eat that includes weight and vital signs. *Id*. ¶ 136. The patient should be scheduled for RN sick call "daily to monitor weight, medical condition and hydration status." *Id*. Despite their repeated documentation that Roselee was refusing food, Defendants never weighed Roselee. *Id*. ¶ 137.

### C. Roselee is Admitted to the Hospital where Her Dire Condition Significantly Improves.

On April 26, Roselee was transported to Alvarado Hospital Medical Center ("AHMC") suffering from weakness and dehydration. *Id*. ¶ 138. The ER doctor noted Roselee "had a high probability of imminent or life-threatening deterioration" which required immediate admission. *Id*. ¶ 140. Roselee was diagnosed with numerous conditions, including hypokalemia (low potassium) and severe

malnutrition. *Id*. ¶ 141. Roselee remained at AHMC for 14 days, during which her condition markedly improved until she was discharged and returned to Las Colinas on May 10. *Id*. ¶¶ 142-143. Roselee had lost 33 pounds from the time she was admitted to Las Colinas. *Id*. ¶ 144. Though medical staff at Las Colinas were aware of Roselee's diagnosis and treatment at AHMC, they made no effort to have her transferred to a facility that could appropriately care for her. *Id*. ¶ 145.

### D. Roselee Returns to Las Colinas and Swiftly Deteriorates.

Upon her return to Las Colinas, Roselee was admitted to the Medical Observation Bed Unit ("MOB"). *Id*. ¶ 146. Defendant Esquivel noted Roselee's discharge diagnoses. *Id*. Though she knew that Roselee had been hospitalized with severe malnutrition, Esquivel did not weigh Roselee. *Id*. ¶ 147. In the MOB, Roselee was not eating solid foods and was only intermittently drinking fluids. *Id*. ¶ 148. On or about May 16, Naphcare Defendant Anderson ordered that Roselee be weighed once a week. *Id*. ¶ 149. Ignoring this directive, from May 16 until her death, no one ever took Roselee's weight. *Id*. ¶ 151. On May 18, Roselee was seen incoherently mumbling with feces and vomit on the floor and had to be sent to Sharp Grossmont Hospital for refusing food, fluids and her medications. *Id*. ¶¶ 152, 153. By May 20, Roselee had not had food or fluids for 48 hours. *Id*. ¶ 154. She was sent back to the hospital where they noted her urine was dark brown and foul smelling. *Id*. Roselee was once again diagnosed with hypokalemia and treated with K Dur. *Id*. Hypokalemia is caused by malnutrition, vomiting or kidney disease. *Id*. When untreated, hypokalemia causes arrhythmia and can cause cardiac arrest. *Id*. K Dur is a common mineral supplement used to treat or prevent hypokalemia. *Id*.

Defendants knew that Roselee had been successfully treated for hypokalemia at AHMC with a supplement before she returned to Las Colinas on May 21 but failed to treat her with it. *Id*. ¶ 156.  On May 22, Roselee was admitted to the WPSU where Germono conducted the assessment and could see Roselee's declining

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

condition. *Id*. ¶¶ 158-159. She knew Roselee was starving but took no vital signs and did not weigh her, in violation of jail policy. *Id*. Germono noted that Roselee was a client of SDRC but took no action. *Id*. ¶ 160.

On May 24, Anderson finally spoke with Roselee's SDRC case manager and asked about the SDRC's access to placement facilities for Roselee. *Id*. ¶ 166. This is the only documented interaction between Jail medical staff and the SDRC. *Id*. ¶ 167. This conversation occurred **48 days** after Roselee was booked into the Jail. *Id*.

On May 25, Rioveros knew Roselee was still not eating. *Id*. ¶ 169. She had access to medical charts which contained critical information, including her repeat hypokalemia diagnoses. *Id*. Rioveros recommended a soft diet, once again without examining her. *Id*. ¶ 170. Rioveros did not recommend blood be drawn to assess levels of potassium. *Id*. ¶ 171. Rioveros documented that no weight had been recorded since Roselee was booked into jail and that she should have it checked. *Id*. ¶ 172. Rioveros knew that tracking weight was critical yet failed to weigh her. *Id*.

As of May 25, Roselee had again refused any food, fluids and medications for a full 48 hours. *Id*. ¶ 175. Roselee did not consume any solid foods for eight days, from the time of her return from AHMC on May 21 until her death. *Id*. ¶ 176. Between May 15 and May 20, Defendants Lam and Axelsson (collectively, "Hygiene Check Deputies") were responsible for conducting hygiene checks on Roselee's cell. *Id*. ¶ 178. These defendants did nothing. *Id*. They made no effort to provide basic sanitation and permitted Roselee to remain in rotting food, urine and feces. *Id*. On May 28 and May 29, Defendants Leonard, Kuder, Millard, Vasquez, Millard, Wilson and supervisors Boatright and Nanusevic (collectively, "WPSU Deputies") conducted cell checks. *Id*. ¶ 179. They saw Roselee's dire condition and saw her dying in her own filth. *Id*. Deputies are required to check for the wellbeing of incarcerated persons under California state law. *Id*. ¶ 180.

At approximately 11:36 p.m. on May 28, Roselee was found in her bed, cold to the touch, likely dead long before she was found. *Id*. ¶¶ 182-183. Defendants

Leonard, Kuder, Millard, Vasquez, Wilson, Boatright and Nanusevic failed to conduct regular cell checks. *Id*. ¶ 184. They violated California state law on conducting safety checks of patients to ensure they are not in medical distress. *Id*. They failed to render timely and adequate medical care. *Id*. Roselee was pronounced dead at 00:12 a.m. on May 29. *Id*. ¶ 185. At autopsy, Roselee weighed 41 pounds less than she weighed when she was booked into Las Colinas. *Id*. ¶ 186.

## IV.  ARGUMENT

### A. Plaintiff Has Sufficiently Alleged a Deliberate Indifference Claim.

The Due Process Clause of the Fourteenth Amendment guarantees that pretrial detainees receive constitutionally adequate medical and mental health care. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1122 (9th Cir. 2018). Claims for violations of the right to adequate medical care brought by pretrial detainees must be evaluated under the objective deliberate indifference standard. *Id*. at 1124-25.

1. Carlon, Crawford, Walters and Taylor.

Carlon, Crawford, Walters and Taylor knew that Roselee was suffering from acute psychosis but refused to provide emergency medical care. These defendants knew that Roselee was unable to comprehend what was happening because of her severe intellectual disability. A reasonable officer, knowing someone was in an acute state of emergency in which she is hallucinating and hearing voices, would have gotten help from a mental health professional. Whether these defendants had probable cause to arrest Roselee is beside the point. The issue here is whether a reasonable officer would have provided constitutionally adequate psychiatric care to someone known to be suffering from an active crisis by taking her to a facility that could stabilize her before taking her to jail. A reasonable jury could consider that California Welfare and Institutions Code § 5150 was implemented for this particular emergency situation and conclude that it violated Roselee's rights when the deputies failed to transport her to any facility to obtain basic monitoring or clearance for a psychiatric emergency.

Law enforcement officers are required under the Fourth Amendment to provide objectively reasonable post-arrest care, and the minimum Ninth Circuit standard requires officers to summon necessary medical help or take an injured arrestee to a hospital. *Est. of Cornejo ex rel Solis v. City of Los Angeles*, 618 Fed. App'x 917, 920 (9th Cir. 2015); *Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006). In *Ames v. Cnty. of San Bernardino*, No. ED-CV-181362-JGB-JEMx, 2020 WL 5875012 (C.D. Cal. July 30, 2020), the decedent was arrested for being under the influence of methamphetamine, and ultimately died in a holding cell. *Id.* at *3-*4. Because the officers failed to take the decedent to a hospital instead of jail, and failed to communicate the seriousness of decedent's drug use, the court denied the defendant's motion for summary judgment. *Id.* at *6.

While Defendants argue that they had no reason to believe intake screening by a medical staff at the jail would be insufficient, that is a question of fact and the jury can consider that the first time anyone with even basic psychiatric training even saw Roselee was three days after she had already been decompensating in segregation.

A jury could find that a reasonable officer would have provided emergency medical care instead of immediately booking Roselee in jail in her unstable, psychotic condition. A jury may also consider that in failing to transport Roselee to a hospital or a 5150 hold, these defendants cut off any line of communication between Roselee's mom and medical staff, which deputies knew was critical for Roselee's treatment given that Roselee lacked capacity to speak or understand. This was compounded by the deputies' failures to notify the SDRC, which resulted in no one being able to assist Roselee in communicating.

After arguing that, on the one hand, Carlon, Crawford, Walters and Taylor could reasonably assume Roselee would receive adequate medical care in jail, and on the other, Defendants argue they had no obligation to communicate crucial information about her condition that might allow her to receive proper care. They

cannot have it both ways. Carlon mentioned nothing about the need to contact the SDRC or that the initial call by Roseann had been for an emergency psychiatric hold for an ongoing acute psychosis. Arresting and transporting officers have an obligation to transmit critical medical information to the Jail staff. *Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009) (amended and superseded on other grounds) (clearly established that the transporting officers must report incidents to those who will next be responsible for an arrestee's custody and safety); *see also Enyart v. Cnty. of San Bernardino*, No. 5:23-CV-00540-RGK-SHK, 2024 WL 2104489, at *5 (C.D. Cal. Apr. 22, 2024).

***Because*** Carlon, Crawford, Walters and Taylor brought Roselee into the jail for booking in an acutely psychotic state without the capacity to communicate, and then failed to provide critical information about her mental illness, the housing deputies labeled Roselee "uncooperative" and "unpredictable" and punished her by housing her in segregation before she could see a doctor. Instead of seeing a psychiatrist, Roselee was thrown into solitary confinement, often referred to as the "hole", for five days specifically because of the volatile condition in which she was brought to the jail. Because she was in the hole, Roselee finally saw a psychiatrist five days later, during which she continued her downward spiral. Whether timely treatment at a hospital by a psychiatrist or treatment under 5150 would have stabilized Roselee before booking and whether defendants caused an unreasonable delay in Roselee receiving emergency psychiatric treatment is a pure question of fact for the jury.

A reasonable jury could conclude Defendants' failure to either transport Roselee to the hospital or inform the Jail staff of Roselee's acute psychosis and developmental disorder, caused Roselee to be placed in isolation with no psychiatric help for five days during which her condition irreversibly deteriorated. and that this failure set off a chain of events which led to Roselee's suffering and death.

## 2. <u>Paul Mata and Jeffrey Monti.</u>

The Sheriff's Department Policy E.2.1 provides that certain behaviors, such as thought disorganization, nonsensical communication, altered mental status, confusion and psychosis, may necessitate further evaluation at the emergency department or a psychiatric hospital prior to the inmate being accepted into the jail. At intake, defendants could see Roselee exhibited every single one of these behaviors. She could understand nothing. She could not answer a single question. She could not sign a single form. In the grip of a full-blown psychosis, Rosalee could only hear voices and speak in gibberish. Despite clear signs that Roselee was gravely disabled and incapable of communicating, intake nurse, Paul Mata, and classification deputy, Jeffrey Monti, labeled Roselee as "uncooperative." There was no basis for this determination given clear signs that Roselee lacked the ability to "cooperate." Any reasonable nurse or deputy responsible for intake screening would have followed the jail's own policy and sent Roselee to the hospital for stabilization rather than clear her as fit for booking.

Mata and Monti assert that their conduct was reasonable because the County has psychiatric units and mental health care. But they ***didn't*** refer Roselee for immediate treatment at the psychiatric unit or receive mental health care. Instead, Monti punished Roselee for her perceived intransigence and placed her in segregation, where she spiraled into an even deeper psychosis for five days.[1] By labelling Roselee as "uncooperative", "unpredictable" and ordering her into segregation, Mata and Monti actively prevented others from providing immediate care because they signaled to others that Roselee was volitionally choosing to be uncooperative. This is evidenced by the fact that Roselee languished in segregation for three days before she saw a mental health clinician.

---

[1] Defendants Maraia and Banuelos have not challenged the sufficiency of any allegations against them and have waived their right to do so.

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

It has long been held that "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Sandoval v. County of San Diego*, 985 F.3d 657, 679–80 (9th Cir. 2021) (*discussing Jett v. Penner*, 439 F.3d 1091, 1097–98 (9th Cir. 2006); *Clement v. Gomez*, 298 F.3d 898, 902, 904–05 (9th Cir. 2002); and *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)). Deliberate indifference may be shown when "prison officials deny, delay or intentionally interfere with medical treatment[.]" *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). A jury could find that as a result of Mata and Monti's disregard of the obvious signs that Roselee was gravely disabled and in the midst of a severe psychotic episode, Roselee was denied intervention she might otherwise have received from other providers.

### 3. Evangelina Reynoso.

Evangelina Reynoso was the first mental health professional to assess Roselee as she languished in solitary confinement. Reynoso saw Roselee lying in filth, incapable of responding to her with anything other than gibberish nonsense. Reynoso could see that Roselee was not, as Mata and Monti had dismissively labelled her, "uncooperative" but that Roselee had no ability to cooperate because she suffered from mental retardation. Reynoso instantly recognized that Roselee's placement in administrative segregation was a grave mistake and that if left there, she would continue to decompensate and spiral to the point of no return. Reynoso knew of the risks posed to Roselee if she remained in segregation because outside practitioners had repeatedly warned the Jail that leaving a mentally ill patient in administrative segregation was dangerous. FAC at ¶ 84.

It was Reynoso's job to contact the SDRC for emergency intervention. The state law requiring immediate notification was specifically intended to prevent the exact harm that Roselee endured. A reasonable mental health professional would have contacted the SDRC immediately, ensured Roselee was removed from solitary

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

confinement and provided emergency psychiatric treatment. Instead, Reynoso made Roselee someone else's problem and walked away. As a result, no doctor saw Roselee for another two days while she continued her downward spiral. Reynoso saw Roselee at a critical juncture, just days into her confinement, when the SDRC could have intervened to make medical decisions on Roselee's behalf. Reynoso was the first responder to deal with Roselee's psychiatric emergency and by failing to correct the course, she set off a chain of events in which Roselee continued to decompensate for days in the hole, becoming more difficult for the subsequent providers to treat. Reynoso's conduct was a substantial factor not only in Roselee's pain and suffering before death, but ultimately in others' leaving her to die. *See Chaudry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014).

### 4. Macy Germono and Sherry Esquivel.

When seeing Roselee on two occasions, Macy Germono failed to do a single thing she was required to do by state law and the Jail's written policies. When Roselee was admitted to the WPSU, her admission plan **required** nurses to take vitals. Germono ignored the order and took no vital signs. This alone constitutes deliberate indifference. *Morton v. Cnty. of San Diego*, No. 21-cv-1428, MMA-DDL, 2024 WL 1642809, at *2 (S.D. Cal. Apr. 16, 2024) (denying motion to dismiss deliberate indifference claim to mental health clinician who failed to perform a follow-up ordered by another clinician).

Germono, dealing with a "childlike" patient with mental retardation who was babbling nonsense, sucking her fingers and who was incapable of making eye contact, still decided to take no action. Germono knew Roselee had been refusing her psychiatric medications and that she was a client of the SDRC, but still did nothing. Knowing that Roselee's condition was so dire that she was being admitted to the Jail's psychiatric ward, Germono ignored her obligation under California state law to contact the SDRC to get intervention for Roselee, who was rapidly declining. As a result, Roselee was denied an emergency intervention.

When Germono saw Roselee again on May 22, she could see that Roselee had lost a substantial amount of weight since she had seen her the month before. Germono knew that the Jail policy for patients refusing to eat required that Roselee be weighed daily. Even though Germono knew Roselee had been hospitalized for starvation and hypokalemia, she still ignored Jail policy and failed to weigh her.

Germono was well aware of the dangers of failing to weigh a patient because her own failure to weigh another patient who suffered from congenital heart failure in 2019 resulted in grave consequences. *See Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 20-cv-00457-RBM-DEB, 2023 WL 8360718, at *8 (S.D. Cal. Dec. 1, 2020). Knowing that her patient, Michael Wilson, had died from lack of medication and weight monitoring just two years earlier, Germono continued to engage in the same conduct in ignoring her obligations.

Esquivel displayed the same indifference after Roselee returned from two weeks in the hospital, having been treated for a host of life-threatening conditions. Esquival knew from the discharge documents that the hospital had weighed Roselee and that she had lost 33 pounds. Esquivel knew Roselee's discharge diagnoses and the treatment for severe malnutrition. Esquivel was well aware that she was *required* by the Jail policies to weigh Roselee. Esquivel did nothing.

Any objectively reasonable nurse would have weighed Roselee, knowing that the consequences of failing to weigh someone suffering from starvation can be deadly. Both defendants argue that the FAC fails to allege any specific harm suffered by Roselee because of their refusal to weigh her. Weighing a patient is so critical for their care that it is required as a part of the patient's standardized vital signs. Weight, in addition to pulse and blood pressure, is monitored in order to identify and treat life threatening conditions. Particularly in a jail setting where multiple doctors and nurses treat patents day to day, a subsequent provider would not know without objective, quantifiable vital signs if a patient has rapidly lost weight or they are naturally thin. This was especially critical for patients like

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

Roselee who cannot communicate their symptoms. A jury could find that by ignoring policy and refusing to weigh Roselee, Germono and Esquivel intentionally deprived other medical providers information vital to their ability to treat her. A reasonable jury can find that had Germono and Esquivel obtained Roselee's weight, the severity of her malnutrition would have prompted other medical providers to provide swift and aggressive nutritional intervention. The FAC sufficiently alleges that Germono and Esquivel were deliberately indifferent to Roselee's medical needs and that they prevented Roselee from receiving effective treatment, exacerbated her condition and prolonged her suffering.

     5.  <u>Janine Sparks.</u>

Sparks knew as of April 14 that Roselee's condition was dire. Inexplicably, Sparks waited seven days before she contacted the SDRC. When she finally called, she relayed only that Roselee "was not doing well." There was no justification for such an unreasonable delay only to report something meaningless. Sparks deliberately withheld information from the SDRC that was critical to Roselee's diagnosis and treatment, including the fact Roselee was refusing her psychiatric medications. SDRC clients lack legal capacity to refuse treatment, but SDRC would not know it needed to step in because it was never told. Title 15 required Sparks to provide a full and complete picture of Roselee's condition. A reasonable clinician would have relayed that (1) Roselee was speaking in gibberish without the basic capacity to communicate or understand what is happening to her; and (2) she was decompensating without her antipsychotic medication regimen. A reasonable clinician, who complies with state law, would have sought assistance from the SDRC, an agency specializing in treatment of patients like Roselee with extreme intellectual deficiencies. Because Sparks chose not to provide any meaningful information, the SDRC had no way of knowing it needed to intervene. Sparks then failed to properly treat Roselee after her second admission to the WPSU on May 22. Sparks knew that Roselee had been treated for hypokalemia but took no action

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

to ensure she received it. Failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need. *Johnson v. Schwarzenegger*, 366 F. App'x 767, 770 (9th Cir. 2010).

### 6. Diorella Rioveros.

Rioveros may not be dismissed from the case based on her own factual allegation that dieticians have no obligation to evaluate or weigh a person when they are asked to consult on a patient who is refusing food. Plaintiff has adequately alleged that Rioveros knew that Roselee was not eating, and knew the health risks posed by her failure to eat, yet twice made the decision not to examine Roselee. A reasonable provider, understanding the risk posed by hypokalemia, would have ordered or recommended labs to assess Roselee's condition. By the second time she dealt with Roselee, Rioveros knew that in more than a month, no one had weighed Roselee. She did nothing to find out how much weight Roselee had lost or what may be causing it. A reasonable provider, knowing Roselee had stopped eating, would have taken action to deliver hydration and nutrition. A reasonable provider would have seen the patient and taken her weight. A reasonable provider would have considered total parenteral nutrition or at least discussed this option with medical staff. Rioveros took none of these steps and stood idly by. In doing so, Rioveros was deliberately indifferent to Roselee's medical needs.

### 7. Cell Check and Hygiene Check Defendants.

Ad-Seg Deputies and the WPSU Deputies failed to conduct regular checks, required by 15 C.C.R. § 1027. They failed to conduct checks sufficient to check on her welfare, instead conducting "flybys" in which they glanced into her cell without checking on her welfare. They further violated Title 15 by failing to conduct cell checks within 60 minutes of the last round. This was made particularly evident upon her death, when Roselee was found cold in her cell, hours after she had died.

The Ad-Seg Deputies were responsible for conducting checks of Roselee's cell as she languished in segregation between April 6 and April 11. They saw

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

Roselee living in squalor, her cell strewn with trash.  She was naked, sucking her thumbs and covered in urine and feces. They saw her stuffing random items in the toilet, mumbling to herself and not eating for days. They knew she was not eating because they could see uneaten food piled up and rotting around her. Thy knew of the risk to Roselee's health posed by living in such dangerous and toxic conditions but did nothing. They did not initiate the protocol for inmates refusing to eat as they were required to do under the written policy and they did not alert anyone to the condition of her cell so that it could be sanitized. These deputies violated California state law and left Roselee in filth.

The Hygiene Check Deputies demonstrated the same deliberate indifference. These deputies were responsible for conducting hygiene checks on Roselee's cell from May 15 to May 29, when Roselee was found dead surrounded by piles of trash, rotting food, urine and feces. A jury could find that the volume of waste discovered in Roselee's cell on May 29 was so extreme that it would have been impossible for it to accumulate overnight. Instead, this was culmination of *weeks* of neglect by the Hygiene Check Deputies, in which they ignored Roselee's appalling living conditions and took no action to provide even the most basic level of sanitation. They saw these conditions on the last day of Roselee's life, but likewise did nothing as she lay dying in filth.  By the time Roselee was discovered, she had already turned cold, which means no one checked on her welfare for hours.

Defendants contend that this Court must dismiss Plaintiff's claims because the FAC does not itemize each time entry of the cell checks conducted in this case. This is not a motion for summary judgement. Plaintiff has given defendants adequate notice of the nature of its claims that they deliberately violated state law and left Roselee to die in squalor, rotting food and her own filth. Nothing more is required. *Starr v. Baca*, 652 F.3d 1202, 1212 (9th Cir. 2011) ("The theory of Rule 8(a), and of the federal rules in general, is notice pleading.").

**B. Plaintiff Has Alleged Sufficient Facts Against DOES 7-27 and 44-55.**

"Where the identity of the alleged defendant is not known prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants. . . ." *Hernandez v. San Bernardino Cnty.*, No. EDCV-22-1101-JGB-SPx, 2023 WL 3432206, at *3 (C.D. Cal. Jan. 26, 2023) (*quoting Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980). Plaintiff has alleged claims against DOE Defendants with specificity, providing notice of the nature of claims against each defendant.

DOES 7-27 were medical personnel who failed to provide psychiatric or medical care to Roselee Bartolacci despite knowing Roselee was refusing medication, food and hydration; was unable to interact with medical staff; and was languishing in a filthy cell. They failed to treat Roselee's condition even after she returned from hospital for treatment of life-threatening conditions. FAC at ¶ 27-26. They repeatedly failed to weigh Roselee, in violation of department policy which required that inmates not eating be weighed daily. They failed to order potassium supplement for Roselee's known hypokalemia. They knew of their obligation to contact SDRC for diagnosis and treatment within 24 hours, yet failed to do so.

DOES 44-55 were supervisors, responsible for supervising, disciplining, and training subordinates and responsible for promulgating policies and practices. *Id*. ¶ 30. They failed to train and supervise their subordinates on (1) the need to communicate critical medical information, including between Jail staff and outside agencies, including the SDRC; (2) the need to transmit critical information; (3) the need to classify and house seriously ill inmates; and (4) the need to provide care of monitoring of seriously ill inmates through frequent and regular cell checks and monitoring of vital signs. *Id*. ¶ 339. These defendants knew of numerous instances of deaths related to the inadequate provision of medical care but failed to properly supervise or discipline their employees. *Id*. ¶ 347. These allegations are sufficient to put the County on notice of the claims at issue.

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

**C. Plaintiff Has Sufficiently Alleged a 1983 Claim for Failure to Train, Supervise and Discipline.**

Plaintiff's second cause of action is pursuant to 42 U.S.C. § 1983 against the supervisory defendants for their failure to train, supervise and discipline.  Plaintiff has sufficiently alleged that these defendants were aware of the previous instances of misconduct and took no action to prevent the infliction of Constitutional violations on Roselee.  Defendants move to dismiss the second cause of action based on California Government Code section 844.6. Because this cause of action does not sound in negligence, California immunities do not apply.

**D. Plaintiff Has Sufficiently Alleged a *Monell* Claim against the County.**

The County's written policy on contacting the Regional Center when developmentally disabled individuals are booked into the jail is facially deficient because it failed to specify in accordance with Title 15, § 1057 that staff were required to contact the Regional Center for the ***purposes of diagnosis or treatment***. FAC at ¶ 355. On its face, the County's policy requires only that jail staff report the presence of a developmentally disabled person. *Id*. ¶ 356. As a result of the deficient policy, not a single employee contacted the SDRC to request a diagnosis or treatment by the Center until four days before Roselee's death, denying SDRC the opportunity to engage in a critical early intervention that could have prevented Roselee from decompensating the point of no return.

Plaintiff has alleged numerous pervasive and widespread customs adopted by the County that violate pretrial detainees' Fourteenth Amendment right to medical care, including (1) failing to provide medication to patients suffering acute psychiatric conditions; (2) failing to properly screening inmates at intake, and not identifying or treating those with severe developmental disabilities; (3) allowing gravely and developmentally disabled inmates to make medical decisions for themselves, including to dictating their own medical care and food and water intake, when they obviously lacked the capacity to do so; (4) ignoring critical medical information and failing to communicate those conditions; (5) failing to take vital

signs and weighing those in obvious medical distress; (6) permitting its employees to ignore patient medical records; (7) failing to conduct proper cell checks or monitoring, as required by Title 15; and (8) failing to conduct proper hygiene and sanitation checks of inmate's cells. *See generally Id*. ¶¶ 365-378. The County knew that its unconstitutional practices and customs had resulted in a series of preventable and tragic deaths[2], including the deaths of Christopher Carroll, Ruben Nunez, Richard Boulanger, Heron Moriarty, Jose Sevilla, Lonnie Rupard and Matthew Settles. The County knew that Jail staff's failure to weigh critically ill patients had led to the deaths of Michael Wilson, Elisa Serna and Lonnie Rupard. *Id*. ¶ 215.

The County has recycled the same losing argument that Plaintiff's *Monell* allegations are deficient despite multiple Courts finding virtually identical allegations to be sufficient. *See Est. of Wilson*, 2023 WL 8360718, at *29-31 (finding a *Monell* violation based on the same *de facto* policies where San Diego Jail nurses denied decedent heart medication). In *Greer*, the plaintiff had alleged the same *de facto* policies on denial of medical care and failure to communicate that are alleged here. *Greer v. Cnty. of San Diego*, No. 19-cv-0378-GPC-AGS, 2019 WL 5453955 (S.D. Cal. Oct. 24, 2019). The Court found that the County was liable under *Monell* because the plaintiff had pleaded "specific instances of death and injury to inmates due to the denial of needed medical care. These repeated incidences allegedly resulted from Jail staff's failures to communicate medical needs and coordinate care for inmates' known medical conditions." *Id*. at *10. Plaintiff in this case has alleged a myriad of sources including prior inmate deaths, the state auditor's scathing report, and NCCHC report alerting the County of its

---

[2] Contrary to the County's assertion, Plaintiff is not required to cite to cases involving mental health screening or deaths resulting from a failure to force feed or hydrate an inmate. See *Sandoval*, 985 F.3d at 682 (internal citation omitted) ("A constitutional injury can be substantially certain to follow from a practice even if an injury has yet to occur. If this were not the case, every municipal defendant would get one "free pass" for unconstitutional policies or practices."

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

gross deficiencies, which made Defendants aware that they were failing to conduct proper screening at intake, failing to perform cell checks for hours, and failing to provide medical care to those with urgent medical needs, causing injuries and deaths. FAC at ¶¶ 215-237.

Despite the Department's awareness of the high rate of preventable inmate deaths, it took no steps to abate that risk by properly training, monitoring, and supervising its subordinates. This failure gave the inference of a municipal custom that authorized or condoned staff misconduct.  In *Canton,* the Court recognized that *Monell* liability may attach when a facially valid policy is unconstitutionally applied by a municipal employee "if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). "Policy of inaction" is the functional equivalent of a decision by the city itself to violate the Constitution." *Id.* at 394-95. (O'Connor, J., concurring in part and dissenting in part.).

The Ninth Circuit has recognized evidence of inaction, including failure to train employees, can form a "policy of inaction" and the basis for municipal liability.  See *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011). "We have long recognized that a custom or practice can be 'inferred from widespread practices or 'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Id.* at 1233. (internal citations omitted).[3] Here, even in the face of a slew of preventable deaths, the County did nothing to retrain its employees. That is made evident by the fact

---

[3] Even without the clear pattern of prior violations alleged by the plaintiff, conducting intake, performing cell checks, giving medication to patients, and taking vital signs are recurring situations that occur on a daily basis. Death and serious injuries are highly predictable consequences of the County's failure to train its employees to perform these critical tasks, such that a pattern of misconduct is not even required. See *Bd. of Cnty. Commissioners v. Brown*, 520 U.S. 397, 409 (1997); *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

that not a single employee weighed Roselee or gave her life saving supplements; no one called SDRC for over 40 days; and deputies went so long without conducting cell checks that Roselee was already cold to the touch when they found her.

Moreover, constitutional violations by employees are *not* a prerequisite to a *Monell* claim in the Ninth Circuit. *See Richards v. County of San Bernardino, et al.*, 39 F.4th 562, 574 (9th Cir. 2022). The Constitutional deprivations suffered by Roselee were not only the result of the conduct of individual defendants, but also arose from the collective inaction of the County as a result of its employees' adherence to the County's unconstitutional practices. The County is liable for those practices even if every individual defendant is exonerated "on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." *Id*. The County's failures were the moving force that caused Roselee's death and its motion to dismiss Plaintiff's *Monell* claim should be denied.

**E. Plaintiff Has Properly Alleged a Bane Act Claim.**

The County continues to argue that the threat, intimidation or coercion under Section 52.1 must be pled as a separate and distinct act from the underlying misconduct. The County advances this frivolous argument despite being told repeatedly by Courts in this District that *Shoyoye* no longer applies given that the Ninth Circuit explicitly rejected this contention seven years ago. *See Greer v. County of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2021 WL 615046, at *9 (S.D. Cal. Feb. 17, 2021); *Dalton v. County of San Diego*, No. 21-CV-2143 W (WVG), 2022 WL 1214438, at *7-8 (S.D. Cal. Apr. 25, 2022); *Est. of Schuck by & through Schuck v. Cnty. of San Diego*, No. 23-CV-785-DMS-AHG, 2024 WL 500711, at *11 (S.D. Cal. Feb. 8, 2024).

The Ninth Circuit has held "the Bane Act does not require the 'threat, intimidation[,] or coercion' element of the claim to be transactionally independent from the constitutional violation alleged" so long as the claimant shows the defendant had a "specific intent" to commit the constitutional violation. *Reese v.*

*County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018). An allegation of a defendant's deliberate indifference to a plaintiff's serious medical needs suffices to state a claim under the Bane Act because of the coercion, or specific intent, inherent in the deliberate indifference standard. *E.g.*, *Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) (emphasis added) (finding sufficient acts that are inherently coercive and threatening, such as ***housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observations***); *Scalia v. Cty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("[A] prison official's deliberate indifference to serious medical needs is a coercive act that rises above mere negligence."); *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013) ("Because deliberate indifference claims necessarily require more than 'mere negligence,' a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs in violation of his constitutional rights presents a case far more like *Venegas* than *Shoyoye* and adequately states a claim for relief under the Bane Act."); *see also Cornell v. City & Cnty. Of Sacramento*, 17 Cal. App. 5th 766, 802 n.31 (2017). As to "specific intent" under the Bane act, *Reese* held that it is met by showing a defendant acted with reckless disregard to the plaintiff's rights. *Reese*, 888 F.3d at 1045; *accord Est. of Serna v. County of San Diego*, No. 20CV2096-LAB-MSB, 2022 WL 827123 at *8 (S.D. Cal. Mar. 18, 2022) (holding the "intent requirement is satisfied where the defendant allegedly acted with reckless disregard of the right at issue.") (internal citations omitted); *Greer*, 2021 WL 615046, at *9. Both *Serna* and *Greer* involved similar conduct of the medical staff's denial of medication to patients in the San Diego County jails.

     A local government can be vicariously liable for its employees' Bane Act violations under a theory of *respondeat superior*. *Gant v. County of Los Angeles*, 772 F.3d 608, 623 (9th Cir. 2014). Because Plaintiff has adequately set forth a Bane

OPPOSITION TO COUNTY OF SAN DIEGO DEFENDANTS' MOTION TO DISMISS FAC

Act claim against the individual County defendants, Plaintiff has also set forth a Bane Act claim against the County. Defendants' motion to dismiss must be denied.

### F. Plaintiff Has Sufficiently Alleged a Negligence Claim.

Government Code § 845.6 provides that a public employee and the public entity are liable for an injury proximately caused to a prisoner where the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to summon such medical care. *See also Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1384 (2010). Here, each defendant was aware that Roselee was experiencing a critical medical emergency and acute psychosis, life threatening conditions from her refusal to eat or drink. They failed to summon medical care and left Roselee to die. The supervisory defendants are liable for their employees' failure to summon medical care under Government Code § 845.6 for negligent supervision and training as to when to summon medical care. *See Villarreal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1187 (N.D. Cal. 2017); *Greer v. Cnty. of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2020 WL 1864640, at *7 (S.D. Cal. Apr. 14, 2020); *Greer v. Cnty. of San Diego*, 726 F.Supp.3d 1058, 1085 (S.D. Cal. 2023) (denying summary judgment to County because negligence theory was predicated on County employee's failure to provide emergency medical care.)

### V. CONCLUSION

Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss. In the alternative, should the Court find any deficiency in the pleading, Plaintiff respectfully requests leave to amend.

DATED: September 15, 2025          Respectfully Submitted,


                                   s/ Sarah Musumeci
                                   _____
                                   **EUGENE IREDALE**
                                   **JULIA YOO**
                                   **SARAH MUSUMECI**
                                   Attorneys for Plaintiff