1  EUGENE G. IREDALE: SBN 75292
2  JULIA YOO: SBN 231163
3  SARAH MUSUMECI: SBN 328306
   IREDALE & YOO, APC
4  105 West F Street, Fourth Floor
5  San Diego, CA 92101-6036
   TEL: (619) 233-1525
6  Attorneys for Plaintiff
7

8            **UNITED STATES DISTRICT COURT**
             **SOUTHERN DISTRICT OF CALIFORNIA**
9

10  THE ESTATE OF ROSELEE              CASE NO. 24-cv-01156-WQH-JLB
    BARTOLACCI, by and through its
11  successor in interest, ROSEANN     **PLAINTIFF'S OPPOSITION TO**
    BARTOLACCI,                        **CORRECTIONAL HEALTHCARE**
12                                     **PARTNERS, INC., DAVID**
                                       **CHRISTENSEN M.D., LACEY**
13             Plaintiff,              **BEASTON AND TERESA**
                                       **HURLEY'S MOTION TO**
14  v.                                 **DISMISS PLAINTIFF'S FIRST**
                                       **AMENDED COMPLAINT**
15  COUNTY OF SAN DIEGO, *et al.*,
                                       Hon. William Q. Hayes
16
               Defendants.
17

18

19                                     **NO ORAL ARGUMENT UNLESS**
                                       **REQUESTED BY THE COURT**
20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................................1

II.    LEGAL STANDARD .................................................................................2

III.    FACTUAL BACKGROUND.......................................................................3

   A.  Roselee Bartolacci Languishes and Dies in Las Colinas After CHP Medical Providers Choose Not to Treat Her on Multiple Occasions. ............................3

IV.    ARGUMENT...............................................................................................8

   A.  Plaintiff Has Sufficiently Alleged a Deliberate Indifference Claim Against Christensen, Beaston and Hurley.................................................. 8

    1.    Christensen Was Deliberately Indifferent.......................................8

    2.    Beaston Was Deliberately Indifferent....................................................12

    3.    Hurley Was Deliberately Indifferent.........................................................15

   B.  Plaintiff Has Sufficiently Stated a *Monell* Claim Against CHP. ........... 17

   C.  Plaintiff Has Sufficiently Alleged a Bane Act Violation Against All CHP Defendants. ...................................................... 20

   D.  Plaintiff Has Sufficiently Alleged a Negligence Cause of Action Against All CHP Defendants. ...................................................... 21

V.    CONCLUSION.............................................................................................23

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662  (2009)................................................................2

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................3

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) ...........................15

*Clement v. Gomez*, 298 F.3d 898 (9th Cir. 2002)..................................................9

*Corales v. Bennett*, 567 F.3d 554 (9th Cir. 2009)..................................................22

*Cornell v. City & Cnty. Of Sacramento*, 17 Cal. App. 5th 766, (2017)..................21

*Deloney v. Cnty. of Fresno*, No. 117CV01336LJOEPG, 2019 WL 1875588 (E.D. Cal. Apr. 26, 2019) .................................................................................................21

*Est. of Schuck by & through Schuck v. Cnty. of San Diego*, No. 23-CV-785-DMS-AHG, 2024 WL 500711 (S.D. Cal. Feb. 8, 2024)...............................................22

*Est. of Wilson by & through Jackson v. Cnty. of San Diego,*729 F.Supp.3d 1039 (S.D. Cal. 2024)....................................................................................................16

*Fairley v. Luman*, 281 F.3d 913 (9th Cir. 2002)...................................................17

*Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175 (9th Cir. 2002) ..........................15

*Gordon v. Cnty. of Orange*, 888 F.3d 1118 (9th Cir. 2018) ....................................8

*Greason v. Kemp*, 891 F.2d 829 (11th Cir. 1990) ................................................12

*Greer v. Cnty. of San Diego*, 19-cv-0378-GPC-AGS, 2021 WL 615046 (S.D. Cal. Feb 17, 2021)........................................................................................................11

*Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058 (S.D. Cal. 2023)....................21

*Hayes v. Cnty of San Diego*, 57 Cal. 4th 622 (2013)..............................................21

*Hunt v. Dental Dep't*, 865 F.2d 198 (9th Cir. 1989)...............................................9

*Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136 (9th Cir. 2020) ...........18

*Jackson v. Germono*, No. 23-4408, 2024 WL 4144074 (9th Cir. Sept. 11, 2024)..11

*Jett v. Penner*, 439 F.3d 1091 (9th Cir. 2006) .......................................................9

*Johnson v. Schwarzenegger*, 366 F. App'x 767 (9th Cir. 2010) .............................11

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

*Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183 (E.D. Cal. 2018)........................................................................................................20

*Linarez-Rodriguez v. Honea*, No. 22-cv-1692 KJN P, 2024 WL 402811 (E.D. Cal. Feb. 2, 2024).....................................................................................11

*Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal 4th 291 (1995)..................22

*LSO, Ltd. v. Stroh*, 205 F.3d 1146 (9th Cir. 2000) ........................................3

*M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889 (N.D. Cal. 2013) ............................21

*Morton v. Cnty. of San Diego*, No. 21-cv-1428-MMA-DDL, 2024 WL 1642809 (S.D. Cal. Apr. 16, 2024) ....................................................................16

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ..............................................2

*Ortiz v. City of Imperial*, 884 F.2d 1312 (9th Cir. 1989)..........................10

*Oviatt v. Pearce*, 954 F.2d 1470 (9th Cir. 1992) ...............................17

*Richards v. County of San Bernardino, et al.*, 39 F.4th 562 (9th Cir. 2022)...........20

*Russell v. Lumitap*, 31 F.4th 729 (9th Cir. 2022) ...............................10

*Sandoval v. Cnty. of San Diego*, 985 F.3d 657 (9th Cir. 2021) ................... 8, 14, 15

*Scalia v. Cty. of Kern*, 308 F. Supp. 3d 1064 (E.D. Cal. 2018)............................20

*Schwarz v. United States*, 234 F.3d 428 (9th Cir. 2000) ........................3

*Steele v. Shah*, 87 F.3d 1266 (11th Cir. 1996) ........................................12

*Venegas v. County of Los Angeles*, 32 Cal.4th 820 (2004)....................................21

*Villegas v. Cate*, No. 10-cv-01917-AWI, 2012 WL 4863065 (E.D. Cal. Oct. 11, 2012)........................................................................................13

**Rules**

Fed. R. Civ. P. 8(a)(2)..............................................................................2, 11

Fed. R Civ. P. 12(b)(6)...............................................................................2

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

# I.  INTRODUCTION

Roselee Bartolacci was a developmentally disabled woman with an extensive history of mental illness. She functioned at the level of an eight-year-old. Roselee was booked into the Las Colinas Detention Facility in April of 2023. Away from her mother and unable to take care of herself, Roselee was entirely dependent on the staff and medical professionals of Las Colinas to ensure her health, safety and well-being. Three of those medical professionals were David Christensen, M.D. and nurse practitioners Teresa Hurley and Lacey Beaston. These defendants were employees of Correctional Healthcare Partners ("CHP"). Roselee quickly decompensated in the Jail. She refused psychiatric medications, food, and fluids. Unable to take care of herself, she languished in filthy cells that were full of trash, urine and feces.

Defendants were aware of Roselee's rapid and continuing decline, yet they made no effort to medicate her, give her nutrition through an IV, have her transferred to a facility that could provide any meaningful care, properly monitor her, or take her vital signs. They failed to contact the San Diego Regional Center to help diagnose and treat Roselee, in breach of their obligations under California state law and Jail policy. Though they knew Roselee was refusing medications and fluids, and living in a dangerously toxic environment exposing her to disease and sepsis, they did nothing. Even after Roselee returned from the hospital after being treated for a host of life-threatening conditions of which Defendants were aware, they did nothing.

When Christensen learned Roselee was vomiting, he prescribed Zofran without a physical examination to determine the cause or to rule out any serious conditions. At no point did Christensen, a doctor whose job was to coordinate care among providers, examine Roselee or provide any life-saving care. Christensen knew Roselee had been diagnosed with and treated for hypokalemia (low potassium), a condition that can be fatal when left untreated. Yet, when notified

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

Roselee is vomiting, Christensen took no steps to assess whether the life threatening hypokalemia may be recurring.

Christensen went to Roselee's cell a few days before her death, but did not bother to enter her cell to examine her or provide any care. By this time, Roselee had fully decompensated from the complete lack of psychiatric medication. From outside the cell, Christensen could see that Roselee was sitting in a pile of trash and fecal matter. She had lost 40 pounds. She had not eaten solid foods for at least three days. Christensen stood outside the cell, watched a human being suffer, turned and left here there to die.

Beaston knew that Roselee suffered from a potentially lethal condition for which she had been hospitalized. She knew that the hospital had given Roselee a simple vitamin to treat her dangerously low potassium level. Seeing Roselee quickly decline back at the jail, Beaston did nothing to provide a simple readily available vitamin that could have saved Roselee's life.

Hurley was responsible for Roselee's care for weeks and watched her rapidly decline each day. Hurley saw Roselee moaning and crying like a child in her cell on the last day of her life. Instead of rendering emergency medical care to Roselee as she lay dying, Hurley walked away and left her there moaning and crying for her mom. Roselee was found dead in filth and trash just hours later. She was 32 years old.

## II. LEGAL STANDARD

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A claim will normally survive a motion to dismiss if it offers a "short and plain statement...showing that the pleader is entitled to relief." See Fed. R. Civ. P. 8(a)(2). This statement "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

When considering a Rule 12(b)(6) motion, the court must accept as true all factual allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1150 n. 2 (9th Cir. 2000). Such allegations must be construed in the light most favorable to the nonmoving party. *Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000).

### III. FACTUAL BACKGROUND[1]

**A. Roselee Bartolacci Languishes and Dies in Las Colinas After CHP Medical Providers Choose Not to Treat Her on Multiple Occasions.**

Defendant David Christensen, M.D. was a medical doctor employed by CHP. ECF No. 57, FAC at ¶ 18. Defendants Teresa Hurley and Lacey Beaston were nurse practitioners employed by CHP. *Id.* ¶¶ 20-21. CHP was a third-party contractor to the San Diego County Sheriff's Department. *Id.* ¶ 24. CHP supervised and trained Christensen, Hurley and Beaston. *Id.* Roselee was under the care of each of these defendants at various times during her incarceration at the Las Colinas Detention Facility. *Id.* ¶¶ 118, 131, 157, 161.

Roselee suffered from severe psychiatric issues. *Id.* ¶ 35. She was diagnosed with bipolar type schizoaffective disorder as a child. *Id.* Roselee had a history of developmental disorder, ADHD, depression and mild mental retardation. *Id.* ¶ 36. She functioned at the level of an eight-year-old, unable to care for herself independently. *Id.* Roselee was under the care of the San Diego Regional Center ("SDRC"), which provides support and services to persons with developmental disabilities. *Id.* ¶ 37.

---

[1] For the sake of brevity, plaintiff incorporates by reference the additional factual allegations set forth in Plaintiff's opposition to the County's motion to dismiss (ECF No. 66).

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

On or about April 6, 2023, while struggling with an adjustment to her psychiatric medications, Roselee hit her mother with a hammer and was arrested. *Id*. ¶¶ 44-45, 56. Soon after she was booked at Las Colinas, Roselee began to decompensate; she refused all prescribed medications, including psychiatric medications. *Id*. ¶¶ 57, 88. From April 6 to April 12, Roselee refused all her medications. *Id*. ¶¶ 88, 94, 98, 117. Between April 12 and April 26, Roselee was under the care of Christensen and Hurley, among others. *Id*. ¶¶ 117-118. Roselee's condition continued to decline, as she consistently refused medication, food and hydration. *Id*. ¶ 117. She was agitated, intermittently yelling, and staring into space. *Id* She was unable to interact with the medical staff. *Id*. Her cell was filthy, malodorous and covered in food, urine and feces. *Id*. On or about April 14, Roselee began vomiting. *Id*. ¶ 119. Christensen knew she was vomiting and prescribed Zofran but there is no notation that he ever saw or examined Roselee. *Id*.

Despite being aware of the seriousness of Roselee's condition, Christensen and Hurley both failed to intervene to assess her medical needs at any point between April 12 and April 26. *Id*. ¶ 131. They failed to consistently take Roselee's vital signs. *Id*. ¶ 134. They knew that Roselee was not eating and that she was vomiting. *Id*. ¶ 135. Christensen and Hurley both failed to transfer Roselee to a facility where she could receive adequate psychiatric care, despite their knowledge of the ongoing, serious decline in Roselee's mental and physical health. *Id*. ¶ 132.

Sheriff's Department Medical Services Division Policy MSD.H.12 provides guidelines for the care of patients who refuse to eat. *Id*. ¶ 136. The policy mandates that nursing staff do an assessment that includes weight and vital signs. *Id*. In addition, the patient should be scheduled for an RN sick call "daily to monitor weight, medical condition and hydration status." *Id*. Despite the repeated documentation that Roselee was refusing food, Christensen and Hurley made no effort to weigh Roselee. *Id*. ¶ 137.

Under Cal. Code Regs. Tit. 15 ("Title 15"), § 1057, the Regional Center shall be contacted "for any incarcerated person suspected or confirmed to have a developmental disability for the purposes of diagnosis or treatment within 24 hours of such determination, excluding holidays and weekends." *Id.* ¶ 81. There is no record of any communication between Christensen, Hurley or Beaston and Roselee's SDRC case manager. *Id.* ¶ 86. Christensen, Hurley and Beaston knew they were required to regularly and thoroughly consult with the San Diego Regional Center to coordinate Roselee's placement, care, and to ensure her health, safety, and well-being. *Id.* ¶ 316. They knew, or should have known that Roselee was unable to advocate for herself and required a guardian or representative to advocate for her. *Id.* Despite this knowledge, neither Christensen, Hurley or Beaston made any effort to contact the Regional Center. *Id.*

Roselee's condition continued to decline and she spent two weeks at the Alvarado Hospital Medical Center ("AHMC"). *Id.* ¶¶ 138, 142. When she was admitted to AHMC, the ER doctor noted that Roselee "had a high probability of imminent or life-threatening deterioration" which required immediate and direct attention. *Id.* ¶ 140. At AHMC, Roselee was diagnosed with several conditions, including acute renal failure with tubular necrosis (kidney disorder that can lead to acute kidney failure); hypokalemia (low potassium); severe malnutrition; and sepsis. *Id.* ¶ 141. Roselee's condition improved with hospital intervention but when she was released, she was returned to Las Colinas. *Id.* ¶¶ 142-143. Though the defendants were aware of Roselee's diagnosis and treatment at AHMC, they made no effort to have Roselee transferred to a facility that could appropriately care for her. *Id.* ¶ 145.

When she returned to Las Colinas, Roselee declined once more. *Id.* ¶ 148. She was not caring for herself or maintaining her hygiene. *Id.* She was not eating solid foods and was only intermittently drinking fluids. *Id.* Despite her ongoing starvation, no medical professional, including Christensen, Hurley and Beaston

weighed Roselee from May 16 until her death. *Id.* ¶ 151. On or about May 18, there was feces on Roselee's cell floor and vomit near her bed. *Id.* ¶ 152. She was mumbling, incoherent and unable to respond to questions. *Id.*

As of May 20, Roselee had not eaten food or consumed fluids for 48 hours. *Id.* ¶ 154. Her urine was dark brown and smelled foul. *Id.* The same day, she was sent back to AHMC where she was diagnosed with hypokalemia and vomiting and treated with K Dur. *Id.* K Dur is a common mineral supplement used to treat or prevent low potassium in the blood. *Id.* Hypokalemia, low levels of potassium in the blood, is caused by malnutrition, vomiting or kidney disease. *Id.* Potassium is critical to the proper functioning of nerve and muscle cells, particularly heart muscle cells. *Id.* When untreated, hypokalemia causes arrhythmia and can cause cardiac arrest. *Id.* Potassium levels ranging from 3.5 mmol/L to 5.5 mmol/L are considered normal for adults. *Id.* ¶ 155. Below 3.5 is hypokalemia. *Id.* Roselee's level at AHMC was 3.3 mmol/L. *Id.* This level was such that it was easily treatable with supplements. *Id.*

Christensen, Hurley and Beaston knew that Roselee had been treated for hypokalemia at AHMC but did not continue to treat her hypokalemia with supplements or by ensuring she was eating or drinking when she returned to Las Colinas. *Id.* ¶ 156.

Beaston was the medical professional who conducted the post-ER visit evaluation of Roselee upon her return from AHMC on May 21. *Id.* ¶ 157. Beaston knew that Roselee had been sent to AHMC for not eating and drinking, that she had been diagnosed with hypokalemia at AHMC and treated with K Dur, and that she was at great risk of dehydration due to her mental state. *Id.* But when Roselee declined Beaston's offer of a sandwich, Beaston simply ordered that medical staff should encourage her to eat and drink. *Id.* ¶ 156. Beaston did not order K Dur or any other potassium supplement, despite her knowledge that Roselee was suffering from hypokalemia. *Id.*

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

On May 22, Roselee was admitted to the Women's Psychiatric Stabilization Unit ("WPSU.") *Id.* ¶ 158. Roselee was once again placed under the care of Christensen and Hurley, among others. *Id.* ¶ 161. Roselee's admission note indicated that Roselee had not been eating and drinking enough, and she was vomiting. *Id.* ¶ 162. Roselee's medical records showed that she had been hospitalized with hypokalemia between April 26 and May 10. *Id.* The records indicated that Roselee was declining in a jail setting. *Id.*

Lauren Anderson, an employee of another contractor, Naphcare, ordered that Roselee be monitored and encouraged to eat and drink, and again, that her vitals and weight be checked weekly. *Id.* ¶ 163. For an unknown reason, Roselee's vital signs were recorded for the last time on May 24. *Id.* ¶ 164.

On May 24, Christensen went to assess Roselee but did not enter her cell. *Id.* ¶ 165. He did not examine Roselee or obtain her vital signs. *Id.* Christensen had access to Roselee's medical records which indicated her serious medical conditions and her hospitalization with hypokalemia. *Id.* He ordered no medication, even those that had been given to Roselee in the hospital. *Id.* Christensen either failed to review Roselee's medical records or he ignored them. *Id.*

On or about May 25, Dietician Diorella Rioveros noted that Roselee should have her weight checked to monitor nutrition, and Rioveros documented that no weight had ever been recorded for Roselee since she was first booked into the jail. *Id.* ¶¶ 168, 172. Christensen and Hurley ignored this note and did not weigh Roselee. *Id.* ¶¶ 173-174.

As of May 25, Roselee had refused medications, food and fluids for a full 48 hours. *Id.* ¶ 175. Roselee did not consume any solid foods for eight days, from the time of her return to Los Colinas from AHMC on May 21 until her death. *Id.* ¶ 176. On that eighth day of Roselee's starvation, May 28, Hurley saw Roselee at her cell. *Id.* ¶ 177. Roselee was laying in her bed, covered with a blanket and was moaning and crying. *Id.* There was a heavy ammonia scent in her room and full trays of

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

uneaten food on her counter. *Id*. Hurley's "treatment plan," as Roselee laid there dying in her filth, was to continue to offer fluids, Ensure and favorite foods to encourage intake. *Id*.

At approximately 11:36 p.m. the same day, Roselee was found unresponsive in her bed. *Id*. ¶ 182. She was pronounced dead shortly after midnight. *Id*. ¶ 185. Roselee had lost 41 pounds since being booked into Las Colinas. *Id*. ¶ 186.

## IV. ARGUMENT

### A. Plaintiff Has Sufficiently Alleged a Deliberate Indifference Claim Against Christensen, Beaston and Hurley.

Claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard. *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). "[T]he plaintiff must prove more than negligence but less than subjective intent–something akin to reckless disregard." *Id*. at 1125.

#### 1. Christensen Was Deliberately Indifferent.

Taking the facts and inferences in light most favorable to the nonmoving party, Christensen saw a childlike young woman sitting in her own filth, crying, babbling, staring into space, and rapidly losing a dangerous amount of weight. Christensen could see from the medical records that the Jail medical staff's treatment was so deficient that the emergency room doctor immediately admitted Roselee into the hospital to keep her from dying. When Roselee recovered and was sent back to the Jail, Christensen, who is the medical doctor responsible for coordinating Roselee's care, chose to do nothing. As a result of Christensen's failures, other care providers also did nothing and Roselee died.

It has long been held that "a prison official who is aware that an inmate is suffering from a serious acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Sandoval v. County of San Diego*, 985 F.3d 657, 679–80 (9th Cir. 2021)

(discussing *Jett v. Penner*, 439 F.3d 1091, 1097–98 (9th Cir. 2006); *Clement v. Gomez*, 298 F.3d 898, 902, 904–05 (9th Cir. 2002); and *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)). Deliberate indifference may be shown when "prison officials deny, delay or intentionally interfere with medical treatment[.]" *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).

Christensen knew that Roselee was a client of the SDRC, and that both Title 15 and jail policy required him to coordinate Roselee's care with her Regional Center representative. Christensen knew that Roselee lacked capacity to refuse medical treatment. He was aware that only a guardian could make medical decisions on Roselee's behalf. Yet he did nothing to comply with the law. The purpose of the policy which required Christensen to contact the SDRC is to prevent the very type of harm and suffering Roselee endured.

Christensen failed to provide Roselee with critical medical treatment on multiple occasions. On April 14, though Roselee was noted to be refusing medication, food and fluids, and living in a cell covered in uneaten food, urine and feces, Christensen chose not to examine Roselee. A reasonable doctor would have considered that intractable vomiting could have multiple possible underlying causes, some of which could be life-threatening. Christensen knew that Roselee suffered from a serious condition which required hospitalization.  Christensen prescribed Zofran to treat vomiting without ever examining his patient to assess or treat the underlying condition. Christensen argues that "this action reflects professional judgement and constitutes a medical intervention." ECF No. 60-1, p. 12. The Ninth Circuit has held that when "deciding whether there has been deliberate indifference to an inmate's serious medical needs, we need not defer to the judgment of prison doctors or administrators." *Hunt*, 865 F.2d at 200. Here, his "professional judgment" was to prescribe anti-nausea medication while choosing to ignore the patient's underlying cause for her starvation, dehydration and failure to thrive.  A reasonable doctor with knowledge that Roselee was consistently refusing

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

medication, food and fluids, vomiting and languishing in a filthy cell would have examined Roselee, at a minimum to measure her weight or to check for physical pain or infection. Vomiting was only one of a multitude of symptoms of a serious underlying condition.

Christensen justifies his failure to examine Roselee on April 14 by pointing to Roselee's supposed inability to participate in Defendant Sparks' examination that day because Sparks found her "too disorganized, nonsensical, and internally preoccupied." According to Christensen, Roselee's response to Sparks made his "basic assessments impractical." ECF No. 60-1, p. 13. First, given that he never attempted to examine Roselee, he would not know whether it was practical or impractical. Christensen's assertion appears to be that when he has a gravely disabled patient who is too mentally ill to communicate her condition, he is not required to conduct an assessment. But this gets Christensen's obligations backward — the very fact that Roselee could not communicate the basis for her vomiting should have alerted a reasonable doctor that he was *required* to physically examine his patient and independently assess the underlying cause. Instead of contacting the SDRC as he was required to in order to coordinate care, Christensen used Roselee's disability as an excuse to avoid caring for his patient.

It is deliberate indifference to prescribe medication without any assessment and to ignore symptoms of serious illness. *See Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (reversing district court's grant of summary judgment to a doctor on deliberate indifference claim where the doctor knew of plaintiff's head injury but prescribed sedatives over the phone without examining the patient.) Medically inadequate treatment does not defeat a claim of deliberate indifference. *See Russell v. Lumitap*, 31 F.4th 729, 743 (9th Cir. 2022) (denying summary judgment on qualified immunity to doctor who "could not have reasonably believed based on clearly established law that he could provide constitutionally adequate care without even examining a patient with Russell's symptoms who had not

responded to a dose of nitroglycerin."); *Linarez-Rodriguez v. Honea*, No. 22-cv-1692 KJN P, 2024 WL 402811 (E.D. Cal. Feb. 2, 2024) (nurse's prescription of only Tylenol and Ibuprofen for plaintiff's kidney stone constituted deliberate indifference).

The complaint alleges that despite being aware of the seriousness of Roselee's condition, Christensen failed to intervene to assess Roselee's medical needs at any point between April 12 and April 26. Defendant quarrels that these allegations are "vague and generalized" (ECF No. 60-1, p. 12), but the specific allegation here is that for each single day within those fourteen days, Christensen did nothing to treat a patient who continued to decline substantially and rapidly. Fed. R. Civ. P. 8(a)(2) does not require that Plaintiff lay Defendants' omissions out day by day in separate paragraphs.

Christensen knew that Roselee had been treated for hypokalemia at AHMC but did not continue to treat her serious condition with supplements such as K Dur or by ensuring that she was eating or drinking. This amounts to deliberate indifference. *See Johnson v. Schwarzenegger*, 366 F. App'x 767, 770 (9th Cir. 2010) (failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need.); *see also Greer v. Cnty. of San Diego*, 19-cv-0378-GPC-AGS, 2021 WL 615046 (S.D. Cal. Feb 17, 2021) (denying a motion to dismiss when a reasonable physician would know the dangers of delaying or missing doses of detainee's medication); *Jackson v. Germono*, No. 23-4408, 2024 WL 4144074 (9th Cir. Sept. 11, 2024) (medical staff's failure to provide all doses of heart medication to a patient with congestive heart failure was in disregard of a substantial risk to decedent's health).

A reasonable doctor with the knowledge Roselee was suffering from hypokalemia, a potentially lethal condition, would have ordered K-Dur or another potassium supplement to treat her. A reasonable doctor would have ordered bloodwork to closely monitor her potassium levels. A reasonable doctor would have

taken action to ensure Roselee was eating and drinking to maintain her potassium levels, by ordering IV nutrition and hydration if necessary. Failing that, a reasonable doctor would have taken action to have Roselee transferred to a facility that could provide adequate care for her.

On May 24, Christensen once again failed to examine Roselee though he had access to the medical records which showed Roselee was suffering serious medical conditions which posed an immediate and excessive risk to her health. Those records showed that Roselee had not been eating and drinking and that she was vomiting. Those records showed she was not functioning in jail and that she had been hospitalized with hypokalemia. Either Christensen was deliberately indifferent when he ignored the critical information or he failed to review the records altogether. Courts have held that a refusal to thoroughly review an inmate's medical file to become aware of pertinent information can itself constitute deliberate indifference. *See Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990); *Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996). In any event, when Christensen went to Roselee's cell on May 24, the reasonable inference is that he saw with his own eyes what was reflected in weeks' worth of medical records: a vulnerable, child-like woman who was starving and languishing in her own filth. Still, Christensen refused to enter her cell to render aid. He did not weigh her, he did not take her vitals and he did not make any effort to transfer her to a facility that could provide adequate medical care. Knowing that Roselee's condition is so serious that she had to be hospitalized, he walked away and left Roselee to die.

2. Beaston Was Deliberately Indifferent.

Like Christensen, Beaston knew Roselee was a client of the SDRC and that she was *required* by jail policy and Title 15 to coordinate Roselee's care with her Regional Center representative. Beaston violated this policy and made no effort to contact the Center.

When Beaston examined Roselee, she acknowledged and documented in her medical note that Roselee had been sent to AHMC and treated with K Dur to address her hypokalemia. Beaston was aware that Roselee had not been eating or drinking due to her mental illness, and that Roselee was at great risk of dehydration. Beaston knew that hypokalemia can be fatal when left untreated. Despite this, Beaston did nothing to ensure that Roselee would receive medicine for this easily treatable deficiency. Beaston is a nurse practitioner authorized to prescribe medication to patients. *See Villegas v. Cate*, No. 10-cv-01917-AWI, 2012 WL 4863065, at n.3 (E.D. Cal. Oct. 11, 2012) ("Nurse practitioners are permitted to prescribe medication…"); *accord Williams v. Kernan*, No. C 07-5574 MMC (PR), 2013 WL 556147, at *10 (N.D. Cal. Feb. 12, 2013). Despite having the ability and authorization to do so, Beaston did not prescribe a potassium supplement for Roselee and did not recommend that anyone else do so. A reasonable nurse practitioner knowing Roselee was suffering from a potentially fatal potassium deficiency would have ordered K Dur or another potassium supplement. A reasonable nurse practitioner would have ordered labs to continuously monitor Roselee's potassium levels upon her return to Las Colinas. Beaston did neither of these things. Her failure to provide continuity care amounts to deliberate indifference.

Beaston knew that Roselee had ended up in the emergency room as a result of not eating or drinking. She knew that this was an ongoing serious problem. Beaston knew this was a continuing problem because Roselee refused to eat the food Beaston had offered her.[2] Instead of taking any action, Beaston ordered that Roselee remain in the same unit and for medical staff to continue to encourage

---

[2] Beaston argues that she was never advised of Roselee's continued refusal of food or liquids. On a motion to dismiss, Beaston is not entitled to her own facts. A reasonable inference a jury could draw is that Beaston knew that Roselee was refusing food, which was the only reason why she made an entry that day for others to "encourage" Roselee to eat.

Roselee to eat and drink. Beaston already knew at this point that "encouragement" had resulted in Roselee becoming critically ill and Roselee had ended up in the emergency room. Given Beaston's access to Roselee's medical records and her knowledge that Roselee had been refusing nutrition and hydration for weeks, she knew this was useless and futile.

The fact that Beaston saw Roselee once is immaterial. Even if a medical provider only encounters a patient once, failure to provide adequate treatment to the patient may constitute deliberate indifference to a pretrial detainee's serious medical need. *Sandoval v. Cnty. of San Diego*, 985 F.3d 657 (9th Cir. 2021). In *Sandoval*, the Ninth Circuit reversed summary judgment on a deliberate indifference claim against a jail nurse. Defendant nurse de Guzman only encountered the decedent once, administered a blood test, asked for him to be moved to a sobering tank, and then neglected to check on him again during the rest of her six hour shift. Deputies had informed de Guzman that the decedent was sweating, tired, and disoriented, and there was "something going on [with him] so you need to look at him more thoroughly." *Id.* at 670. The court held a jury could conclude a reasonable nurse would have understood that the plaintiff faced a substantial risk of suffering serious harm. *Id.* "Sweating and being so disoriented that officers observe and comment about it are not everyday conditions," the court reasoned, and de Guzman's six-hour neglect of plaintiff following the blood test was "akin to reckless disregard." *Id.*

During Beaston's encounter, she knew that Roselee faced a substantial risk of serious harm, as did the nurse in *Sandoval*. Beaston knew that (1) Roselee was suffering from hypokalemia so serious that it required admission at AHMC; and (2) Roselee continued to refuse food at the time she saw her. Unlike *Sandoval*, Beaston did not have to rely on the secondhand account of a deputy with no medical training; she specifically acknowledged Roselee's serious need for medicine in her medical note. "If it is a constitutional violation to delay treatment for four hours for inmates

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

exposed to pepper spray, or to fail to promptly set a fractured thumb, — neither of which are potentially life-threatening conditions—the same must be true for failing to provide any meaningful treatment to an inmate who was sweating and appeared so tired and disoriented that a deputy urged that he be re-evaluated." *Sandoval*, 985 F.3d at 680.

Like sweating and disorientation, refusing to eat to the point of hospitalization is not an "everyday condition," and the failure to ensure that Roselee received her medicine already proven to work to keep Roselee alive is akin to the reckless disregard found in *Sandoval*. Drawing all inferences in favor of the nonmoving party, this allegation makes clear that Beaston was on notice Roselee was still refusing food, which could easily cause hypokalemia, a life-threatening condition and she did nothing.

### 3. Hurley Was Deliberately Indifferent.

On May 28, Hurley encountered a severely afflicted Roselee, hours away from her death, covered in blankets, moaning, and crying. Hurley knew Roselee had lost a significant amount of weight because Roselee had been under her care for weeks. Roselee's condition on May 28 was the culmination of several weeks' worth of Hurley's deliberate indifference. Yet, Hurley did nothing as Roselee wasted away in her own filth. Hurley did not render emergency aid, call paramedics or alert a doctor, as a reasonable medical professional would have done. *See Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1194 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1194-95 (9th Cir. 2016) (finding deliberate indifference where a nurse failed to provide emergency aid or hospitalize pretrial detainee). Hurley's only "plan" was to continue to encourage Roselee, who was speaking gibberish and sitting in her own urine, to eat and drink. It was evident that her "plan" had not worked for weeks.

Hurley's argument that Plaintiff did not allege what she did to treat Roselee prior to May 28 is correct because, as Plaintiff has alleged, Hurley did nothing to

OPPOSITION TO CHP DEFENDANTS' MOTION TO DISMISS FAC

treat Roselee. The Medical Services Division Policy for patients who refuse to eat, requires RN staff to monitor patients' weight, medical condition, and hydration status ***daily***, schedule a psychiatric sick call, and assess the patient's medical and psychiatric history. Further, like her colleagues, Hurley was required by Title 15 to contact the SDRC. Hurley did none of these things while Roselee was under her care and made no request that anyone else comply with either of these policies.

The FAC alleges that between May 22 and May 28, Roselee was committed to Hurley's care. It is reasonable to infer that Hurley knew that a patient in her care had recently been hospitalized and that she was declining rapidly in the jail. Hurley knew that on May 25, dietician Rioveros stated Roselee needed to be weighed. Hurley did nothing. Ignoring the dietician's direction to weigh Roselee and doing nothing posed a substantial risk to Roselee's health. *See Morton v. Cnty. of San Diego*, No. 21-cv-1428-MMA-DDL, 2024 WL 1642809 (S.D. Cal. Apr. 16, 2024) (denying motion to dismiss deliberate indifference claim to jail nurse who failed to perform a follow-up ordered by another clinician).

Hurley argues that it was "reasonable" for her to defer to other medical professionals for Roselee's treatment. No other medical professionals told Hurley to leave a patient in feces and rotten food to die. Moreover, reliance on other medical professionals is not a defense to a deliberate indifference claim. *See Est. of Wilson by & through Jackson v. Cnty. of San Diego,* 729 F.Supp.3d 1039, 1049 (S.D. Cal. 2024) ("[T]he Ninth Circuit has not drawn a distinction in cases where both nurses and physicians are aware of a substantial risk of serious harm yet fail to reasonably respond or in cases where nurses unreasonably rely on a physician's outdated assessment."); *Russell*, 31 F.4th at 743-745 (denying summary judgment on deliberate indifference claim to nurses who unreasonably relied on physician's hours-earlier assessment of inmate-patient with classic symptoms of a heart attack even though the symptoms had become far more severe).

On Roselee's final day, Hurley stood at the door of a cell looking at another human being whimpering and suffering. The smell of putrid uneaten food and trash piled up over weeks filled the room. Roselee's cell was full of uneaten, rotting food. Roselee was calling out for her mother like a lost child. Confronted with this agony and watching a life slip away, Hurley turned around, walked away and left Roselee to die.

### C. Plaintiff Has Sufficiently Stated a *Monell* Claim Against CHP.

Plaintiff alleged numerous pervasive and widespread customs and practices against CHP that violate pretrial detainees' Fourteenth Amendment right to medical care, including: (1) failing to render medical care to patients suffering acute psychiatric and medical conditions; (2) failing to identify or treat patients with severe developmental disabilities; (3) allowing gravely and developmentally disabled inmates to make medical decisions for themselves, including to dictating their own medical care and food and water intake, when they obviously lacked the capacity to do so; (4) failing to take vital signs and weighing those in obvious medical distress; and (5) permitting its employees to ignore patient medical records, knowing previous failures had caused serious deaths and injuries; and (6) understaffing medical and mental health positions to maximize profits. See FAC ¶¶ 365-372, 381. Plaintiff further alleged that CHP maintains a custom of placing contract employees in the Jails without proper training and supervision and fails to provide them the tools to adequately treat their patients. *Id*. ¶ 381.

Plaintiff has alleged a *Monell* claim based upon CHP's failure to implement policies crucial to the effective provision of medical care to critically ill inmates. A failure to implement a policy, or a policy omission, can be subject to *Monell* liability. *See Oviatt v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992) (holding sheriff's awareness that some inmates were not arraigned on time as required by Oregon law and decision to do nothing was a conscious choice of deliberate indifference subject to *Monell* liability); s*ee also Fairley v. Luman*, 281 F.3d 913,

918 (9th Cir. 2002) (finding *Monell* liability where a sheriff, who was aware it was common for individuals to be arrested on the wrong warrant, failed to implement any procedures to alleviate the problem.)

A plaintiff may make out a claim for liability under *Monell* by showing "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141–42 (9th Cir. 2020).

As Plaintiff has alleged in specific detail, Roselee's death was not an isolated incident, but the predictable result of systemic failures at CHP. CHP failed to implement crucial policies requiring its providers to review patents' medical charts, including medication orders, and to communicate and coordinate with other medical professionals to ensure continuity of care. FAC at ¶ 361, 364. CHP was on notice of a pattern of prior similar violations caused by the same failures due to a series of deaths in San Diego jails and a previous lawsuit involving CHP's founder, Peter Freedland. *Id*. ¶ 359, 379. Freedland founded CHP in 2020, the same year he and his former employer, Coast Correctional Medical Group ("CCMG"), were sued over the 2019 death of Michael Wilson in the San Diego Central Jail. *Id*. ¶ 359. There, Freedland was accused of failing to read Michael's medical records and failing to have Michael weighed despite the fact that rapid weight gain is a symptom of a serious medical condition for heart patients like Michael Wilson. *Id*. Michael died the day after Freedland's examination due to untreated congestive heart failure. *Id*.

CHP dismisses this incident as "irrelevant," but it is the Wilson case, along with Freedland's prior experience in the Jail during his employment with CCMG, that put him on notice of repeat incidents in which Jail medical providers caused serious injuries or deaths due to their failure to read medical records and failure to properly examine patients and weigh patients. Moreover, CHP provides no

authority to establish that the knowledge of an official policymaker is "irrelevant" to the notice requirement of a *Monell* claim.

It was more than Michael Wilson's death that put CHP on notice. In 2022, two years after Freedland and CHP replaced CCMG, Lonnie Rupard died after losing 36 percent of his total body weight. *Id*. ¶ 215. From the time Lonnie was booked into the jail in Dec 2021 until his death in March 2022, Lonnie was never weighed despite multiple sick calls and his obviously deteriorating condition. *Id*. Lonnie Rupard's cause of death was pneumonia, malnutrition, and dehydration in the setting of neglected schizophrenia. *Id*. When they finally found Lonnie dead in his cell, the walls and floor of his cell were smeared with feces. *Id*. No one had given him medication to treat his serious psychiatric conditions. *Id*.

Despite these red flags, warnings, state law requiring providers to contact SDRC, and jail's written policies requiring patients to be weighed CHP implemented no such policies to guide its employees. Despite Freedland's firsthand knowledge that failing to review medical records and to physically evaluate a patient caused deaths in the jail, CHP did nothing to ensure its employees would review records, communicate patient conditions to other providers and evaluate their patients. In the face of obvious known dangers, CHP did nothing. It then failed to train its employees to weigh their patients, communicate their weight fluctuations, and to coordinate care with intellectually impaired people through SDRC. The failure to implement these policies and training was deliberately indifferent to the needs of the most vulnerable patients.

CHP's failure to implement policies resulted in Christensen prescribing Zofran without ever seeing Roselee. As a result of the failure to implement policies and to train its employees, a doctor and two nurses stood idly by knowing that Roselee had not eaten solid foods for eight days, provided not even the simplest vitamin proven to save Roselee's life, and walked away from a patient dying in abject filth. CHP's misconduct was the moving force behind Roselee's suffering

and death. These failures were not, as CHP argues, "isolate lapses in care" but instead the foreseeable result of CHP's failure to implement critical policies.

Finally, contrary to CHP's assertion, constitutional violations by employees are *not* a prerequisite to a *Monell* claim in the Ninth Circuit. *See Richards v. County of San Bernardino, et al.*, 39 F.4th 562, 574 (9th Cir. 2022). The Constitutional deprivations suffered by Roselee were not only the result of the conduct of individual defendants, but also arose from the collective inaction of CHP as a result of its employees' adherence to CHP's unconstitutional practices. CHP is liable for those practices even if every individual defendant is exonerated "on the basis of qualified immunity, because they were merely negligent, or for other failure of proof." *Id*.

### D. Plaintiff Has Sufficiently Alleged a Bane Act Violation Against All CHP Defendants.

Plaintiff has adequately alleged that defendants acted with deliberate indifference in failing to render medical care. Defendants violated Roselee's rights under both the United States and California Constitutions, including her right to be free from objectively unreasonable treatment and deliberate indifference to her medical needs while in custody as a pre-trial detainee. Despite this, Defendants argue that Plaintiff's Bane Act claim does not allege sufficient facts to state a claim for relief. ECF No. 60-1 at p. 20.

An allegation of a defendant's deliberate indifference to a plaintiff's serious medical needs suffices to state a claim under the Bane Act because of the coercion, or specific intent, inherent in the deliberate indifference standard. *E.g., Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018) ("Plaintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening, such as housing a prisoner in an inappropriate cell, failing to provide

treatment plans or adequate mental health care, and failing to provide sufficient observations."); *Scalia v. Cty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) ("[A] prison official's deliberate indifference to serious medical needs is a coercive act that rises above mere negligence."); *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013) ("Because deliberate indifference claims necessarily require more than 'mere negligence,' a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs in violation of his constitutional rights presents a case far more like *Venegas* than *Shoyoye* and adequately states a claim for relief under the Bane Act."); *accord Cornell v. City & Cnty. Of Sacramento*, 17 Cal. App. 5th 766, 802 n.31 (2017) (noting that "depending on the right alleged to have been interfered with, physical force is not required at all" to show coercion and citing *M.H.* with approval.)

In addition to the claims against CHP for its own Fourteenth Amendment violation, the California Supreme Court has implicitly held that a Bane Act claim can be brought based on supervisory conduct, which Plaintiff has also alleged. *See Venegas v. County of Los Angeles*, 32 Cal.4th 820, 843 (2004) (affirming lower court finding that plaintiff could bring Bane Act claim against the County, its sheriff's department, and its sheriff based on conduct of sheriff's deputies); *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1085–86 (S.D. Cal. 2023).

Because Plaintiff has sufficiently stated a claim of deliberate indifference against all CHP Defendants and because the Bane Act claim is based upon the same underlying conduct, she has also adequately alleged a Bane Act violation against these defendants.

### E. Plaintiff Has Sufficiently Alleged a Negligence Cause of Action Against All CHP Defendants.

The elements of a negligence claim are: "(1) defendant had a duty to use care; (2) defendant breached that duty; and (3) the breach of duty was the proximate or legal cause of the resulting injury." *Deloney v. Cnty. of Fresno*, No.

117CV01336LJOEPG, 2019 WL 1875588, at *9 (E.D. Cal. Apr. 26, 2019) (citing *Hayes v. Cnty of San Diego*, 57 Cal. 4th 622, 627 (2013)); *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009). The same conduct that forms the basis for CHP defendants' deliberate indifference claim forms the basis for the negligence claim. Since Plaintiff has adequately alleged a claim of deliberate indifference against each of the CHP Defendants, Plaintiff's negligence claim is likewise sufficient. "The same allegations supporting liability under a deliberate indifference standard are necessarily sufficient to support liability under a negligence standard." *Est. of Schuck by & through Schuck v. Cnty. of San Diego*, No. 23-CV-785-DMS-AHG, 2024 WL 500711, at *14 (S.D. Cal. Feb. 8, 2024); see also *Russell*, 31 F.4th at 739 (explaining that the evidentiary standard for negligence is less than deliberate indifference.)

As medical providers responsible for Roselee's care, each CHP Defendant owed a duty to provide Roselee with medical care when their patient in need of urgent medical intervention. Hurley and Beaston breached their duty to Roselee by failing to medicate her (including for a known potentially life-threatening condition), feed her through an IV, have her transferred to a facility to receive continuous adequate care, contact the Regional Center to coordinate her care, properly monitor her, communicate her serious medical needs with other jail medical staff, weigh her or consistently take her vital signs. Christensen breached the same duties and is further liable for his failure to read or otherwise ignoring Roselee's medical records and his repeated failing to examine her. CHP breached its duty by failing to set forth policies regarding appropriate medical treatment for inmates suffering from serious medical and mental health conditions.

CHP is also vicariously liable for the acts of Christensen, Beaston and Hurley. *See Lisa M. v. Henry Mayo Newhall Mem'l Hosp.*, 12 Cal 4th 291, 297 (1995) (An employer is vicariously liable for the negligent acts of its employees if there is a "causal nexus to the employee's work.") Plaintiff has adequately alleged

that Christensen, Beaston and Hurley's acts occurred in their capacity as medical providers employed by CHP, a third-party contractor to the Sheriff's Department. Plaintiff states a claim against CHP for vicarious liability.

Finally, Plaintiff has adequately alleged that, as a direct and proximate result of Defendants' negligent conduct, Roselee died. FAC at ¶ 438. Plaintiff has sufficiently alleged a negligence cause of action against CHP defendants.

## V.  CONCLUSION

Plaintiff respectfully requests that the Court deny CHP Defendants' motion to dismiss. In the alternative, should the Court find any deficiency in the pleading, Plaintiff respectfully requests leave to amend.

DATED: September 15, 2025          Respectfully submitted,


                                   **IREDALE AND YOO, APC**

                                   *s/ Julia Yoo*
                                   _____
                                   **EUGENE IREDALE**
                                   **JULIA YOO**
                                   **SARAH MUSUMECI**
                                   Attorneys for Plaintiff THE ESTATE OF ROSELEE BARTOLACCI