1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10         SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| THE ESTATE OF ROSELEE BARTOLACCI, by and through its successor in interest, ROSEANN BARTOLACCI, | Case No.: 3:24-cv-1156-WQH-JLB **ORDER** |
| Plaintiff, | |
| v. | |
| COUNTY OF SAN DIEGO, *et al.*, | |
| Defendants. | |

HAYES, Judge:

　　The matters before the Court are: (1) the Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 60) filed by Defendants Correctional Healthcare Partners, David Christensen, M.D., Teresa Hurley, and Lacey Beaston; (2) the Motion to Dismiss Portions of Plaintiff's First Amended Complaint (ECF No. 62) filed by Defendants NaphCare of San Diego, LLC and Lauren Anderson; and (3) the Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 63) filed by Defendants the County of San Diego, Kelly Martinez, Ricardo Carlon, Paul Mata, Evangelina Reynoso, Macy Germono, Janine Sparks, Sherry Esquivel, and Diorella Rioveros.

## I.  PROCEDURAL BACKGROUND

On July 3, 2024, Plaintiff the Estate of Roselee Bartolacci, by and through its successor in interest, Roseann Bartolacci ("Plaintiff"), initiated this action by filing a Complaint against Defendants the County of San Diego ("the County"), Ricardo Carlon ("Carlon"), Sherry Esquivel ("Esquivel"), Macy Germono ("Germono"), Kelly Martinez ("Martinez"), Paul Mata ("Mata"), Evangelina Reynoso ("Reynoso"), Diorella Rioveros ("Rioveros"), Janine Sparks ("Sparks"), Teresa Hurley ("Hurley"), Lacey Beaston ("Beaston"), David Christensen, M.D. ("Christensen"), Lauren Anderson ("Anderson"), NaphCare of San Diego, LLC (erroneously sued as NaphCare Correctional Health) ("NaphCare"), and Does 1–55. (Complaint, ECF No. 1.)

On August 30, 2024, Defendants the County, Carlon, Esquivel, Germono, Martinez, Mata, Reynoso, Rioveros, and Sparks (collectively, the "Initial County Defendants") filed a Motion to Dismiss Plaintiff's Complaint (the "County's First Motion to Dismiss"). (ECF No. 18.) On September 30, 2024, Plaintiff filed a Response to the County's First Motion to Dismiss. (ECF No. 30.) On October 7, 2024, the Initial County Defendants filed a Reply. (ECF No. 33.)

On August 30, 2024, Defendants NaphCare and Anderson filed a Motion to Dismiss Portions of Plaintiff's Complaint ("NaphCare's and Anderson's First Motion to Dismiss"). (ECF No. 19.) On September 30, 2024, Plaintiff filed a Response to NaphCare's and Anderson's First Motion to Dismiss. (ECF No. 29.) On October 7, 2024, NaphCare and Anderson filed a Reply. (ECF No. 32.)

On August 30, 2024, Plaintiff and NaphCare filed a Joint Stipulation and Request for Dismissal of Plaintiff's Third Cause of Action as to NaphCare Only (the "Joint Stipulation"), asking the Court to dismiss Plaintiff's third cause of action for *Monell* Municipal Liability against NaphCare only. (ECF No. 20 at 2.) On January 21, 2025, the Court issued an Order granting the Joint Stipulation. (ECF No. 47.)

On September 3, 2024, Defendants Hurley and Beaston filed a Motion to Dismiss Plaintiff's Complaint ("Hurley and Beaston's Motion to Dismiss"). (ECF No. 24.) On

October 1, 2024, Plaintiff filed a Response to Hurley and Beaston's Motion to Dismiss. (ECF No. 31.) On October 8, 2024, Hurley and Beaston filed a Reply. (ECF No. 35.)

On November 20, 2024, Defendant Christensen filed a Motion to Dismiss Plaintiff's Complaint ("Christensen's Motion to Dismiss"). (ECF No. 42.) On December 16, 2024, Plaintiff filed a Response to Christensen's Motion to Dismiss. (ECF No. 43.) On December 23, 2024, Christensen filed a Reply. (ECF No. 45.)

On April 30, 2025, Plaintiff filed a Motion for Leave to File First Amended Complaint ("Motion for Leave to Amend"). (ECF No. 51.) On July 31, 2025, the Court issued an Order granting Plaintiff's Motion for Leave to Amend and denying the foregoing Motions to Dismiss filed by Defendants as moot. (ECF No. 56.)

On July 31, 2025, Plaintiff filed the First Amended Complaint ("FAC"), which named as additional Defendants Correctional Healthcare Partners ("CHP") and 32 new County Defendants, 23 of whom were previously identified as Does in Plaintiff's initial Complaint: Cory Crawford ("Crawford"), Jason Walters ("Walters"), Robert Taylor ("Taylor"), Jeffrey Monti ("Monti"), Ernesto L. Banuelos ("Banuelos"), Steven M. Maraia ("Maraia"), Katherine Sanoni ("Sanoni"), Camille Reyes ("Reyes"), Matthew Ellsworth ("Ellsworth"), Christina Montoy ("Montoy"), Belinda Lam ("Lam"), Brittany Stubbs ("Stubbs"), Gregory Biggs ("Biggs"), Nicole Odell ("Odell"), Shannon Huard ("Huard"), Kimberly Scott ("Scott"), Matthew Tilman ("Tilman"), Elizabeth Garcia ("Garcia"), Julio Arias ("Arias"), Esmeralda Lopez ("Lopez"), Maribel Montes-Skinner ("Montes-Skinner"), Mary Camacho ("Camacho"), Rose Hadley ("Hadley"), Raombo Leonard ("Leonard"), Sgt. Iva Nanusevic ("Nanusevic"), Adam Kuder ("Kuder"), Elizabeth Millard ("E. Millard"), Karina Vasquez ("Vazquez"), Villa Millard ("V. Millard"), Lt. Wayne Boatright ("Boatright"), Burgos Wilson ("Wilson"), and Hakan Axelsson ("Axelsson") (collectively, the "New County Defendants"). (ECF No. 57.)

On August 14, 2025, Defendants CHP, Christensen, Hurley, and Beaston (collectively, the "CHP Defendants") filed a Motion to Dismiss Plaintiff's First Amended Complaint ("CHP's Motion to Dismiss the FAC"). (ECF No. 60.) On September 15, 2025,

3:24-cv-1156-WQH-JLB

Plaintiff filed an Opposition to CHP's Motion to Dismiss the FAC. (ECF No. 67.) On September 22, 2025, the CHP Defendants filed a Reply. (ECF No. 70.)

On August 21, 2025, Defendants NaphCare and Anderson (collectively, the "NaphCare Defendants") filed a Motion to Dismiss Portions of Plaintiff's First Amended Complaint ("NaphCare's Motion to Dismiss the FAC"). (ECF No. 62.) On September 22, 2025, Plaintiff filed an Opposition to NaphCare's Motion to Dismiss the FAC. (ECF No. 71.) On September 29, 2025, the NaphCare Defendants filed a Reply. (ECF No. 73.) On October 1, 2025, Plaintiff filed a Notice of Supplemental Authority regarding NaphCare's Motion to Dismiss the FAC. (ECF No. 74.)

On August 21, 2025, the Initial County Defendants filed a Motion to Dismiss Plaintiff's First Amended Complaint ("County's Motion to Dismiss the FAC"). (ECF No. 63.) The New County Defendants had neither been served nor entered an appearance at the time the County's Motion to Dismiss the FAC was filed. *Id.* at 1 n.1. On September 15, 2025, Plaintiff filed an Opposition to the County's Motion to Dismiss the FAC. (ECF No. 66.) On September 22, 2025, the Initial County Defendants filed a Reply. (ECF No. 69.)

On October 17, 2025, Plaintiff filed a Motion to Strike the County of San Diego's Motion to Dismiss the FAC ("Motion to Strike"). (ECF No. 90.) On November 10, 2025, the Initial County Defendants and Defendants Arias, Kuder, E. Millard, Montes-Skinner, Nanusevic, and Odell filed an Opposition in Part to Plaintiff's Motion to Strike. (ECF No. 102.) On November 17, 2025, Plaintiff filed a Reply. (ECF No. 112.)

## II.    MOTION TO STRIKE

Plaintiff requests that the Court strike the entirety of the County's Motion to Dismiss the FAC (ECF No. 63) on the grounds that the County filed that motion purporting to represent the New County Defendants, *see id.* at 1 n.1, even though they had not yet been served. (ECF No. 90-1.) Plaintiff contends that "the filing of the motion to dismiss on behalf of the new County defendants without their knowledge and authorization undermines the integrity of judicial proceedings." *Id.* at 6.

4

3:24-cv-1156-WQH-JLB

As of the filing of this Order, all but five of the 32 New County Defendants have either been served or executed a waiver of service. (*See* ECF Nos. 68, 72, 78–80, 85, 103–11, 113–16, 120–28, 132–33, 139, 142, 150.) Regarding the New County Defendants who have entered appearances, the County has filed Notices of Joinder stating that these newly served Defendants "hereby join in and adopt by reference" the County's Motion to Dismiss the FAC (ECF No. 63). (ECF Nos. 92, 100, 119, 131, 136, 141, 149.) Plaintiff has until February 26, 2026, to serve the five remaining New County Defendants. (ECF No. 146.)

In the interests of judicial economy and justice, the Court denies Plaintiff's Motion to Strike. (ECF No. 90.) For the purposes of this Order and having considered the County's Notices of Joinder, the Court will assume the County's Motion to Dismiss the FAC (ECF No. 63) applies to all of the New County Defendants who have entered appearances as of the filing of this Order. This Order is not binding upon and does not purport to rule on the Plaintiff's claims against the five New County Defendants who have not yet entered appearances: Hakan Axelsson, Rose Hadley, Palombo Leonard, Villa Millard, and Burgos Wilson.

## III.    ALLEGATIONS IN THE FAC

### A. Roselee's Background

Roselee Bartolacci ("Roselee"), was a 32-year-old woman diagnosed with bipolar type schizoaffective disorder and with "a history of developmental disorder, ADHD, depression, and mild mental retardation." (FAC at 4; ¶¶ 35–36.) Functioning at the level of an eight-year-old, Roselee "required the constant care and support of her mother, Roseann Bartolacci" ("Plaintiff"). *Id.* ¶ 36.

Since 2012, Roselee had been under the care of an outpatient psychiatrist at the San Diego Regional Center (the "Regional Center"), which provides support services for individuals with developmental disabilities. *Id.* ¶¶ 37–38. When Roselee was properly medicated and treated, she remained calm and stable. *Id.* ¶¶ 39–40. "However, when psychiatrists discontinued or adjusted her medication regime . . . she required emergency psychiatric intervention." *Id.* ¶ 40.

In February of 2023, Roselee reported "feeling paranoid that someone was watching her" and admitted to hitting her mother on the arm. *Id.* ¶ 43. As a result, her psychiatrist "adjusted her medication," but Roselee struggled with these changes. *Id.* ¶¶ 43–44. "She had intermittent angry outbursts and suffered auditory hallucinations." *Id.* ¶ 44.

**B. Roselee's Arrest by Defendants Carlon, Crawford, Walters, and Taylor**

On April 6, 2023, while experiencing psychosis and auditory hallucinations from her medication adjustments, Roselee hit her mother with a hammer. *Id.* ¶¶ 44–45. In an attempt "to secure emergency medical help for her daughter" Plaintiff "called the police and asked for a PERT [Psychiatric Emergency Response Team] clinician" but was told that none was available. *Id.* ¶ 46. Instead, several Sheriff's deputies, including Defendants Carlon, Crawford, Walters, and Taylor (collectively, the "Responding Defendants"), responded to Plaintiff's call. *Id.* ¶ 12, 48.

Plaintiff informed the Responding Defendants that Roselee suffered from schizoaffective bipolar disorder and had hit her due to her "acute psychosis." *Id.* ¶¶ 48–49. Plaintiff told Carlon and another deputy that Roselee "lacked the capacity to understand what was happening as a result of her severe mental health and cognitive impairment," and that she was a client of the Regional Center. *Id.* ¶ 51–54. Plaintiff also "told [the Responding Defendants] that she did not want to press charges against" her daughter, stating that Roselee "needed to go to a hospital for emergency psychiatric intervention and stabilization, not to jail." *Id.* ¶¶ 48–50.

The Responding Defendants had the authority to transport Roselee to a hospital, as "[t]ransferring an acutely psychotic patient under 5150 to a hospital is a service the County provides to accommodate the disabled." *Id.* ¶ 55. However, they instead arrested Roselee and transported her to Las Colinas Detention and Reentry Facility (the "Jail" or "Las Colinas"), where Carlon completed the arresting officer screening. *Id.* ¶¶ 56–58.

Carlon informed the intake nurse who completed Roselee's medical clearance screening, Defendant Mata, that Roselee had a history of schizophrenia and bipolar disorder. *Id.* ¶¶ 59, 65. However, he failed to communicate to Mata or other intake staff

that Roselee "was *currently* experiencing severe psychosis and required emergency psychiatric treatment." *Id.* ¶ 59. "For example, to the question, 'Are you aware of any illnesses or injuries?' Carlon answered, 'no'" and "[t]o the question 'Do you have any additional information to help us care for the patient's health and safety?' Carlon answered, 'no.'" *Id.* ¶¶ 59–60.

Carlon failed to disclose to Defendants Mata and Does 2–3 [1] —the personnel responsible for screening Roselee on April 6, 2023 (collectively, the "Screening Defendants")—the severity of Roselee's acute psychosis, Plaintiff's belief that Roselee needed immediate psychiatric care, or the fact that Plaintiff's initial call sought the assistance of a PERT clinician and a 5150 hold. *Id.* ¶¶ 61–62. The Responding Defendants also "failed to notify the Jail staff or anyone else that Roselee was a patient of the Regional Center," despite Plaintiff's "repeated requests" to contact the Regional Center. *Id.* ¶ 63.

### C. Roselee's Medical Screening by the Screening Defendants

Mata completed Roselee's medical screening and knew "Roselee lacked the capacity to understand or answer the most basic questions" and "that Roselee was willing but unable to sign the screening or general informed consent forms." *Id.* ¶¶ 65–66, 68.

The San Diego County Sheriff's Department Medical Services Division Policy E.2.1 states that certain behaviors—such as thought disorganization, nonsensical communication, altered mental status, confusion, and psychosis—may require additional evaluation at an emergency department or psychiatric hospital before admitting a detainee into a detention facility. *Id.* ¶ 69. Roselee "exhibited some or all of these behaviors at the time she was booked into Las Colinas" and was unable to sign her name or answer any

---

[1] Plaintiff alleges that Carlon failed to disclose information to "Mata and DOES 2-3" but does not bring claims against "Does 2–3" or refer to "Does 2–3" elsewhere in the FAC. (FAC ¶ 62.) The Court assumes that, instead of "Does 2–3," Plaintiff intended to refer to Defendants Sgt. Ernesto L. Banuelos and Deputy Steven M. Maraia—the other Defendants who allegedly assisted Defendant Mata in screening Roselee and placing her in administrative segregation. *See id.* ¶ 78. Plaintiff alleges that Defendants Sgt. Ernesto L. Banuelos and Deputy Steven M. Maraia, previously designated as Does, were responsible for placing Roselee Bartolacci in administrative segregation at Las Colinas." *Id.* ¶ 26.

7

questions. *Id.* ¶¶ 70, 72. "[I]t was, or should have been, obvious to [the Screening Defendants] that Roselee was in severe psychiatric distress and required transfer to a psychiatric hospital." *Id.* ¶ 72.

The Screening Defendants "were required to undertake further investigation to determine whether a jail placement was appropriate for Roselee" but "failed to undertake any such referral or investigation, instead labeling Roselee as 'uncooperative' and 'unpredictable' and clearing her as fit to be booked into the [J]ail." *Id.* ¶¶ 74–75.

### D. Roselee's Administrative-Segregation Placement by Defendants Monti, Maraia, and Banuelos

"Under [Title 15 of the California Code of Regulations], § 1057, '[t]he health authority or designee shall contact the regional center for any incarcerated person suspected or confirmed to have a developmental disability for the purposes of diagnosis or treatment within 24 hours of such determination, excluding holidays and weekends.'" *Id.* ¶ 81 (second alteration in original).

"Defendants were aware of Roselee's status as a client of the [ ] Regional Center as of April 6, 2023." *Id.* ¶ 80. However, rather than "complying with the law" or accommodating her serious cognitive and psychiatric disabilities, Defendants Monti, Maraia, and Banuelos punitively placed Roselee in administrative segregation ("Ad-Seg")—essentially solitary confinement—from April 6 to April 10, despite prior warnings by staff that Ad-Seg is not clinically safe for patients. *Id.* ¶¶ 78, 80, 83–85.

### E. Roselee's Deterioration in Ad-Seg Under the Care of Defendants Reynoso & Anderson

On April 7, 8, and 9, 2023, "Roselee refused all her prescribed medications." *Id.* ¶¶ 88, 94. On April 9, 2023, Defendant Reynoso, a County mental health clinician, reported that Roselee was "making non-sensical statements" and "sleeping under her bed," which was "dirty with food on the floor." *Id.* ¶¶ 14, 90–91. Despite assessing Roselee as "mentally retarded" and knowing that "Roselee was a Regional Center client," Reynoso "ignored her legal obligation to contact Roselee's Regional Center case manager." *Id.* ¶ 92. In fact, even knowing that Roselee had refused her medications for three days and seeing Roselee's

condition rapidly worsen, Reynoso "did nothing other than [ ] schedule Roselee for a psychiatric sick call." *Id.* ¶¶ 94–96. No doctor saw Roselee for another two days. *Id.* ¶ 96.

On April 10, 2023, Plaintiff spoke with nurse Lourdes Cua and informed her that "Roselee needed messages repeated to her three times in order for her to understand them and that she had schizophrenia and bipolar disorder. Nurse Cua documented the call in Roselee's medical charts." *Id.* ¶ 97.

On April 10, 2023, Roselee refused her medications again. *Id.* ¶ 98.

On April 11, 2023, Defendant Anderson, a psychiatrist employed by NaphCare, reported seeing Roselee in her cell, which she documented was littered with trash and feces. *Id.* ¶ 15, 100. She noted that Roselee was "sitting naked on the floor, sucking her fingers" and could not "make eye contact or answer any questions." *Id.* ¶ 100. Roselee was still refusing her medications. *Id.* ¶ 112.

On April 12, 2023, Anderson saw Roselee again, reporting that she was "staring blankly, pacing, shaking, sucking her fingers, spitting, urinating on the floor, [ ] putting items in the toilet" and even "sitting on the floor in a puddle of urine while making strange gestures and mumbling nonsensically." *Id.* ¶ 101.

Anderson "knew that Roselee was under the care of the [ ] Regional Center," but made no effort to contact Roselee's case manager. *Id.* ¶¶ 102–03.

### F. Roselee's Deterioration in Ad-Seg Under the Surveillance of the Cell Check Defendants

While Roselee remained in Ad-Seg from April 6 to April 11, 2023, and at other unspecified points during Roselee's incarceration, Defendants Sanoni, Reyes, Ellsworth, Montoy, Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho, and Hadley (collectively, some of the "Cell Check Defendants") conducted checks of Roselee's cell. *Id.* ¶¶ 113–16. They witnessed Roselee "sitting naked on the floor . . . covered in urine and feces," "putting items in the toilet," and "mumbling to herself, refusing to eat her meals for days," but did not notify anyone about Roselee's

condition. *Id.* The Cell Check Defendants' untimely "flyby checks" violated California law requiring hourly cell checks. *Id.* ¶¶ 114, 116, 264.

### G. Roselee's Deterioration in the WPSU Under the Care of Defendants Germono, Anderson, Sparks, Christensen, Hurley, & Does 7–27

On April 12, 2023, instead of referring Roselee "to an outside facility better suited" to her needs, "Roselee was admitted to the [Women's Psychiatric Stabilization Unit] WPSU on a 5150 hold." *Id.* ¶ 104. "The admission plan directed psychiatric medication adjustments, to maintain a regular diet[,] and to take routine vitals." *Id.* Defendant Germono, a County nurse, completed Roselee's "WPSU Nursing Admission Assessment" but "failed to take Roselee's vital signs, including her weight"—despite the direction of the admission plan. *Id.* ¶¶ 16, 105–06.

Germono observed that "Roselee was 'child-like,'" "unable to cooperate," "selectively mute," "could not make eye contact," "and did not answer questions." *Id.* ¶ 107. Germono knew that Roselee was: (1) refusing her medications; (2) a Regional Center client; and (3) in a dire situation, but she "ignored her legal obligation[s]" and "did nothing." *Id.* ¶¶ 108–11.

On April 14, 2023, Roselee began vomiting. *Id.* ¶ 119. Defendant Christensen, a doctor employed by CHP, prescribed Zofran "but there is no notation that he ever saw or examined" Roselee. *Id.* ¶¶ 18, 119.

The same day, Defendant Sparks, a County mental health clinician, "attempted a psychosocial assessment of Roselee" but found that Roselee was too "nonsensical" to participate. *Id.* ¶ 17, 120. Despite knowing that Roselee was a client of the Regional Center, Sparks failed to contact Roselee's case manager until April 21, 2023—seven days after first seeing her. *Id.* ¶¶ 121–22. When Sparks did call the Regional Center, she only relayed that "Roselee was not 'doing well,'" withholding that "Roselee was decompensating from the interruption of critical antipsychotic medication [and] that she was living in complete filth." *Id.* ¶¶ 122–23.

On April 17, 2023, Rioveros, a County dietician, "reviewed Roselee's chart," learning "that Roselee was not eating" and that her weight had not been recorded since she was admitted to the Jail. *Id.* ¶¶ 22, 125–26. Without examining Roselee or acquiring her weight history or lab results, Rioveros instructed staff to switch her diet from liquid to gastric. *Id.* ¶¶ 127–29. Rioveros failed to instruct staff to weigh Roselee or to recommend lab testing to assess Roselee's health. *Id.* ¶¶ 129–30.

Between April 12 and 26, 2023, Roselee deteriorated significantly, as she continued to refuse medication, food, and hydration while living in a filthy cell "covered in food, urine, and feces." *Id.* ¶ 117. Despite knowing of Roselee's decline, Defendants Sparks, Anderson, Christensen, and medical professional Does 7–27 willfully ignored Sheriff's Department Medical Services Division Policy MSD.H.12, which mandates daily monitoring of a patient's weight, vital signs, medical condition, and hydration. *Id.* ¶¶ 135–37.

### H. Roselee's Hospital Admittance

"On April 26, 2023, Roselee was transported to Alvarado Hospital Medical Center ('AHMC') suffering from weakness and dehydration." *Id.* ¶ 138. Roselee was diagnosed with "acute renal failure with tubular necrosis (kidney disorder that can lead to acute kidney failure); hypokalemia (low potassium); hyponatremia (low sodium levels in blood); severe protein-calorie malnutrition; sepsis; transaminitis (elevated liver enzymes); acute metabolic encephalopathy; and a urinary tract infection." *Id.* ¶ 141. "Roselee remained at AHMC for approximately 14 days, during which" "[s]he began to eat, was more alert and responsive[,] and her mood stabilized." *Id.* ¶ 142.

On May 10, 2023, Roselee was discharged from AHMC and returned to the Jail, instead of to a facility that could appropriately care for her. *Id.* ¶¶ 143, 145.

3:24-cv-1156-WQH-JLB

**I. Roselee's Continued Deterioration Under the Care of Defendants Esquivel, Anderson, Beaston, Germono, Christensen, Rioveros, & Does 7–27**

At the Jail, "Roselee was admitted to the Medical Observation Bed ('MOB')" where Defendant Esquivel, a County nurse, noted the diagnoses she had received at AHMC, but, again, failed to take her weight. *Id.* ¶¶ 19, 146–47.

On May 16, 2023, Defendant Anderson disregarded Sheriff's Department Medical Services Division Policy MSD.H.12 by ordering that Roselee be weighed weekly instead of daily, then failed to ensure compliance with her order. *Id.* ¶¶ 149–50. Roselee was never weighed again at Las Colinas. *Id.* ¶ 151.

On May 18, 2023, after observing feces on her cell floor and vomit near her bed, Roselee was sent to Sharp Grossmont Hospital for refusing food, drink, and medication. *Id.* ¶¶ 152–53. "Roselee returned to Las Colinas the same day." *Id.* ¶ 153.

After 48 hours without food or fluids, Roselee was sent back to AHMC on May 20, 2023, where she was diagnosed with hypokalemia—a potassium deficiency. *Id.* ¶ 154. Though potentially fatal if left untreated, hypokalemia, particularly the level Roselee had, can easily be treated with supplements. *Id.* ¶¶ 154–55.

Upon Roselee's return to the Jail, Defendants failed to treat her hypokalemia. *Id.* ¶ 156. For example, during a post-ER visit evaluation, Defendant Beaston, a nurse practitioner employed by CHP, ordered only close monitoring of Roselee but did not prescribe her any supplements. *Id.* ¶¶ 21, 157.

On May 22, 2023, Roselee was admitted to a "Close Watch" cell at the WPSU, where Defendant Germono conducted her nursing admission assessment. *Id.* ¶¶ 158–59. In violation of County policies, Germono failed to take Roselee's vital signs or weigh her. *Id.* ¶ 159. Additionally, despite noting that Roselee was a client of the Regional Center, Germono made no effort to contact it. *Id.* ¶ 160.

On May 22, 2023, Anderson completed a Psychiatrist WPSU Admission Note in which she recorded Roselee's malnutrition, vomiting, hypokalemia hospitalization, and

general decline. *Id.* ¶ 162. Anderson ordered only that Roselee be monitored and encouraged to eat, but did not order any supplements. *Id.* ¶ 163.

On May 24, 2023, Roselee's vital signs were recorded for the last time. *Id.* ¶ 164.

The same day, Defendant Christensen assessed Roselee—without entering her cell, examining her, or obtaining her vital signs. *Id.* ¶ 165. Although Christensen had access to Roselee's medical records indicating serious medical conditions, Christensen "either failed to review [them] or ignored them. *Id.*

The same day, Anderson spoke with Roselee's Regional Center case manager, who said Roselee was well cared for by her mother before her arrest. *Id.* ¶ 166. He recommended returning her home but supported a conservatorship if that wasn't possible. *Id.* Anderson inquired about the Regional Center's placement options for Roselee. *Id.* This conversation, which occurred 48 days after her arrest, is the "only documented interaction between Jail medical staff and the [ ] Regional Center for assistance and outside placement options for Roselee." *Id.* ¶ 167.

On May 25, 2023, Defendant Rioveros discussed Roselee's status with a nurse and recommended she have her weight checked and be placed on a soft diet, without examining her or recommending that blood be drawn to assess Roselee's hydration and potassium levels. *Id.* ¶¶ 168–72. "Rioveros' note for tracking weight was promptly ignored by all medical providers." *Id.* ¶ 172.

From May 21, 2023, until her death on May 29, 2023, Roselee did not consume any solid foods. *Id.* ¶ 176. As of May 25, 2023, "Roselee had refused medications, food[,] and fluids for a full 48 hours." *Id.* ¶ 175.

On May 28, 2023, Defendant Hurley, a nurse practitioner employed by CHP, saw Roselee on her bed, moaning and crying, surrounded by a heavy ammonia smell and filth. *Id.* ¶¶ 20, 177. Hurley's treatment plan was to "continue to offer fluids, Ensure[,] and favorite foods." *Id.* ¶ 177.

### J. Roselee's Continued Deterioration Under the Surveillance of the Cell Check and Hygiene Check Defendants

From May 15 to May 29, 2023, Defendants Lam and Axelsson (collectively, the "Hygiene Check Defendants") had a responsibility to conduct hygiene checks of Roselee's cell but "did nothing" and "permitted Roselee to remain in rotting food, urine and feces." *Id.* ¶ 178.

On May 28 and May 29, 2023, Defendants Leonard, Kuder, E. Millard, Vasquez, V. Millard, and Wilson and their two supervisors, Boatright and Nanusevic (collectively, some of the "Cell Check Defendants"), conducted cell checks of Roselee's cell. *Id.* ¶ 180. They witnessed "Roselee dying in her own filth" and "ignored obvious symptoms of medical distress as Roselee lay dying." *Id.* ¶¶ 179, 181.

### K. Roselee's Death

On May 28, 2023, at approximately 11:36 p.m., Roselee was found unresponsive and cold to the touch. *Id.* ¶¶ 182–83. She was pronounced dead at 12:12 a.m. on May 29, 2023. *Id.* ¶ 185.

Roselee weighed 250 pounds on April 6, 2023, the day she was booked into the Jail. *Id.* ¶ 87. At her autopsy, Roselee weighed 209 pounds. *Id.* ¶ 186. She had lost 41 pounds in the 53 days she spent at the Jail. *Id.*

### L. The Systemic Allegations

Defendant County operates the San Diego County Sheriff's Department (the "Sheriff's Department"), which operates the Jail. *Id.* ¶ 7.

Defendant Martinez served as the Sheriff of the County of San Diego and "was responsible for hiring, screening, training, retention, supervision, discipline, counseling, and control of all" Sheriff's Department employees, including any Doe Defendants. *Id.* ¶¶ 8–9. Martinez also acted as a policy maker for the Department. *Id.* ¶ 9. "Before taking office as Sheriff in January 2023, Defendant Martinez was the Undersheriff," where she was also responsible for making policies and ensuring the County's compliance with state and federal laws. *Id.* ¶ 10.

Defendant NaphCare "was a third-party contractor" that "employed, supervised, and/or trained Defendant Anderson." *Id.* ¶ 23.

Defendant CHP "was a third-party contractor" that "employed, supervised, and/or trained Defendants Beaston, Hurley and Christensen." *Id.* ¶ 24.

Defendant Does 41–55 "were the supervisors, captains, commanders, and other high-ranking officials" at the Sheriff's Department or employed by CHP and NaphCare, "who were responsible for supervising, disciplining, and training subordinate individual defendants in this case" and for promulgating and approving the policies and practices in this case. *Id.* ¶ 31.

The Sheriff's Department's policies are inherently deficient under Title 15, § 1057 of the California Code of Regulations and the Americans with Disabilities Act ("ADA"). *Id.* ¶¶ 188–201. Specifically, Sheriff's Department Policy M.9, titled "Receiving Screening," fails to mandate that jails contact the Regional Center specifically for the purposes of diagnosis or treatment of any detainees who may be a patient of the Center, as required by § 1057, instead only requiring that "[p]ersons with developmental disabilities [ ] be identified and reported to the San Diego Regional Center's developmental disability intake office the next business day." *Id.* ¶¶ 188–91. Additionally, Sheriff's Department Policy M.39 violates the ADA by improperly placing the burden on developmentally disabled detainees to request their own accommodations because it requires accommodation requests to be initiated by "the incarcerated person, their family members, or an outside agency." *Id.* ¶¶ 197–200. Lastly, there is a custom or practice among the Jail staff of failing to adhere to these deficient policies, as evidenced by the Jail staff's failure to contact the Regional Center for the first 47 days of Roselee's detention. *Id.* ¶¶ 192, 201.

The Sheriff's Department has a higher rate of in-custody inmate deaths than any other large county in California, and Defendants are aware of a persisting and recurring pattern of preventable deaths and serious injuries caused by the Sheriff's Department's misconduct, apathy, and neglect, as evidenced by the state Department of Justice data and at least 10 documented cases of such inmate deaths or injuries spanning from 2014 to 2022.

*Id.* ¶¶ 202–215. One such case, which occurred in 2021, features facts strikingly similar to those alleged before the Court in the present case, where inmate Lonnie Rupard died in the Jail after refusing all his medications and suffering a 60-pound-weight-loss because "jail staff failed to intervene and assess Mr. Rupard's medical needs." *Id.* ¶ 215(h).

The Sheriff's Department's inadequate screening and intake process fails to identify and treat medical problems of newly arriving incarcerated people. *Id.* ¶¶ 216–19.

External audits and reports have warned the County and Martinez of a pervasive failure to adequately supervise subordinates. *Id.* ¶¶ 220–54. Furthermore, the County has systemically failed to maintain sufficient numbers of health care professionals, resulting in deficient care. *Id.* ¶¶ 255–58.

The County and Martinez have repeatedly violated California state law on safety checks by permitting a more than 60-minute lapse between safety checks on several occasions. *Id.* ¶¶ 259–94. Together, these allegations indicate systemic failures by the County and the Supervisory Defendants.

**K. Summary of the Claims**

Plaintiff alleges three federal claims against Defendants under 42 U.S.C. § 1983: (1) a Fourteenth Amendment deliberate indifference claim against Carlon, Mata, Monti, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Beaston, Rioveros, Crawford, Walters, Taylor, Sanoni, Reyes, Ellsworth, Montoy, Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho, Hadley, Leonard, Nanusevic, Kuder, E. Millard, Vasquez, V. Millard, Boatright, Wilson, Axelsson, and Does 7–27 and 44–55; (2) a Fourteenth Amendment claim for supervisory liability against Martinez, Axelsson, Nanusevic, Boatright, and Does 44–55; and (3) a *Monell* claim against the County and CHP. Plaintiff also asserts federal claims against the County for violations of the ADA and the Rehabilitation Act.

Plaintiff also alleges two state-law claims: (1) a claim for Bane Act violations against Carlon, Crawford, Walters, Taylor, Mata, Monti, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Beaston, Rioveros, Sanoni, Reyes, Ellsworth, Montoy,

Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho, Hadley, Leonard, Nanusevic, Kuder, E. Millard, Vasquez, V. Millard, Boatright, Wilson, Axelsson, Does 7–27 and 44–55, CHP, NaphCare, and the County; and (2) and a negligence survival claim against all Defendants. Plaintiff requests compensatory and punitive damages, costs and expenses, and all other relief that the Court deems just and proper.

## IV.    LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To state a claim for relief, a pleading "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Dismissal under FRCP Rule 12(b)(6) "is proper only where there is no cognizable legal theory[,] or an absence of sufficient facts alleged to support a cognizable legal theory." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alteration in original) (quoting Fed. R. Civ. P. 8(a)). While a pleading "does not require 'detailed factual allegations,'" FRCP Rule 8 nevertheless "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988

(9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

## V.    DISCUSSION

### A. Whether Plaintiff Adequately Alleges Fourteenth Amendment Violations Under § 1983 by Defendants Carlon, Mata, Monti, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Beaston, Rioveros, Crawford, Walters, Taylor, Sanoni, Reyes, Ellsworth, Montoy, Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho, Hadley, Leonard, Nanusevic, Kuder, Millard, Vasquez, Millard, Boatright, Wilson, Axelsson Does 7-27, and Does 44-55

#### 1. *Legal Standard*

Section 1983 is a "vehicle by which plaintiffs can bring federal[,] constitutional[,] and statutory challenges to actions by state and local officials." *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006) (citation omitted). Thus, to state a claim under § 1983, a plaintiff must allege "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a federal[,] constitutional[,] or statutory right." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1998) (quotations and citation omitted).

> A person "subjects" another to the deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made. Moreover, personal participation is not the only predicate for section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

*Lacey v. Maricopa County*, 693 F.3d 896, 915 (9th Cir. 2012). "Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand

a motion to dismiss." *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).

Claims that a pretrial detainee was denied medical care are analyzed under the Fourteenth Amendment, which provides that no State "shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. "[T]he substantive component of the Due Process Clause is violated by executive action only when it can be properly characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). Mere negligence or liability grounded in tort does not meet the standard for a substantive due process claim. *See id.* at 848–49. A plaintiff can satisfy the "shocks the conscience" standard either by showing that a state official "acted with *deliberate indifference*" or "with a *purpose to harm.*" *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008).

"Medical malpractice does not become a constitutional violation merely because the victim is a [detainee]. In order to state a cognizable claim, a [detainee] must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> In the Ninth Circuit, the test for deliberate indifference consists of two parts. First, the plaintiff must show a serious medical need by demonstrating that failure to treat a [detainee]'s condition could result in further significant injury or the unnecessary and wanton infliction of pain. Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

To meet the requirements of the first prong, "a plaintiff must demonstrate the existence of a serious medical need." *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). "Such a need exists if failure to treat the injury or condition could result in further significant injury or cause the unnecessary and wanton infliction of pain." *Id.* A "heightened" risk of suicide is considered a serious medical need. *Simmons v. Navajo County*, 609 F.3d 1011, 1017 (9th Cir. 2010).

3:24-cv-1156-WQH-JLB

Pursuant to the second prong, "claims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1125.

"With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn[ ] on the facts and circumstances of each particular case." *Id.* (alteration in original). Deliberate "[i]ndifference may appear when [jail] officials deny, delay[,] or intentionally interfere with medical treatment, or it may be shown by the way in which [jail] physicians provide medical care." *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to a[ ] [detainee]'s serious medical needs, [courts] need not defer to the judgment of [jail] doctors or administrators." *Colwell*, 763 F.3d at 1066. However, "[t]he mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Gordon*, 888 F.3d at 1125. "[T]he plaintiff must prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

### 2. *Application*

#### i. The Responding Defendants: Carlon, Crawford, Waters, & Taylor

Plaintiff alleges that the Responding Defendants violated Roselee's Fourteenth Amendment rights by exhibiting deliberate indifference to her serious medical needs when they failed to take her to a hospital for psychiatric evaluation upon her arrest. (FAC ¶¶ 301–

04.) Plaintiff also alleges that Carlon failed to communicate the extent of her condition to the Jail intake staff. *Id.* at 305. However, claims by *pretrial detainees* are analyzed under the Fourteenth Amendment, whereas "[c]laims of denial of medical care *during and immediately following an arrest* are analyzed under the Fourth Amendment and its 'objective reasonableness' standard." *Est. of Adomako v. City of Fremont*, No. 17-CV-06386-DMR, 2018 WL 587146, at *5 (N.D. Cal. Jan. 29, 2018) (emphasis added) (citing *Borges v. City of Eureka*, No. 15-cv-00846-YGR, 2017 WL 363212, at *6 (N.D. Cal. Jan. 25, 2017)); *see also Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1098 (9th Cir. 2006) (analyzing officers' decision not to perform CPR or monitor an arrestee's deterioration under the Fourth, rather than the Fourteenth, Amendment); *Holcomb v. Ramar*, No. 1:13-CV-1102 AWI SKO, 2013 WL 5947621, at *4 (E.D. Cal. Nov. 4, 2013) ("[T]he Ninth Circuit has indicated that claims regarding deficient medical care during and immediately following an arrest are governed by the Fourth Amendment."). Because Plaintiff alleges that the Responding Defendants failed to provide Roselee with adequate medical care immediately following her arrest, the Court analyzes her allegations under the Fourth Amendment.

The exact contours of the Fourth Amendment's objective reasonableness standard have not been determined; however, the Ninth Circuit has held that "[a]n officer fulfills this [Fourth Amendment] obligation by promptly summoning the necessary medical help or taking the injured detainee to a hospital." *Bordegaray v. Cnty. of Santa Barbara*, No. 2:14-cv-08610-CAS-JPR, 2016 WL 7223254, at *8 (C.D. Cal. Dec. 12, 2016) (citing *Tatum*, 441 F.3d at 1099). The Fourth Amendment does not, however, require that a police officer "provide what hindsight reveals to be the most effective medical care for an arrested suspect." *Tatum*, 441 F.3d at 1098 (citations omitted). "Courts in the Ninth Circuit have often held that the reasonableness inquiry under the Fourth Amendment is ordinarily a question of fact for the jury." *Henriquez v. City of Bell*, No. CV 14-196-GW(SSx), 2015 WL 13357606, at *7 (C.D. Cal. Apr. 16, 2015).

Plaintiff alleges that the Responding Defendants knew that Plaintiff's initial call to the police "was for a PERT clinician 5150 hold" and that Roselee was suffering from acute psychosis, schizoaffective and bipolar disorders, and was hearing voices. (FAC ¶¶ 303–04.) Plaintiff alleges that she told the Responding Defendants at the scene of Roselee's arrest that Roselee was hallucinating, that she was a client of the Regional Center, that she needed emergency medical care, and that her severe cognitive impairment prevented her from understanding what was happening. *Id.* ¶¶ 51–53. Plaintiff alleges that the Responding Defendants knew that Roselee "needed to go to a hospital for psychiatric intervention and stabilization" but did not provide her with such care. *Id.* ¶ 304. Plaintiff alleges that the Responding Defendants failed to contact the Regional Center, despite Plaintiff's requests. *Id.* ¶ 63. Plaintiff alleges that Carlon compounded this error by failing to transmit critical information regarding Roselee's mental health condition to the Jail staff, particularly the intake nurse. *Id.* ¶ 305. For example, Plaintiff alleges that Defendant Carlon failed to inform the intake nurse that Roselee was "*currently* experiencing severe psychosis and required emergency psychiatric treatment." *Id.* ¶ 59. Carlon answered "no" in response to the questions, "Are you aware of any illness or injuries?" and "Do you have any additional information to help us care for the patient's health and safety?" *Id.* ¶¶ 59–60.

The Responding Defendants contend that Plaintiff's allegations fail to demonstrate that their actions were objectively unreasonable under the circumstances. (ECF No. 63-1 at 14.) Rather, the Responding Defendants contend that because they "had no reason to believe that the intake screening [at the Jail] would be insufficient," it was objectively reasonable for them to take Roselee to the Jail for "evaluation by trained medical staff, who could then assess Roselee and determine the appropriate level of treatment." *Id.* The Responding Defendants also contend that bringing Roselee to the Jail was reasonable in the "immediate aftermath of a reported violent crime." *Id.* However, they concede that Plaintiff alleges they knew of Roselee's "severe mental and cognitive impairments." *Id.* at 15. The Responding Defendants further contend that Carlon acted reasonably by telling intake staff only that Roselee had schizophrenia and bipolar disorder because Plaintiff

alleges that Roselee exhibited obvious symptoms of acute psychosis, thus "put[ting] jail staff on notice of her condition." (ECF No. 69 at 5.)

Under the Fourth Amendment, Plaintiff alleges sufficient facts to support a reasonable inference that the Responding Defendants violated Roselee's right to objectively reasonable post-arrest care when they (1) failed to transport Roselee to a hospital despite knowing she was suffering from acute psychosis, schizoaffective and bipolar disorders, and was hearing voices, and (2) failed to provide Jail intake staff with crucial information regarding her mental state. *See, e.g.*, *Ames v. Cnty. of San Bernardino*, No. EDCV181362JGBJEMX, 2020 WL 5875012, at *6 (C.D. Cal. July 30, 2020) (finding that a reasonable jury could conclude that an officer violated the Fourth Amendment by failing to transport an arrestee exhibiting signs of medical distress from drug intoxication to a hospital and failing to communicate the seriousness of the arrestee's circumstances to the jail intake staff); *Est. of Arroyo ex rel. Wilson v. Cnty. of San Diego*, No. 321CV01956RBMSBC, 2024 WL 4668146, at *7 (S.D. Cal. Nov. 4, 2024) (finding that plaintiff adequately alleged a defendant's failure to provide objectively reasonable post-arrest care where defendant, among other omissions, withheld the arrestee's medical information from booking staff, denied any signs of illness, substance influence, or mental health concerns, and failed to disclose the family's mental health concerns or its initial 5150 call); *cf. Borges*, 2017 WL 363212, at *7 (finding that there was not sufficient evidence that officers had failed to provide objectively reasonable post-arrest care to an arrestee that may have been exhibiting signs of an overdose by transporting him to a nearby jail instead of a hospital where "video footage of the arrest show[ed] that [the arrestee] was capable of understanding officer instructions and was compliant").[2]

---

[2] Unlike the arrestee in *Borges*, Plaintiff alleges that Roselee "lacked the capacity to understand or answer the most basic questions" and that she exhibited some or all of the following behaviors: "disorganization, nonsensical communication, altered mental status, confusion and psychosis." (FAC ¶¶ 68–70.)

Even under the more stringent Fourteenth Amendment deliberate indifference standard, Plaintiff's allegations—that the Responding Defendants were aware of Roselee's acute psychosis but failed to either transport her to a hospital or relay critical information to the Jail staff—are sufficient to support a finding that a reasonable jury could conclude the Responding Defendants acted with deliberate indifference to Roselee's serious medical needs. *See, e.g.*, *Conn v. City of Reno*, 591 F.3d 1081, 1098–1101 (9th Cir. 2010), *reinstated, except as modified on other grounds*, 658 F.3d 897 (9th Cir. 2011) (finding that a genuine dispute of material fact existed as to whether two officers were deliberately indifferent to an arrestee's serious medical need where they witnessed the arrestee attempt to kill herself with a seatbelt but failed to report the incident to jail personnel or take her to a hospital); *Enyart v. Cnty. of San Bernardino*, No. 5:23-CV-00540-RGK-SHK, 2024 WL 2104489, at *6 (C.D. Cal. Apr. 22, 2024) (finding that a reasonable jury could conclude that an officer who had been told of concerns that an arrestee would suffer fatal alcohol withdrawal symptoms failed to take reasonable measures to abate these health risks when he did not relay this information to jail staff).

At this stage of the proceedings, Plaintiff adequately states a § 1983 claim against the Responding Defendants under either the Fourth or Fourteenth Amendment.

### ii. The Screening Defendants: Mata & Monti[3]

---

[3] In the Motion to Dismiss the FAC, the County purports to represent Defendants Sgt. Ernesto L. Banuelos and Deputy Steven M. Maraia but does not address deliberate indifference with respect to those Defendants. (*See* ECF No. 63-1.) Plaintiff contends that Banuelos and Maraia have waived their right to challenge "any allegations" against them. (ECF No. 66 at 17 n.1.) However, the Court finds that the FAC does not allege and makes no attempt to allege § 1983 deliberate indifference claims against Banuelos or Maraia. (*See* FAC at 58–59.) The FAC's only references to Banuelos and Maraia allege that they "were responsible for placing Roselee Bartolacci in administrative segregation at Las Colinas, [and] allowed, condoned, ordered, or required her to remain in administrative segregation between April 6 and April 10, 2023, and [] monitored her while in administrative segregation but failed to intervene or place her in housing suitable for her mental health needs." (FAC ¶ 26.) The FAC further alleges that Banuelos and Maraia "interpreted Roselee's symptoms as intransigence and punished her by placing her in administrative segregation," "continued to punish Roselee by keeping her in administrative segregation until April 10, 2023," and "placed Roselee in segregation without contacting the Regional Center as

The Screening Defendants contend that the FAC fails to allege deliberate indifference on their part, as it fails to "identify [] specific symptoms that Roselee was exhibiting that would make her booking into county jail unreasonable." (ECF No. 63-1 at 17.)

Plaintiff alleges that the Sheriff's Department Medical Services Division Policy E.2.1 provides that behaviors such as "thought disorganization, nonsensical communication, altered mental status, confusion, and psychosis" "may necessitate further evaluation at the emergency department or at a psychiatric hospital prior to the inmate being accepted into the detention facility." (FAC ¶ 69.) Plaintiff alleges that "Roselee exhibited some or all of these behaviors" at the time of her booking, that these symptoms were "readily apparent" to the Screening Defendants, that the Screening Defendants "ignored the obvious signs of Roselee's acute psychosis [and] denied her vital medical care." *Id.* ¶¶ 70–71, 311. Plaintiff alleges that "[a]ny reasonable nurse confronted with an individual like Roselee, who was in severe and acute psychiatric distress, would have undertaken further investigation to establish whether she was fit to be booked into the jail as they are required to do." *Id.* ¶ 307.

At this stage of the proceedings, Plaintiff sufficiently alleges that Roselee had a serious medical need to which the Screening Defendants were deliberately indifferent. Specifically, the Court finds that Plaintiff sufficiently alleges that (i) the Screening Defendants intentionally decided to admit Roselee to the Jail without further medical intervention; (ii) which put Roselee at substantial risk of suffering serious harm because she was experiencing a mental health crisis; (iii) the Screening Defendants failed to take reasonable steps to mitigate that risk—such as recommending hospitalization—even though reasonable nurses in their position would have recognized that the Sheriff's

---

required by policy." *Id.* ¶ 78. The FAC brings negligence claims against "all Defendants." *Id.* at 78. The Court finds that the FAC attempts to allege only negligence claims against Banuelos and Maraia.

Department Medical Services Division Policy E.2.1 was put in place to ensure that detainees receive immediate psychiatric care from facilities better equipped to provide it when they are exhibiting symptoms such as Roselee's at the time of her intake; and (iv) their failure to take these measures caused a material decline in Roselee's health, ultimately resulting in her death. *See, e.g.*, *M.H. v. Cnty. of Alameda*, 62 F. Supp. 3d 1049, 1088 (N.D. Cal. 2014) (denying defense motion for summary judgment on a § 1983 claim where evidence showed that a provider's failure to follow its own policies during the medical intake assessment was a substantial factor in causing the detainee's death from alcohol withdrawal and thus amounted to deliberate indifference).

### iii.  Reynoso

Plaintiff alleges that Defendant Reynoso knew Roselee was experiencing a mental health crisis and reported that Roselee was making non-sensical statements, refusing her medications, and sleeping on her dirty cell floor. (FAC ¶¶ 89–94.) Plaintiff alleges that even though Reynoso knew Roselee was a client of the Regional Center, Reynoso failed to comply with California law (Cal. Code Regs. Tit. 15, § 1057) and Sheriff's Department Policy (M.9) requiring her to contact the Regional Center regarding Roselee's placement and care. *Id.* ¶¶ 81, 92, 190. Instead, Plaintiff alleges that Reynoso "ignored Roselee's symptoms" and left her "in administrative segregation to further decompensate." *Id.* ¶ 314.

Reynoso contends that Plaintiff's allegations that she failed to call the Regional Center in a timely manner do not demonstrate a causal impact on Roselee's death. (ECF No. 63-1 at 18–19.) Reynoso contends that her failure to contact the Regional Center was at worst negligent, not deliberately indifferent. *Id.* at 18. Reynoso contests Plaintiff's allegation that she "walked away" from Roselee's suffering—instead, Reynoso contends, she "escalated [Roselee's] level of care" by ordering a psychiatric sick call. (ECF No. 69 at 6.)

Plaintiff contends that a "reasonable mental health professional would have contacted the [Regional Center] immediately, ensured Roselee was removed from solitary confinement and provided emergency psychiatric treatment," but Reynoso "made Roselee

someone else's problem and walked away." (ECF No. 66 at 19.) Plaintiff further contends that, as the "first responder to deal with Roselee's psychiatric emergency," Reynoso's failure to call the Regional Center or immediately intervene "set off a chain of events" and was a "substantial factor not only in Roselee's pain and suffering before death, but ultimately in others' leaving her to die." *Id.* at 19.

To establish causation, Plaintiff must show that Reynoso's conduct was both the actual and proximate cause of Roselee's injury. *See Conn*, 591 F.3d at 1098–1101. An officer's conduct "is the actual cause" of a plaintiff's injuries "only if the injury would not have occurred 'but for' [their] conduct." *Id.* at 1098 (*citing White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). "The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quoting *Johnson v. Duffy*, 588 F.2d 740, 743–44 (9th Cir. 1978)). An officer's conduct is the proximate cause of the plaintiff's injuries if the harm that resulted was foreseeable. *See id.*

The alleged causal connection between Reynoso's actions and Roselee's death is sufficiently strong such that a rational juror could find that Reynoso's failure to contact the Regional Center or otherwise conduct emergency intervention was both the actual and proximate cause of Roselee's death. Given the Sheriff's Department policy and California law requiring Jail staff to contact the Regional Center within 24 hours if they suspect an incarcerated person has a developmental disability, a juror could reasonably find that Reynoso's failure to do so initiated a chain of events that deprived Roselee of necessary mental health care, ultimately leading to her death.

At this stage of the proceedings, Plaintiff sufficiently alleges that Roselee had a serious medical need to which Reynoso was deliberately indifferent. Specifically, the Court finds Plaintiff adequately alleges that: (i) Reynoso knowingly disregarded Roselee's clear signs of distress and failed to contact the Regional Center; (ii) this inaction placed Roselee at a substantial risk of serious harm, as evidenced by her rapid decompensation; (iii)

Reynoso failed to reasonably abate that risk—by contacting the Regional Center or providing medical care—even though a reasonable nurse, in accordance with California law and the Sheriff's Department Policy, would have contacted the Regional Center or otherwise developed a treatment plan to address Roselee's immediate medical needs; and (iv) Reynoso's failure to take such measures contributed to Roselee's deterioration and ultimately her death.

### iv. Germono

Plaintiff alleges that Defendant Germono completed Roselee's WPSU Nursing Admission Assessment on two occasions but failed to take Roselee's vital signs, including her weight—even after Roselee was diagnosed with hypokalemia and starvation. (FAC ¶¶ 105–06, 159.) Plaintiff alleges that Germono witnessed Roselee's erratic behavior and knew Roselee was refusing her medications but did nothing to address these issues. *Id.* ¶¶ 107–08, 111. Plaintiff alleges that Germono knew Roselee was a client of the Regional Center but ignored her legal obligation to call the Center on at least two occasions. *Id.* ¶¶ 109, 159–60.

Germono contends that "all of the facts alleged as to [] Germono fall within the arena of negligence—not deliberate indifference." (ECF No. 63-1 at 20.) Germono further contends that "no [causal] link" exists between the two missed vital checks and Roselee's death. (ECF No. 69 at 7.) However, as with Reynoso's failures, the Court finds that Plaintiff's allegations support a reasonable inference that Germono's failure to take Roselee's vitals, call the Regional Center, or otherwise intervene when Roselee was in crisis "set[] in motion a series of acts" that contributed to Roselee's deterioration and death. *See Conn*, 591 F.3d at 1098.

At this stage of the proceedings, the Court finds that Plaintiff sufficiently alleges the following: (i) Germono twice made intentional decisions to disregard Roselee's admission plan, to forgo monitoring her vital signs, and to fail to contact the Regional Center; (ii) these decisions placed Roselee at a substantial risk of serious harm, particularly in light of her rapidly deteriorating condition and her diagnoses—by the second incident—of

3:24-cv-1156-WQH-JLB

hypokalemia and starvation; (iii) Germono failed to take reasonable measures to abate these risks—such as weighing Roselee or contacting the Regional Center—even though a reasonable nurse in the same circumstances would have appreciated that tracking the weight of a severely malnourished patient was critical to assessing her condition and that contacting the Regional Center was required by California law and the Sheriff's Department policies; and (iv) Germono's failure to take such measures contributed to Roselee's deterioration and ultimately her death.

Plaintiff adequately alleges that Germono acted with deliberate indifference to Roselee's serious medical needs.

### v.  Esquivel

Plaintiff alleges that Defendant Esquivel cared for Roselee when she returned from her hospitalization at AHMC, where she was diagnosed with anemia; hypokalemia; hyponatremia; hypophosphatemia; folic acid deficiency; schizoaffective disorder; acute renal failure with tubular necrosis; severe protein calorie malnutrition; sepsis; transaminitis; acute metabolic encephalopathy; UTI; candida auris colonization; and obesity. (FAC ¶ 146.) Plaintiff alleges that Esquivel noted Roselee's diagnoses but still made no effort to determine her weight. *Id.* ¶ 147.

Esquivel contends that Plaintiff brings no allegations against her other than that she failed to take Plaintiff's weight on one occasion. (ECF No. 63-1 at 22.) Esquivel contends that "[o]ne isolated omission, without more, cannot plausibly constitute deliberate indifference." (ECF No. 69 at 7.) Esquivel further contends that Plaintiff fails to allege that Esquivel's failure to weigh Roselee caused Roselee any "specified harm." (ECF No. 63-1 at 22.)

Although Plaintiff alleges that Esquivel failed to take Roselee's weight on only one occasion, the Court finds that, at this stage of the proceedings, the allegations support an inference that this failure amounted to deliberate indifference because Plaintiff sufficiently alleges that Esquivel was aware of Roselee's hospitalization for a host of serious medical issues resulting from a period of starvation. (*See* FAC ¶ 146 (alleging that Esquivel "noted

Roselee's discharge diagnoses").) Accordingly, a reasonable juror could find that (i) Esquivel made an intentional decision to not weigh Roselee upon her return to Las Colinas; (ii) which put Roselee at substantial risk of suffering serious harm because she had just been hospitalized, in part, for malnutrition; (iii) Esquivel did not reasonably abate that risk by weighing Roselee, even though a reasonable nurse would have appreciated that tracking the weight of a malnourished patient was critical to assessing her condition; and (iv) by not taking such measures, Esquivel caused Roselee's deterioration and death. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (highlighting the importance of alleging that an act or omission is accompanied by knowledge of a significant risk of harm in proving deliberate indifference); *Est. of Wilson ex rel. Jackson v. Cnty. of San Diego*, No. 3:20-CV-00457-RBM-DEB, 2023 WL 8360718, at *8 (S.D. Cal. Dec. 1, 2023) (denying a motion for summary judgment where a jail medical provider failed to weigh the decedent on at least one occasion, despite being aware that a daily weight gain of three or more pounds signaled worsening heart failure), *aff'd sub nom. Jackson v. Germono*, No. 23-4408, 2024 WL 4144074 (9th Cir. Sept. 11, 2024).

### vi. Sparks

Plaintiff alleges that Roselee was under the care of Defendant Sparks from April 12, 2023 to April 26, 2023 and that during this time, Roselee's health rapidly deteriorated. (FAC ¶¶ 117–18.) Plaintiff alleges that on April 14, 2023, Sparks "attempted to conduct a psychosocial assessment of Roselee" but noted that she was too "'disorganized, nonsensical, and internally preoccupied' to participate." *Id.* ¶ 120. Plaintiff alleges that Sparks knew Roselee was a Regional Center client but failed to call the Regional Center for seven days; when she did call the Regional Center, Sparks only relayed that "Roselee was 'not doing well'" and failed to disclose the extent of Roselee's decompensation. *Id.* ¶¶ 121–23. Plaintiff alleges that Sparks failed to "properly monitor and treat Roselee's serious medical condition despite knowing she was refusing her medications and was frequently refusing food and liquids." *Id.* ¶ 315.

Sparks contends that the allegations against her "amount to negligence at most but fall short of" deliberate indifference. (ECF No. 63-1 at 20.) Sparks contends that she did not exhibit deliberate indifference because she "escalate[d]" Roselee's care when she eventually called the Regional Center, and it was not her responsibility as a mental health clinician to provide medication for hypokalemia. (ECF No. 69 at 8.)

Even assuming that ordering hypokalemia medication falls outside the scope of a mental health provider's job duties, Plaintiff alleges several other failures committed by Sparks. The Court finds that Plaintiff sufficiently alleges that: (i) Sparks made an intentional decision, on numerous occasions, to fail to properly monitor and treat Roselee's medical condition or to provide the Regional Center with an accurate assessment of Roselee's condition; (ii) which put Roselee at substantial risk of suffering serious harm because she was rapidly deteriorating; (iii) Sparks did not take reasonable available measures to abate that risk—by disclosing the extent of Roselee's condition to the Regional Center or properly treating Roselee's medical needs—even though a reasonable official in the circumstances would have appreciated that full disclosure with the Regional Center was crucial and that Roselee urgently needed treatment; and (iv) by not taking such measures, Sparks caused Roselee's deterioration and eventual death. At this stage of the proceedings, Plaintiff sufficiently alleges that Sparks was deliberately indifferent to Roselee's serious medical needs.

### vii. Rioveros

Plaintiff alleges that Roselee was cared for by dietician Defendant Rioveros on April 17, 2023, after Plaintiff "called the jail to inform them of Roselee's allergy to red dye." (FAC ¶ 125.) Plaintiff alleges that Rioveros knew that Roselee was not eating and knew that Roselee's weight had not been recorded for 11 days. *Id.* ¶ 126. Without obtaining Roselee's current weight or personally examining her, Plaintiff alleges that Rioveros instructed staff to consider switching Roselee from a liquid diet to a gastric diet. *Id.* ¶ 127. Plaintiff alleges that Rioveros did not order that Roselee be weighed nor did she recommend lab testing to assess Roselee's nutrition and dehydration levels. *Id.* ¶¶ 129–30.

Plaintiff alleges that on May 25, 2023, Rioveros was consulted regarding Roselee's refusal to eat. *Id.* ¶ 168. Plaintiff alleges that Rioveros knew that Roselee had been diagnosed with hypokalemia and that she was nonverbal but failed to recommend that blood be drawn to assess Roselee's levels of hydration or potassium and recommended only that Roselee be switched to a soft diet. *Id.* ¶¶ 169–71. Plaintiff alleges that Rioveros documented that Roselee's weight had never been recorded since being booked into the Jail and noted that it needed to be checked but did not actually weigh Roselee. *Id.* ¶ 172.

Rioveros contends that the allegations against her "at most . . . sound in negligence, not deliberate indifference," and are not causally connected to Roselee's death. (ECF No. 69 at 8.) Rioveros contends that "Plaintiff misunderstands the role of a dietician in assuming she would or could go to an incarcerated person's cell and personally medically evaluate and/or weigh them." (ECF No. 63-1 at 21.)

Rioveros' contention that Plaintiff misunderstands the role of a dietician contradicts Plaintiff's allegations in the FAC when construed in the light most favorable to Plaintiff. *See Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (stating that, when evaluating a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."). Plaintiff's allegations—that Rioveros possessed extensive knowledge of Roselee's weight-related medical issues, was aware that Jail staff had repeatedly failed to record her weight, and yet consistently failed to order lab tests to assess her nutrition levels or ensure that she was weighed or weigh her herself—are sufficient, under the four-part test, to adequately allege deliberate indifference at this stage of the proceedings.

### viii. Cell Check and Hygiene Check Defendants

Plaintiff alleges that Defendants Sanoni, Reyes, Ellsworth, Montoy, Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho, and Hadley conducted cell checks of Roselee's cell from April 6 to April 11, 2023 and observed Roselee sitting naked on the floor amid a pile of trash and clothes, covered in urine and

feces, but they failed to notify anyone of Roselee's condition. (FAC ¶¶ 113–16.) Plaintiff alleges that Defendants Leonard, Kuder, E. Millard, Vasquez, V. Millard, Wilson, Boatright, and Nanusevic conducted cell checks on May 28 and May 29, 2023, during which they saw Roselee "dying in her own filth" and ignored her symptoms. *Id.* ¶¶ 179, 181. Plaintiff alleges that the Cell Check Defendants conducted "flyby checks"—merely glancing into cells without checking on the occupants' welfare—and did not conduct them within 60 minutes of the last round, in violation of California regulations. *Id.* ¶¶ 113–15, 331. Plaintiff alleges that the Cell Check Defendants' failure to conduct regular cell checks and to provide medical care when they observed Roselee's state caused Roselee to be left "in a dire medical condition" and without access to medical care, basic nutrition, or hygiene in the hours before her death. *Id.* ¶¶ 331–32.

Plaintiff alleges that the Hygiene Check Defendants—Defendants Lam and Axelsson—failed to conduct hygiene checks from May 15 to May 29, 2023, the two weeks before Roselee died in her cell among a "pile of trash, rotting food, feces, and urine." *Id.* ¶ 333. Plaintiff alleges that the Hygiene Check Defendants "made no effort to provide basic sanitation and permitted Roselee to remain in rotting food, urine, and feces." *Id.* ¶ 178.

The Cell Check and Hygiene Check Defendants contend that Plaintiff's allegations against them are conclusory and lack specificity. (ECF No. 63-1 at 22.) Without that specificity, the Cell Check and Hygiene Check Defendants contend, "there is no basis to infer that each of the individually named defendants had knowledge" of a substantial risk of serious harm to Roselee. *Id.* at 23. The Cell Check and Hygiene Check Defendants further contend that they cannot be held liable under the Fourteenth Amendment because they are not medical providers, and they knew that Roselee was already under the care of medical staff. (ECF No. 69 at 9.)

Pretrial detainees have a constitutional right to "direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 973 (9th Cir. 2021). The Court finds that, at this stage of the proceedings, Plaintiff sufficiently alleges that the Cell Check and Hygiene Check

Defendants were deliberately indifferent to Roselee's serious medical needs. Specifically, the Court finds that Plaintiff sufficiently alleges that: (i) the Cell Check and Hygiene Check Defendants made numerous intentional decisions to conduct untimely and inadequate cell checks in violation of California law and to ignore Roselee's obvious, severe medical and psychiatric symptoms during those checks; (ii) which put Roselee at substantial risk of suffering serious harm because she was rapidly decompensating in her cell; (iii) the Cell Check and Hygiene Check Defendants did not take reasonable steps to mitigate this risk by notifying someone about Roselee's medical distress or intervening to provide care, even though a reasonable official under the circumstances would have alerted someone to Roselee's "dire medical condition"; and (iv) these failures caused Roselee to deteriorate in her cell without medical intervention, and ultimately to die. *See Est. of Silva v. City of San Diego*, No. 3:18-cv-2282-L-MSB, 2020 WL 6946011, at *10–11 (S.D. Cal. Nov. 25, 2020) (denying motion to dismiss deliberate indifference claims against Sheriff's Department officials who observed detainee's signs of decompensation during cell checks but failed to call for medical assistance).

The Court's ruling does not apply to the claims against Hadley, Leonard, V. Millard, Wilson, and Axelsson because they have not yet entered appearances.

### ix.    Does 7–27

Plaintiff alleges that Defendant Does 7–27 "were the nurses, mental health clinicians, psychiatrists, nurse practitioners, doctors, and all other medical personnel who . . . failed to provide adequate psychiatric or medical care to Roselee Bartolacci" from April 12, 2023, to May 29, 2023—when she was in the PSU, WPSU, and MOB. (FAC ¶¶ 27, 117–18.) Among other allegations, Plaintiff alleges that despite an obligation to do so, Does 7–27 never contacted the Regional Center, *id.* ¶ 316, failed to properly monitor and treat Roselee's serious medical condition, even after she was diagnosed with hypokalemia, *id.* ¶ 318, failed to weigh Roselee, *id.* ¶ 174, and failed to order Roselee's transfer to a psychiatric hospital or other community-based provider, *id.* ¶ 324. *See also id.* ¶¶ 131, 315, 320.

The County Defendants contend that Plaintiff's allegations against Does 7–27 are at most equivalent to negligence and not deliberate indifference. (ECF No. 63-1 at 23.) The Court finds that, at this stage of the proceedings, Plaintiff sufficiently alleges a deliberate indifference claim against Does 7–27. Specifically, the Court finds that Plaintiff sufficiently alleges the following: (i) Does 7–27 made several intentional decisions; (ii) these decisions placed Roselee at substantial risk of serious harm due to her rapidly deteriorating condition; (iii) Does 7–27 failed to take reasonable measures to mitigate that risk, even though a reasonable official in similar circumstances would have recognized the need to provide Roselee with appropriate medical care; and (iv) by not taking such measures, Does 7–27 caused Roselee's deterioration and death.

x. Hurley

Plaintiff alleges that between April 12, 2023 and April 26, 2023, Roselee was under the care of Defendant Hurley, a nurse practitioner employed by CHP. (FAC ¶¶ 20, 117–18.) Plaintiff alleges that between May 22, 2023 and May 28, 2023, Roselee was again under the care of Hurley. *Id.* ¶¶ 158, 161, 177. Plaintiff alleges that Hurley ignored orders to weigh Roselee on at least one occasion. *Id.* ¶ 173–74. Plaintiff alleges that on May 28, 2023, hours before Roselee passed away, Hurley witnessed Roselee "laying in her bed, covered with a blanket[,]moaning and crying" and that "[t]here was a heavy ammonia smell in her room and full food trays of uneaten food on her counter." *Id.* ¶ 177. Plaintiff alleges that Hurley's only treatment plan for Roselee's condition was "to continue to offer fluids, Ensure and favorite foods." *Id.* Plaintiff alleges that Hurley knew Roselee was a client of the Regional Center but failed to contact the Center as required by California law and Sheriff's Department policy. *Id.* ¶ 316.

Hurley contends that the majority of Plaintiff's allegations against her are too vague and conclusory to support a claim for deliberate indifference, particularly because Plaintiff does not allege that Hurley witnessed any of Roselee's concerning behaviors or her subpar environment. (ECF No. 60-1 at 15–16.) Hurley contends that the FAC instead lumps her together with other Defendants, without alleging what she "personally saw, was told, or

35

ordered." (ECF No. 70 at 7.) Hurley contends that Plaintiff's allegations do not proscribe the possibility that Hurley took Roselee's vitals at some point, or that Roselee's vitals were taken shortly before Hurley's encounters with her. (ECF No. 60-1 at 15–16.) Hurley contends that Plaintiff's allegations concerning her encounter with Roselee on May 28, 2023, do not support a finding that Hurley failed to treat a serious medical need or that she faced "emergency signs requiring immediate escalation," but rather that her course of action was reasonable. *Id.* at 16–17; ECF No. 70 at 7. Hurley contends that Roselee was under the care of a physician and psychiatrist at the time of her death, making it reasonable for Hurley to rely on their medical decision making. *Id.* at 17.

Plaintiff alleges that Hurley provided care for Plaintiff for nearly 20 days, thereby acquiring intimate knowledge of Roselee's physical and mental health conditions. Plaintiff alleges that Hurley nevertheless failed to weigh Roselee or to contact the Regional Center, and her only response to finding Roselee in a near-death state—moaning in a room that reeked of ammonia—was to offer fluids and favorite foods, which Roselee rejected.

The Court finds that, at this stage of the proceedings, Plaintiff adequately alleges that Hurley's actions, or lack thereof, demonstrate deliberate indifference. The Court also finds that a reasonable official in the same circumstances would have appreciated Roselee's critical condition, regularly monitored her weight, contacted the Regional Center per California law and Sheriff's Department policy, and developed a more robust treatment plan to address her immediate needs upon finding her in a deteriorated state on May 28, 2023, hours before her death. *See, e.g.*, *Pajas v. Cnty. of Monterey*, No. 16-CV-00945-LHK, 2016 WL 3648686, at *10 (N.D. Cal. July 8, 2016) (finding allegations that a nurse failed to render medical assistance or check the decedent's vital signs sufficient to adequately allege deliberate indifference at the motion to dismiss stage) (citing *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1083 (9th Cir. 2013)).

### xi.  Beaston

Plaintiff alleges that Defendant Beaston, a nurse practitioner employed by CHP, conducted Roselee's post-ER visit evaluation on May 21, 2023. (FAC ¶ 21, 157.) Plaintiff

alleges that Beaston knew that Roselee had been diagnosed with hypokalemia and treated with a potassium supplement. *Id.* ¶ 157. Plaintiff alleges that Beaston knew Roselee was starving and at great risk for dehydration. *Id.* Plaintiff alleges that Beaston offered Roselee a sandwich, which Roselee refused, and ordered that Roselee be closely monitored in the MOB. *Id.* Plaintiff alleges that Beaston failed to order that Roselee be given a potassium supplement. *Id.* Plaintiff alleges that Beaston knew Roselee was a client of the Regional Center but failed to contact the Center as required by California law and Sheriff's Department policy. *Id.* ¶ 316.

Beaston contends that Plaintiff's allegations against her constitute mere disagreement with medical judgment, not deliberate indifference. (ECF No. 70 at 5.) Beaston contends that Plaintiff does not allege that Roselee was still suffering from hypokalemia when Beaston encountered her, only that she had been treated for hypokalemia at AHMC shortly before. *Id.* at 14. Beaston contends that she had no reason to continue treating Roselee's hypokalemia, because it had already been treated. *Id.* Beaston contends that she "took reasonable steps to abate any risks associated with [Roselee's] history [of starvation and dehydration] by offering her food, ordering that she remain under close monitoring in the MOB, and asking medical staff to encourage her to eat and drink." *Id.* at 15. Beaston contends that Plaintiff does not allege that Beaston was ever alerted to the fact that Roselee continued to refuse food and drink after she saw her, and thus never became aware that Roselee had a substantial risk of suffering serious harm. *Id.*

The Court finds that the allegations against Beaston, when construed in the light most favorable to Plaintiff, sufficiently allege that: (i) Beaston intentionally chose not to order potassium supplements for Roselee, despite being aware that she had recently been hospitalized for hypokalemia and was at significant risk of starvation and dehydration, and Beaston intentionally chose not to contact the Regional Center, despite California law and Sheriff's Department Policy requiring she do so; (ii) both of which put Roselee at substantial risk of suffering serious harm, given her recent hypokalemia diagnosis and

significant mental impairments; (iii) Beaston failed to take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have recognized the necessity of potassium supplementation and the requirement under California law and Sheriff's Department Policy M.9 to contact the Regional Center; and (iv) by failing to act, Beaston caused Roselee's decline and eventual death. *See, e.g.*, *Johnson v. Schwarzenegger*, 366 F. App'x 767, 770 (9th Cir. 2010) (citations omitted) ("Failure to provide medication to prevent a life-threatening condition may amount to deliberate indifference to a serious medical need.").

At this stage of the proceedings, Plaintiff adequately states a deliberate indifference claim against Beaston.

### xii. Christensen

Plaintiff alleges that Roselee was under the care of Defendant Christensen, a CHP employee, between April 12, 2023 and April 26, 2023. (FAC ¶¶ 18, 117–18.) Plaintiff alleges that on April 14, 2023, Christensen prescribed Roselee Zofran because she had been vomiting, but did not examine her. *Id.* ¶ 119. Plaintiff alleges that Christensen, despite being aware of the seriousness of Roselee's condition, did not otherwise intervene to assess her medical needs during this time. *Id.* ¶ 131. Plaintiff alleges that Roselee was again under the care of Christensen between May 22, 2023 and May 28, 2023. *Id.* ¶ 161. Plaintiff alleges that on May 24, 2023, Christensen went to assess Roselee but did not enter her cell, examine her, obtain her vital signs, or weigh her. *Id.* ¶¶ 165, 174. Plaintiff alleges that on his May 24, 2023 encounter with Roselee, Christensen ordered no medication and either failed to review or ignored Roselee's medical records. *Id.* ¶ 165. Plaintiff alleges that Christensen knew Roselee was a client of the Regional Center but failed to contact the Center as required by California law and Sheriff's Department policy. *Id.* ¶ 316.

Christensen contends that Plaintiff's allegations against him do not rise to the level of deliberate indifference. (ECF No. 60-1 at 12–14.) Christensen contends that Plaintiff's allegation that he prescribed Roselee Zofran, a "recognized intervention," on April 14, 2023 contradicts Plaintiff's allegation that he failed to assess Roselee's medical needs. *Id.*

at 12; ECF No. 70 at 3. Christensen contends that Plaintiff's allegation that Christensen failed to perform a physical examination when prescribing the Zofran does not demonstrate deliberate indifference because Plaintiff also alleges that another defendant tried to perform a mental health assessment on the same day and could not because Roselee was too "internally preoccupied" to participate. *Id.* at 12–13. Christensen contends that although Plaintiff alleges that Christensen did not take Roselee's vital signs on May 24, 2023, Plaintiff also alleges that somebody obtained Roselee's vitals on that day, possibly right before Christensen saw her. *Id.* at 13.  Christensen contends that Plaintiff does not allege that Christensen knew no one had contacted the Regional Center, or that the "duty fell uniquely to him." (ECF No. 70 at 4.)

Plaintiff alleges that between April 12, 2023 and April 26, 2023—when Roselee was admitted to AHMC for 14 days because she was suffering from serious medical conditions and "had a high probability of imminent or life-threatening deterioration"—her physician, Christensen, made no attempt to assess her medical needs except to prescribe her Zofran for vomiting, despite knowing the seriousness of her condition. The Court finds that these allegations, in addition to Christensen's failure to contact the Regional Center per California law and Sheriff's Department policy and the remaining allegations against Christensen, sufficiently state that (i) Christensen made several intentional decisions, including to not physically examine Roselee or adequately assess her medical needs; (ii) which put Roselee at substantial risk of suffering serious harm, exhibited by her 14-day hospitalization; (iii) Christensen failed to take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have recognized Roselee's worsening condition and attempted to treat it; and (iv) by failing to act, Christensen caused Roselee's decline and eventual death.

At this stage of the proceedings, Plaintiff adequately states a deliberate indifference claim against Christensen.

3:24-cv-1156-WQH-JLB

1

xiii.  Anderson

2      Plaintiff alleges that between April 11, 2023 and April 12, 2023, Anderson observed

3  that Roselee's cell was filthy (with both trash and bodily excrement), and that Roselee was

4  unresponsive and unable to follow simple instructions. (FAC ¶¶ 15, 100–01.) Plaintiff

5  alleges that Anderson knew of Roselee's extensive medical history and that Roselee was

6  under the care of the Regional Center, but she did not contact Roselee's Regional Center

7  case manager.[4] *Id.* ¶¶ 102–03. Plaintiff alleges that on April 12, 2023, Roselee was

8  transferred to the WPSU and remained under the care of Anderson until April 26, 2023,

9  but Anderson never intervened to assess Roselee's medical needs at any point during this

10 time. *Id.* ¶¶ 104, 117–18. Plaintiff alleges that on May 16, 2023, Anderson resumed care

11 of Roselee and ordered that she be weighed once a week. *Id.* ¶ 149. Plaintiff alleges that

12 "[t]his order was deficient per [Sheriff's Department Policy] MSD.H.12, which required

13 that Roselee be weighed each day," that this order was not followed, and that Anderson

14 never followed up to ensure it would be.[5] *Id.* ¶¶ 149–50. Plaintiff alleges that on May 22,

15 2023, when Roselee was transferred to the WPSU, Anderson completed her Admission

16 Note, noting that Roselee "had not been eating and drinking enough and was vomiting,"

17 that Roselee had been hospitalized with hypokalemia, and that Roselee "was declining in

18

19

---

20 [4] Anderson contends that the FAC contradicts itself—it alleges both that "there is no notation that
21 Anderson made any effort to contact" the Regional Center (FAC ¶ 103) and that Anderson "spoke with
   Roselee's Regional Center case manager" (FAC ¶¶ 166–67). (ECF No. 62 at 9.) Viewing the allegations
22 in the light most favorable to Plaintiff at this stage of the proceedings, *see Manzarek*, 519 F.3d at 1031,
   the Court finds that the FAC is not contradictory. Plaintiff alleges that Anderson did not contact the
23 Regional Center soon after her April encounter with Roselee (FAC ¶ 100–03), which does not contradict
   Plaintiff's allegation that Anderson eventually contacted the Regional Center on May 24, 2023 (FAC ¶¶
24 166–67).

25 [5] Anderson contends that she "specifically ordered daily weigh-ins," and that the County RN staff were at
26 fault for failing to weigh Roselee daily, not Anderson. (ECF No. 73 at 5–6.) However, Plaintiff alleges
   that Anderson ordered "that Roselee be weighed once a week," and that she "never followed up to ensure
27 that medical personnel were complying with this order." (FAC ¶ 149–50.) The Court must accept
   Plaintiff's well-pleaded factual allegations as true at the motion to dismiss stage. *See Keates v. Koile*, 883
28 F.3d 1228, 1234 (9th Cir. 2018).

1   a jail setting." *Id.* ¶¶ 161–62. Plaintiff alleges that Anderson ordered that Roselee be

2   encouraged to eat and drink and that her vitals be checked weekly, but that Anderson failed

3   to treat Roselee's hypokalemia by ordering a potassium supplement for her. *Id.* ¶ 163.

4   Plaintiff alleges that on May 24, 2023, 48 days after Roselee was booked into the Jail,

5   Anderson finally spoke with Roselee's Regional Center case manager, who recommended

6   Roselee be sent home or to a conservatorship. *Id.* ¶¶ 166–67.

7           As an initial matter, Anderson contends that Plaintiff cannot state a § 1983 claim

8   against her because Plaintiff fails to allege that Anderson was "acting under the color of

9   law." (ECF No. 62 at 12.) The Supreme Court has found that private physicians under

10  contract with the state to provide medical care in prisons act under color of state law when

11  they treat prisoners' injuries. *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 753 (9th

12  Cir. 2020) (citing *West v. Atkins*, 487 U.S. 42, 54–55 (1988)). Plaintiff alleges that

13  Anderson was employed by NaphCare, a third-party contractor, to provide psychiatric care

14  to inmates in County jails. (FAC ¶¶ 15, 23.) At this stage of the proceedings, the Court

15  finds that Plaintiff has adequately alleged that Anderson acted under color of state law for

16  § 1983 purposes in her role of providing psychiatric care and assessment to inmates in

17  County jails.

18          Anderson contends that Plaintiff conflates the conduct of all Defendants, instead of

19  alleging that Anderson's specific conduct caused Plaintiff's harm. (ECF No. 62 at 13.)

20  Anderson contends that Plaintiff's allegations against her do not establish deliberate

21  indifference because Plaintiff fails to allege that Anderson "made an intentional decision

22  with respect to the conditions under which [Plaintiff] was confined." (ECF No. 73 at 6.)

23  However, Plaintiff alleges that Anderson personally observed an unresponsive Roselee in

24  a feces-ridden cell and knew that Roselee was a client of the Regional Center, but Anderson

25  did not contact the Regional Center until 42 days later. Plaintiff also alleges that Anderson

26  knew Roselee was not eating but failed to order daily weigh-ins, in violation of Sheriff's

27  Department policy. The fact that a medical provider takes *some* steps to treat a patient—

28  such as eventually calling the Regional Center 42 days later and ordering weekly weigh-

3:24-cv-1156-WQH-JLB

ins—does not absolve her from liability for deliberate indifference. *See Russell v. Lumitap*, 31 F.4th 729, 742–43 (9th Cir. 2022) (denying summary judgment on qualified immunity for deliberate indifference claim when jail doctor merely recommended Motrin and a mental health evaluation without examining detainee who exhibited heart-attack symptoms); *Sandoval v. Cnty. of San Diego*, 985 F.3d 667, 679 (9th Cir. 2021) (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).

At this stage of the proceedings, Plaintiff sufficiently alleges that (i) Anderson made the intentional decision to continuously fail to intervene to assess Roselee's medical needs; (ii) which put Roselee at substantial risk of suffering serious harm because she was in the midst of a mental health crisis and needed crisis intervention; (iii) Anderson did not take reasonable measures to abate that risk—such as contacting the Regional Center in a timely manner or prescribing Roselee with medication to address her illnesses—even though a reasonable official in the circumstances would have contacted the Regional Center and appreciated that Roselee was mentally unwell and needed immediate psychiatric care; and (iv) by not taking such measures, Anderson caused Roselee's health to materially decline, which ultimately led to her death. At this stage of the proceedings, Plaintiff sufficiently alleges that Anderson exhibited deliberate indifference to Roselee's serious medical needs.

Anderson contends for the first time in her reply brief that if the Court deems her a state actor, she is entitled to qualified immunity. (ECF No. 73 at 5.) The Court declines to consider Anderson's qualified immunity argument at this stage of the proceedings because she failed to include it in her opening brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Even if the Court were to consider Anderson's argument, it would deny her qualified immunity at this stage of the proceedings. Qualified immunity is categorically unavailable to privately employed healthcare professionals who contract with the county to provide their services. *Jensen v. Lane Cnty.*, 222 F.3d 570, 577–80 (9th Cir. 2000). After the Ninth Circuit decided *Jensen*, the United States Supreme Court expanded the availability of

qualified immunity for some private actors performing work on behalf of the state. *Filarsky v. Delia*, 566 U.S. 377, 393–94 (2012). However, the Ninth Circuit has "not considered" whether privately employed healthcare professionals working as independent contractors in jails are entitled to qualified immunity under *Filarsky*. *Campbell v. Herrera*, No. 24-3296, 2025 WL 1525311, at *5 (9th Cir. May 29, 2025) (Lee, J., dissenting). The Court follows binding Ninth Circuit precedent and holds that, as a privately employed healthcare professional working in a jail, Anderson is not entitled to qualified immunity. *Jensen*, 222 F.3d at 577–80; *see also Est. of Settles ex rel. Settles v. Cnty. of San Diego*, No. 3:24-cv-352-CAB-MSB, 2025 WL 3034072, at *3 (S.D. Cal. Oct. 30, 2025) (relying on *Jensen* to deny qualified immunity to private medical professionals providing contracted mental health services in county jail).

Even if qualified immunity were categorically available to private healthcare providers working under contract in jails, it still would not insulate Anderson from liability. Government officials are entitled to qualified immunity unless the plaintiff can allege the violation of a "clearly established" constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As discussed above, Plaintiff sufficiently alleges that Anderson violated Roselee's clearly established right to constitutionally adequate medical care. *See Russell*, 31 F.4th at 742–43; *Est. of Solis v. Cnty. of Riverside*, No. 5:23-cv-00989-HDV-(SPx), 2025 WL 2632392, at *7 (C.D. Cal. June 23, 2025) (denying qualified immunity to correctional officers who "walk[ed] away from a hunched over, unresponsive detainee that ha[d] documented suicide risk, exacerbated by the conditions of his placement, who was not taking his medication"). Accordingly, Plaintiff's deliberate indifference claim against Anderson survives at this stage of the proceedings.

### B. Whether Plaintiff's Claims Against Does 7–55 Fail to Meet Federal Pleading Standards

The County Defendants contend that Plaintiff's claims against Does 7–55 fail to meet federal pleading standards because Plaintiff impermissibly groups the Doe defendants together, without specifying each Doe defendant's role in violating Roselee's rights. (ECF

3:24-cv-1156-WQH-JLB

No. 63-1 at 29–30.) Plaintiff contends that her allegations against the Doe Defendants are sufficiently specific, noting that Does 7–27 and 44–55 are pled distinctly. (ECF No. 66 at 24.)

### 1. Legal Standard

Although FRCP 10(a) requires a complaint to name all parties, *see* Fed. R. Civ. P. 10(a), the Ninth Circuit has routinely allowed the use of fictitious names for defendants. Specifically,

> where the identity of alleged defendants will not be known prior to the filing of a complaint . . . the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.

*Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980); *see also Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (same). However, a plaintiff must still "allege specific facts showing how each particular doe defendant violated his rights." *Keavney v. Cnty. of San Diego*, No. 319CV01947AJBBGS, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020).

### 2. Application

Plaintiff alleges that Defendant Does 7–27 "were the nurses, mental health clinicians, psychiatrists, nurse practitioners, doctors, and all other medical personnel who . . . failed to provide adequate psychiatric or medical care to Roselee Bartolacci" from April 12, 2023, to May 29, 2023—when she was in the PSU, WPSU, and MOB. (FAC ¶¶ 27, 117–18.) Among other allegations, Plaintiff alleges that despite an obligation to do so, Does 7–27 never contacted the Regional Center, *id.* ¶ 316, failed to properly monitor and treat Roselee's serious medical condition, even after she was diagnosed with hypokalemia, *id.* ¶ 318, failed to weigh Roselee, *id.* ¶ 174, and failed to order Roselee's transfer to a psychiatric hospital or other community-based provider, *id.* ¶ 324. *See also id.* ¶¶ 131, 315, 320.

Plaintiff alleges that Defendant Does 44–55 were high-ranking officials at the Sheriff's Department "responsible for supervising, disciplining, and training subordinate

individual defendants and . . . promulgating and approving all policies and practices in this case." *Id.* ¶ 30. Among other allegations, Plaintiff alleges that Does 44–55:

> failed to properly train and supervise their subordinates with regard to: (1) the need to communicate critical medical information, including between Jail staff and outside agencies where needed, including the San Diego Regional Center; (2) the need to document observations regarding critically ill or mentally ill inmates; (3) the need to appropriately classify and house seriously ill inmates; (4) the need to accommodate the needs of the disabled; and (5) the need to provide adequate care and monitoring of seriously ill inmates through frequent and regular cell checks and monitoring of vital signs, particularly for those suffering with severe psychiatric issues.

*Id.* ¶ 339.

While courts have found that allegations against Doe Defendants must be dismissed where the "[p]laintiff fails to even minimally explain how the [ ] unidentified parties caused a violation of her constitutional rights," *Segura v. City of La Mesa*, 647 F. Supp. 3d 926, 941 (S.D. Cal. 2022), in this case, Plaintiff has done more than minimally explain how the Doe Defendants violated Roselee's rights. Instead, Plaintiff has provided detailed allegations against the Doe Defendants, including the role they played at the Jail and what actions or inactions they took which violated Roselee's rights. The Court finds that, based on Plaintiff's current allegations against the Doe Defendants, it is likely that discovery will uncover their identities.

The County Defendants take issue with Plaintiff's use of "group pleading." (ECF No. 63-1 at 30.) However, the Ninth Circuit states that while "[a] collectively pleaded complaint may fail to provide fair notice to a defendant[] where there are multiple defendants and claims, and the complaint fails to differentiate among them," "our precedent does not prohibit collective pleading so long as the complaint gives defendants fair notice of the claims against them." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 762 (9th Cir. 2025) (en banc). At this stage in the proceedings, Plaintiff's FAC provides the Doe Defendants with fair notice of the claims against them.

Moreover, courts in the Ninth Circuit have regularly found nearly identical pleadings permissible. *See Est. of Osuna v. Cnty. of Stanislaus*, 392 F. Supp. 3d 1162, 1169 (E.D. Cal. 2019) (finding that Plaintiff's group allegations against Doe Defendants 1–25 and Doe Defendants 26–50 did not violate the Federal Rules of Civil Procedure, even though Plaintiff had not made individual allegations against each defendant); *see also Est. of Arroyo ex rel. Wilson*, 2024 WL 1627221, at *3 (finding that Plaintiff's group allegations against Doe Defendants 6–20 and Doe Defendants 21–40 were sufficient such that Plaintiff could substitute individual defendants for the anonymous placeholders, even though Plaintiff had not made individual allegations against each defendant); *Theta Chi Fraternity, Inc. v. Leland Stanford Junior Univ.*, 212 F. Supp. 3d 816, 822 (N.D. Cal. 2016) (finding it premature to dismiss allegations against Does 51–100 where the plaintiff alleged it was unaware of the true names and capacities of such defendants); *Fosbinder v. Cnty. of San Diego*, No. 24-CV-733-RSH-SBC, 2024 WL 4631275, at *4 (S.D. Cal. Oct. 30, 2024) (same).

Plaintiff's allegations against the Doe Defendants are sufficient to satisfy federal pleading standards at this stage of the proceedings.

### C. Whether Plaintiff Adequately Alleges a Failure to Properly Train, Supervise, and Discipline Under § 1983 by Martinez, Axelsson, Nanusevic, Boatright, and Does 41–55

In her second cause of action, Plaintiff alleges that Defendants Martinez, Axelsson, Nanusevic, Boatright, and Doe Defendants 41–55 (collectively, the "Supervisory Defendants") violated § 1983 by failing to properly train and supervise their subordinates regarding:

> (1) the need to communicate critical medical information, including between Jail staff and outside agencies where needed, including the San Diego Regional Center; (2) the need to document observations regarding critically ill or mentally ill inmates; (3) the need to appropriately classify and house seriously ill inmates; (4) the need to accommodate the needs of the disabled; and (5) the need to provide adequate care and monitoring of seriously ill inmates through frequent and regular cell checks and monitoring of vital signs . . . .

(FAC ¶ 339.)

Under § 1983, a supervisor can be held liable in his or her individual capacity if (1) the supervisor was "person[ally] involve[d] in the constitutional deprivation," or (2) there is a "sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 645–46 (9th Cir. 1989). To establish supervisory liability for failure to train under § 1983, a plaintiff must allege that the supervisory defendant "was deliberately indifferent to the need to train subordinates, and the lack of training actually caused the constitutional harm or deprivation of rights." *Flores v. Cnty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (citing *Connick v. Thompson*, 563 U.S. 51, 51–52 (2011)).

The County Defendants contend that Plaintiff's "second cause of action" against the Supervisory Defendants for "negligent training and supervision . . . fails under Government Code section 844.6" and because "Plaintiff has not alleged a special relationship between these Defendants and Roselee" as required by California Government Code Section 815.2. (ECF No. 63-1 at 25.)

The Court finds that the County Defendants' contentions, which rely on California state law, are immaterial to Plaintiff's second cause of action, which alleges a federal constitutional violation under § 1983. *See Martinez v. California*, 444 U.S. 277, 284 n.8 (1980) (stating that "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C § 1983 or § 1985(3) cannot be immunized by state law"); *see also Ganley v. Cnty. of San Mateo*, No. C06-3923 TEH, 2007 WL 902551, at *4 (N.D. Cal. Mar. 22, 2007) ("California state immunity laws cannot provide a defense to a § 1983 action.").

The County Defendants also contend that Plaintiff fails to allege facts sufficient to establish deliberate indifference on the part of the Doe Defendants 41–55 and that "past incidents . . . cannot support supervisory liability" for the Doe Defendants 41–55 because they are "unrelated to the time of [Roselee]'s death." (ECF No. 63-1 at 24; ECF No. 69 at 12.)

Plaintiff alleges that the Supervisory Defendants failed to properly train and supervise their subordinates regarding "render[ing] medical care to meet the standards of the Constitution," (FAC ¶ 340), "accurately assess[ing] critical and emergency medical conditions," *id.*, determining "when to refer a patient to a hospital or other community-based facility," *id.*, "monitoring [ ] inmates" who need accommodations due to disabilities, *id.* ¶ 341, "dealing with developmentally disabled individuals" and "vulnerable inmates who refuse required medications," *id.* ¶¶ 342–43, and "dealing with inmates suffering from dehydration and malnutrition," *id.* ¶ 344. Plaintiff also alleges that the Supervisory Defendants "failed to properly handle misconduct and the violation of citizens' civil rights by correctional officers and medical staff by investigating and disciplining them" and that "[t]here has been an official policy of acquiescence in [Jail staff's] wrongful conduct." *Id.* ¶¶ 346, 349. Plaintiff further alleges that Defendants Axelsson, Nanusevic, and Boatright "failed to correct the wrongs and supervise their subordinates in the face of repeated and prolonged denial of medical care, nutrition, and the required level of hygiene." *Id.* ¶ 349. In the FAC, Plaintiff cites to numerous instances, spanning from 2014 to 2022, where County jail staff failed to properly treat inmates suffering from serious medical conditions or psychotic episodes. *Id.* ¶ 215.

Plaintiff sufficiently alleges the nature of the Supervisory Defendants' deficient training and supervision, that a pattern of constitutional violations occurred to put the Supervisory Defendants on notice of the deficient training and supervision, and that a causal connection exists between the failure to train and supervise and Roselee's constitutional violation. *See, e.g.*, *Est. of Gutierrez ex rel. Benitez v. Castillo*, No. 21-CV-01292-H-LL, 2021 WL 5989972, at *5 (S.D. Cal. Dec. 17, 2021) (finding that plaintiff adequately alleged a § 1983 claim against the San Diego Chief of Police for failure to properly train officers in de-escalation techniques, handling individuals with mental health issues, and firearm use, where the plaintiff cited two prior incidents where San Diego police had similarly shot individuals in psychiatric crises); *McKinnie v. City of San Diego*, No. 3:24-CV-00827-H-SBC, 2024 WL 4126062, at *4 (S.D. Cal. Sept. 9, 2024) (finding that,

at the pleading stage, Plaintiff's allegations of discriminatory policing over a four-year period were "sufficient to plead a 'history of wide-spread abuse' to state a failure to supervise claim").

Plaintiff adequately states a § 1983 failure to train claim against the Supervisory Defendants at this stage of the proceedings. The Court's ruling does not apply to the claims against Axelsson because he has not yet entered an appearance.

### D. Whether Plaintiff Adequately Alleges *Monell* Municipal Liability Against Defendants the County and CHP

#### 1. *Legal Standard*

Municipalities are considered "persons" under § 1983 and therefore may be liable for causing a constitutional deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). A municipality, however, "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under [§ 1983] under a respondeat superior theory." *Id.* at 691. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* at 694.

> In order to establish liability for governmental entities under *Monell*, a plaintiff must prove "(1) that [the plaintiff] possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation."

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alteration in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997))."Failure to train may amount to a policy of 'deliberate indifference,' if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)); *see Miranda v. Clark County*, 319 F.3d 465, 471 (9th Cir. 2003) (the failure of a public defender's office to train subordinates "may result in § 1983 liability where the failure amounts to deliberate

indifference to the rights of persons with whom the subordinates come into contact") (citing *City of Canton*, 489 U.S. at 388). "Similarly, a failure to supervise that is 'sufficiently inadequate' may amount to 'deliberate indifference.'" *Dougherty*, 654 F.3d at 900 (quoting *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989)). Lastly, "evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations'" can suggest that, despite an official policy prohibiting such conduct, a municipality has tacitly adopted an unconstitutional practice. *Rodriguez v. Cnty. of Los Angeles*, 891 F.3d 776, 803 (9th Cir. 2018) (quoting *Hunter v. Cnty. of Sacramento*, 652 F.3d 1225, 1234 n.8 (9th Cir. 2011)).

An official municipal "policy" includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S. at 60 (citations omitted). A municipality's "inaction" or failure to "implement adequate policies or procedures to safeguard its community members' federally protected rights" may constitute an official policy under *Monell*. *Hyun Ju Park v. City & Cnty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020). If the policy "is not obviously, facially deficient," plaintiffs must demonstrate a "pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Id.* at 1142.

Historically, the Ninth Circuit allowed plaintiffs to plead a *Monell* claim with nothing more than "a bare allegation that government officials' conduct conformed to some unidentified government policy or custom." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012). However, following the decisions in *Iqbal* and *Twombly*, the Ninth Circuit clarified that *Monell* claims must include sufficient allegations to provide fair notice to the opposing party and to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Id.* (quotations and citation omitted).

### 2. *Application*

#### i. <u>The County</u>

The County contends that Plaintiff fails to sufficiently allege facts of the underlying constitutional violation necessary to assert a *Monell* claim. (ECF No. 63-1 at 26.) For the reasons discussed in Section (V)(A) above, the Court finds that Plaintiff sufficiently alleges that Roselee possessed a constitutional right to medical care of which she was deprived.

The County contends that Plaintiff "has not alleged facts sufficient to show how any of the 'policies' [she] reference[s] could have caused Roselee's death" or "how any of the customs, policies or practices they allege could have been the 'moving force' and contributed to Roselee's death." *Id.* at 26. The County further contends that Plaintiff's allegations of prior incidents involving constitutional violations are irrelevant because they are not "tied to [Roselee]'s death [n]or shown to reflect policies in effect at the relevant time." (ECF No. 69 at 9.)

Plaintiff alleges that "[t]he County maintained a deficient policy on contacting Regional Centers when developmentally disabled individuals are booked into jail" because the policy fails to specify that contact be made for the purposes of diagnosis or treatment, in violation of California regulations. (FAC ¶ 355.) Plaintiff repeatedly alleges that Defendants' failure to contact the Regional Center to coordinate Roselee's care led to her suffering and death. *See, e.g., id.* ¶¶ 63, 67–68, 74, 86, 92, 103, 109, 121. Plaintiff also alleges that when Jail staff finally did contact the Regional Center, they failed to disclose that "Roselee was decompensating from the interruption of critical antipsychotic medication [and] that she was living in complete filth," instead only reporting that she was "not doing well." *Id.* ¶¶ 122–23.

Plaintiff alleges that "the County maintained a deficient policy under the Americans with Disabilities Act by putting the onus on developmentally disabled detainees to request their own accommodations, rather than requiring jail staff to provide accommodations to individuals they know suffer from grave developmental disabilities and are unable to advocate for themselves." *Id.* ¶ 358. Specifically, Plaintiff alleges that Sheriff's

Department Policy M.39 states that accommodation requests can only be initiated by "the incarcerated person, their family members, or an outside agency" and that this policy caused "the symptoms of Roselee's developmental disability [to be] written off as 'non-cooperative' by the San Diego Sheriff's Department healthcare providers," which led to her receiving "deficient treatment, services and programs up until her death." *Id.* ¶¶ 197–200.

Plaintiff also alleges that there are at least 10 de facto customs giving rise to her *Monell* claim, such as customs of: failing to render care to patients suffering from an acute psychiatric condition, failing to screen inmates properly for medical care, understaffing medical positions and forcing existing personnel to shoulder overwhelming caseloads, allowing gravely disabled patients to dictate their own medical care, food, and water intake, failing to take the vital signs of those in obvious medical distress, failing to conduct proper cell checks, etc. *See id.* ¶¶ 365–77. Plaintiff alleges in detail how Jail staff exhibited these deficient customs that harmed Roselee and ultimately led to her death. Plaintiff alleges that the County is aware of a persistent and recurring pattern of preventable deaths and serious injuries caused by these deficiencies, citing to at least 13 examples of instances where staff at County jails exhibited one of these customs and it led to an inmate death or injury. *See, e.g.*, *id.* ¶¶ 213–215.

Plaintiff further alleges that "Defendant County condoned and acquiesced in the abusive behavior of its subordinates by refusing to retrain them, discipline them, or correct their abusive behaviors." *Id.* ¶ 384. Plaintiff alleges that the County's longstanding failure to properly supervise and discipline its staff—as well as its adoption and ratification of constitutionally deficient customs and practices concerning the care of seriously ill inmates—amounted to deliberate indifference to Roselee's medical needs. *Id.* ¶ 385. Plaintiff alleges that these systemic failures were the moving force behind the misconduct of Jail personnel, the denial of adequate medical care, and the prolonged pain, suffering, and eventual death of Roselee. *Id.* Plaintiff also alleges a well-established pattern of similar constitutional violations resulting from the County's failure to train and supervise its

employees, citing numerous prior incidents involving comparable harms to other detainees. *See id.* ¶¶ 201–300.

In response to Plaintiff's allegation that the Sheriff's Department policy requiring Jail staff to contact the Regional Center is deficient, the County contends that Plaintiff fails to articulate the specific content of the communications between Jail staff and the Regional Center in this case, or to explain what those communications should have included. (ECF No. 63-1 at 27.) However, Plaintiff specifically alleges that many Jail staff members repeatedly failed to contact the Regional Center entirely, and that, at minimum, no one contacted the Regional Center to meaningfully discuss Roselee's placement and treatment options until at least 48 days after her detention began. (FAC ¶¶ 167, 317.) At this stage of the proceedings, the Court finds that Plaintiff sufficiently alleges that the Sheriff's Department policy concerning contact with the Regional Center was both facially inadequate and routinely ignored, and that this policy contributed to the harm suffered by Roselee.

In response to Plaintiff's allegation that Sheriff's Department Policy M.39 is deficient, the County alleges that "Plaintiff misquotes key areas of the policy and takes it out of context." (ECF No. 63-1 at 27.) At this stage of the proceedings, the Court's review is limited to the allegations within the FAC and facts that can be judicially noticed. *See Rothschild v. Pac. Cos.*, No. 23-CV-01721-LJC, 2025 WL 690388, at *3 (N.D. Cal. Mar. 4, 2025) ("A court's review under Rule 12(b)(6) is generally limited to the contents of a complaint, with the exception of materials incorporated by reference in a complaint or materials subject to judicial notice.") (citing *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018)). Because the County has not requested judicial notice of Sheriff's Department Policy M.39, and Plaintiff alleges that the policy specifically states that accommodation requests can only be initiated by "the incarcerated person, their family members, or an outside agency," the Court must accept Plaintiff's allegations as true. *See Khoja*, 899 F.3d at 998. Thus, Plaintiff's allegations regarding Sheriff's Department Policy M.39 are sufficient to support her *Monell* claim.

Finally, the County contends that any remaining policy deficiencies cited by Plaintiff do not sufficiently allege a *Monell* claim because Plaintiff fails to show that such customs were "contained in a facially deficient policy" and were a moving force behind a constitutional violation or connected to Roselee's death. (ECF No. 63-1 at 27.) To trigger municipal liability under *Monell* in the absence of an official policy, Plaintiff must demonstrate a known pattern of similar constitutional violations that resulted from a challenged custom or pervasive practice. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). In this case, Plaintiff pleads that municipal policymakers were aware of and acquiesced in a pattern of constitutional violations. Plaintiff's FAC alleges specific instances of death and injury to inmates in County jails due to the denial of necessary medical care. (*See, e.g.*, FAC ¶ 215.)

At this stage of the proceedings, Plaintiff's allegations sufficiently show that (1) Roselee possessed a constitutional right to medical care of which she was deprived; (2) the County maintained policies and de facto customs; (3) these policies and de facto customs amounted to deliberate indifference to Roselee's right to medical care; and, (4) these policies and de facto customs were the moving force behind the County's violations of Roselee's right to medical care. *See, e.g.*, *Greer v. Cnty. of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2019 WL 5453955, at *10 (S.D. Cal. Oct. 24, 2019) (finding that a plaintiff's allegations of common constitutional violations through the County of San Diego's de facto policies "offer[ed] a plausible theory of pattern and causation" to support municipal liability where the plaintiff's complaint was supported by specific instances of death and injury to other inmates due to the denial of needed medical care).

### ii. CHP

CHP contends that Plaintiff fails to allege sufficient facts of the underlying constitutional violation necessary to state a *Monell* claim. (ECF No. 60-1 at 17.) As discussed in Section (V)(A) above, the Court finds that Plaintiff sufficiently alleges that Roselee possessed a constitutional right to medical care of which she was deprived.

1   CHP further contends that Plaintiff fails to allege that CHP "had a policy, practice,

2   or custom that was the 'moving force' behind" the alleged constitutional violations. *Id.* at

3   18. Plaintiff contends that she sufficiently alleges a *Monell* claim based on CHP's "failure

4   to implement policies crucial to the effective provision of medical care to critically ill

5   inmates." (ECF No. 67 at 21.)

6   Plaintiff alleges that CHP "failed to institute policies . . . requiring providers to

7   review patients' medical charts and to communicate and coordinate care with other medical

8   professionals." (FAC ¶ 360–61.) Plaintiff alleges that CHP's co-founder, Peter Freedland,

9   established CHP after his prior employer faced a lawsuit (the "2019 Michael Wilson case")

10  over the death of Michael Wilson, an inmate in a San Diego jail. *Id.* ¶ 359. Plaintiff alleges

11  that the plaintiff in that lawsuit, accused Freedland himself "of failing to read [Wilson's]

12  medical records and failing to have [Wilson] weighed," and "examin[ing] [Wilson] in the

13  hallway of the Jail instead of the examination room." *Id.* Plaintiff alleges that although

14  "multiple care providers" employed by Freedland's former employer "caused serious

15  injuries or deaths as a result of their failures to read medical records, properly examine

16  patients[,] or weigh their patients," CHP failed to implement policies to "prevent these

17  harms to patients." *Id.* ¶ 360.

18  Plaintiff alleges that CHP's failure to institute such policies caused Christensen to

19  not physically examine Roselee, obtain her vital signs, or review her medical records. *Id.*

20  at ¶ 362. Plaintiff also alleges that CHP's absence of policies caused Christensen and

21  Hurley to "ignore[] the nutritionist's recommendation to weigh Roselee." *Id.* ¶ 363.

22  Plaintiff further alleges that CHP has several de facto customs—most of which

23  overlap with Plaintiff's allegations against the County—that establish *Monell* liability.

24  These customs include: staffing jails with contract employees who lack proper training and

25  supervision, understaffing to maximize profits, failing to render care to patients suffering

26  acute psychiatric conditions, failing to screen inmates properly for medical care, allowing

27  gravely disabled patients to dictate their own medical care, food, and water intake, failing

28

to take the vital signs of those in obvious medical distress, ignoring patients' medical records, etc. *Id.* ¶¶ 381, 365–71.

As with her allegations against the County, Plaintiff alleges in detail how CHP employees' adherence to these de facto customs injured Roselee and caused her death. Plaintiff alleges that CHP had notice of a longstanding pattern of failing to provide adequate medical care, which caused a series of preventable deaths. *Id.* ¶ 379. Plaintiff also alleges that CHP knew its program of supervising and disciplining subordinates was "so inadequate that it was obvious that a failure to correct it would result in further incidents." *Id.* ¶ 385. As with Plaintiff's *Monell* claim against the County, Plaintiff alleges that CHP's deficient practices and customs, its inadequate training, supervision, and discipline of employees, and its knowledge of a "longstanding pattern of failing to provide adequate medical care" rendered CHP deliberately indifferent to Roselee's medical needs and was the "moving force" behind her death. *Id.*

CHP contends that Plaintiff improperly conflates CHP with the County. (ECF No. 60-1 at 18.) CHP further contends that Plaintiff's allegations describe "isolated medical judgments" instead of policies or customs specific to CHP that give rise to *Monell* liability. *Id.* at 18–19. However, Plaintiff specifically alleges that CHP itself failed to implement policies requiring its providers to review medical records and coordinate care. (FAC ¶¶ 361, 364.) Plaintiff also alleges that CHP failed to properly train or supervise its contract employees, and that it understaffed to increase profits. *Id.* ¶ 381. Plaintiff alleges that CHP's systemic failures to implement adequate policies contributed to Roselee's death. *Id.* ¶ 385. At this stage of the proceedings, the Court finds Plaintiff's allegations of CHP's deficient policies and customs specific enough to allege a *Monell* claim for deliberate indifference against CHP. *See M.H. v. Cnty. of Alameda*, 90 F. Supp. 3d 889, 901 (N.D. Cal. 2013) (finding that county's "failure to coordinate the healthcare assessment of inmates" and implement policies "concerning the handling of addicted prisoners" stated a valid deliberate indifference claim under *Monell*).

In response to Plaintiff's allegation that the 2019 Michael Wilson case put Freedland on notice that CHP's deficient policies could result in inmate deaths, CHP contends that pre-2020 allegations lack relevance to CHP's *Monell* liability because it was not established until 2020. (ECF No. 60-1 at 19.) Although CHP is formally a distinct entity from the company involved in Wilson's death, Plaintiff alleges that Freedland continuously played a significant role—as the actual provider in the Wilson case and the founder of CHP. (FAC ¶¶ 359–60.) The Court finds that Plaintiff alleges sufficient continuity between Freedland's former employer and CHP, such that Wilson's death—along with prior incidents that occurred in County jails (*see* FAC ¶ 215, 372)—gave Freedland actual or constructive notice that failure to examine medical records and weigh detainees can lead to detainee deaths and give rise to liability for deliberate indifference claims. *See Est. of Schuck ex rel. Schuck v. Cnty. of San Diego*, No. 23-cv-785-DMS-AHG, 2025 WL 2625254, at \*24 (S.D. Cal. Sept. 11, 2025) (finding that the Wilson case put Freedland "on direct notice that [CHP's policy related to reviewing medical records] could amount to deliberate indifference").

At this stage of the proceedings, Plaintiff sufficiently alleges the following: (1) Roselee possessed a constitutional right to medical care of which she was deprived; (2) CHP had a number of de facto customs and failed to implement adequate policies, which itself created an official policy of inaction; (3) these customs and policy of inaction amounted to deliberate indifference to Roselee's right to medical care; and (4) these customs and policy of inaction were the moving force behind CHP's violations of Roselee's right to medical care. *See, e.g.*, *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1189–90 (9th Cir. 2006) (finding that county's lack of affirmative policies for responding to medically unstable inmates who refused treatment could amount to deliberate indifference); *Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1194–96 (9th Cir. 2002), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (holding that it "should have been obvious" to county that omission in policy related to handling medication for mentally ill detainees could cause constitutional violations).

**E. Whether Plaintiff Adequately Alleges Violations of the Bane Act by Defendants Carlon, Crawford, Walters, Taylor, Mata, Monti, Reynoso, Anderson, Germono, Sparks, Christensen, Esquivel, Hurley, Beaston, Rioveros, Sanoni, Reyes, Ellsworth, Montoy, Lam, Stubbs, Biggs, Odell, Huard, Scott, Tillman, Garcia, Arias, Lopez, Montes-Skinner, Camacho, Hadley, Leonard, Nanusevic, Kuder, Millard, Vasquez, Millard, Boatright, Wilson, Axelsson and Does 7–27 & 44–55, CHP, NaphCare and the County**

### 1. Legal Standard

California Civil Code § 52.1 codifies the Tom Bane Civil Rights Act (the "Bane Act") which creates a private right of action against any person who:

> interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state . . . .

Cal. Civ. Code § 52.1(b). A local government can be vicariously liable for its employees' Bane Act violations under a theory of respondeat superior. *See Gant v. Cnty. of Los Angeles*, 772 F.3d 608, 623 (9th Cir. 2014) (explaining that "[u]nder California law, public entities are liable for actions of their employees within the scope of employment," including for Bane Act claims) (citing Cal. Gov't Code § 815.2(a)). Bane Act claims also apply to supervisory conduct. *Greer v. Cnty. of San Diego*, 726 F. Supp. 3d 1058, 1085–86 (S.D. Cal. 2023).

"The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Cornell v. City & Cnty. of San Francisco*, 225 Cal. Rptr. 3d 356, 376 (Cal. Ct. App. 2017) (citing *Simmons v. Superior Ct.*, 212 Cal. Rptr. 3d 884, 893 (Cal. Ct. App. 2016)). The Act "require[s] an attempted or completed act of interference with a legal right, accompanied by a form of coercion." *Jones v. Kmart Corp.*, 949 P.2d 941, 943–44 (Cal. 1998).

Courts have noted that "'[t]he Bane Act's requirement that interference with rights must be accomplished by threats, intimidation or coercion has been the source of much debate and confusion'" due largely to the decision in *Shoyoye v. Cnty. of Los Angeles*, 137 Cal. Rptr. 3d 839 (Cal. Ct. App. 2012). *Cornell*, 225 Cal. Rptr. 3d at 384 (alteration in original) (quoting *McKibben v. McMahon*, No. EDCV1402171JGBSPX, 2015 WL 10382396, at *3 (C.D. Cal. Apr. 17, 2015)).

"In *Shoyoye*, the court reversed a jury verdict finding defendants liable under the Bane Act for plaintiff's extended detention that resulted from computer error, a mistake which the court described as 'mere negligence.'" *Greer v. Cnty. of San Diego*, No. 3:19-CV-0378-GPC-AGS, 2021 WL 615046, at *9 (S.D. Cal. Feb. 17, 2021) (citing *Cornell*, 225 Cal. Rptr. 3d at 379–82). In 2017, the California Court of Appeals decided *Cornell* and held that *Shoyoye* should be read narrowly "[b]ecause, read closely, *Shoyoye*'s discussion of coercion 'independent from the coercion inherent in the wrongful detention itself' was aimed at separating tort liability from statutory liability in the specific context of a jail overdetention following a lawful arrest—on a record where no legally viable claim of any constitutional violation was pleaded or proved … ." *Cornell*, 225 Cal. Rptr. 3d at 382.

In *Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018), the Ninth Circuit concluded that (1) "the Bane Act does not require that the 'threat, intimidation, or coercion element' of the claim be transactionally independent from the alleged constitutional violation," and (2) "the Bane Act requires [ ] 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Id.* at 1043 (citing *Cornell*, 225 Cal. Rptr. 3d at 382–84). Specific intent can be established by showing that the defendant acted with reckless disregard for the plaintiff's constitutional rights. *Id.* at 1045.

Since the Ninth Circuit's decision in *Reese*, district courts in this circuit have "concluded that an allegation of a defendant's deliberate indifference to a plaintiff's serious medical needs suffices to state a claim under the Bane Act because of the coercion, or specific intent, inherent in the deliberate indifference standard." *Greer*, 2021 WL 615046, at *9 (collecting cases); *see e.g.*, *Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D.

Cal. 2018) ("[A] prison official's deliberate indifference to serious medical needs is a coercive act that rises above mere negligence."); *Barry v. Cnty. of Riverside*, No. EDCV2101770JGBKKX, 2022 WL 2063247, at *7 (C.D. Cal. May 11, 2022) (finding that "a successfully pled deliberate-indifference claim suffices to state a Bane Act claim"); *Campos v. Cnty. of Orange*, No. 8:23-CV-00072-WLH-JDEX, 2024 WL 4799879, at *6 (C.D. Cal. Feb. 27, 2024) (finding that the "Bane Act claim against the Individual Defendants rises or falls with the deliberate indifference claim").

### 2. Application

#### i. The County Defendants

The County Defendants contend that Plaintiff has "not alleged facts sufficient to show deliberate indifference" as required under the Bane Act. (ECF No. 63-1 at 28.) For the reasons discussed in Section (V)(A), the Court finds that Plaintiff alleges facts sufficient to show that each of the County Defendants acted with deliberate indifference towards Roselee's serious medical need.

The County Defendants contend that Plaintiff's Bane Act claim is deficient because "[t]he California Courts of Appeal have routinely held that Bane Act liability requires a threatening, intimidating, or coercive act separate and distinct from the act that allegedly deprived the plaintiff" of her rights. *Id.* (emphasis omitted) (citing *Shoyoye*, 137 Cal. Rptr. 3d at 848–49; *Bender v. Cnty. of Los Angeles*, 159 Cal. Rptr. 3d 204, 213–14 (Cal. Ct. App. 2013); *Lyall v. Cnty. of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015)). As discussed, the California Court of Appeals narrowed the scope of *Shoyoye* in its 2017 *Cornell* decision. The Ninth Circuit recognized this change and held that "the Bane Act does not require that the 'threat, intimidation, or coercion element' of the claim be transactionally independent from the alleged constitutional violation" in its 2018 *Reese* decision. *Reese*, 888 F.3d at 1043. Therefore, Plaintiff's allegations of deliberate indifference are sufficient to establish a claim under the Bane Act. *See Scalia*, 308 F. Supp. 3d at 1084.

The Court's ruling does not apply to the claims against Hadley, V. Millard, Leonard, Wilson, and Axelsson because they have not yet entered appearances.

ii. Defendants Anderson and NaphCare

Defendants Anderson and NaphCare contend that Plaintiff fails to state a claim under the Bane Act because Plaintiff fails to allege that Anderson employed "threats, actions with specific intent, intimidation, or coercion" against Roselee, or that Anderson "inten[ded] to commit a wrongful act." (ECF No. 62 at 15.) However, as discussed above, "Plaintiff is not required to make a separate showing of threats, intimidation, or coercion, or demonstrate specific intent"; allegations of deliberate indifference alone suffice to establish a claim under the Bane Act. *Frost v. Cnty. of San Diego*, No. 21cv01903-L-AGS, 2022 WL 4809364, at *10 (S.D. Cal. Sept. 30, 2022).

As discussed above in Section (V)(A)(2)(xiii), the Court finds that Plaintiff sufficiently alleges that Anderson acted with deliberate indifference toward Roselee's serious medical needs. Accordingly, Plaintiff sufficiently alleges that Anderson violated the Bane Act by acting with deliberate indifference to Roselee's constitutional right to receive medical care.

Because NaphCare may be vicariously liable for Anderson's conduct, the Court finds that Plaintiff adequately pleads a Bane Act claim against NaphCare. *See M.H. v. Cnty. of Alameda*, 90 F. Supp. at 897 (citing *Perreault v. City of Westminister*, No. CV 12-2767-CAS (ANx), 2013 WL 864783, at *7 (C.D. Cal. Mar. 7, 2013)) (finding that employee's liability "gives rise to respondeat superior liability" of private prison healthcare provider "under traditional California common law principles"); *Est. of Schuck ex rel. Schuck v. Cnty. of San Diego*, No. 23-cv-785-DMS-AHG, 2024 WL 500711, at *12 (S.D. Cal. Feb. 8, 2024) (same).

Anderson and NaphCare also contend that Plaintiff's Bane Act claims against them for violating Plaintiff's rights under California Government Code § 845.6 fail because § 845.6 applies only to public employees. (ECF No. 62 at 15.) Plaintiff alleges that Defendants violated the Bane Act because they "interfered with, attempted to interfere with, and violated" Roselee's rights under the following sources of law: (1) the United States Constitution (specifically, the Fourth and Fourteenth Amendments), (2) the

California Constitution, (3) California Civil Code § 43, (4) California Government Code § 845.6, and (5) Title 15 of the California Code of Regulations. (FAC ¶ 408.)

One of those several sources of rights, California Government Code § 845.6, states:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care.

Cal. Gov't Code § 845.6. "Section 845.6 liability does not extend to private entities under contract with the State," like NaphCare and its employees. *Diamond v. Corizon Health, Inc.*, No. 16-cv-03534-JSC, 2016 WL 7034036, at *3 (N.D. Cal. Dec. 2, 2016) (citing *Lawson v. Superior Ct.*, 180 Cal. App. 4th 1372, 1396 (Cal. Ct. App. 2010)). To the extent Plaintiff intends to allege that Anderson and NaphCare violated Roselee's rights under § 845.6, her Bane Act claims fail. However, the remainder of Plaintiff's Bane Act claims against Anderson and NaphCare survive the motion to dismiss stage, as Plaintiff also alleges that Anderson and NaphCare violated Plaintiff's rights under the United States and California constitutions and other California statutes. (FAC ¶ 408.)

### iii. Defendants Hurley, Beaston, and Christensen, and CHP

Defendants Hurley, Beaston, Christensen, and CHP contend that, because Plaintiff fails to state deliberate indifference claims against them, her Bane Act claims also fail. (ECF No. 60-1 at 20–21; ECF No. 70 at 9–10.)

In Section (V)(A) above, the Court found that Plaintiff adequately pleads that Hurley, Beaston, and Christensen acted with objective deliberate indifference to Roselee's right to adequate medical care, which is akin to a showing of reckless disregard. *Est. of Schuck*, 2024 WL 500711, at *12. In Section (V)(D) above, the Court found that Plaintiff states a valid *Monell* claim for deliberate indifference against CHP. Because Plaintiff's Bane Act claim "rises or falls with the deliberate indifference theory" (ECF No. 70 at 9),

the Court finds that Plaintiff adequately pleads that Hurley, Beaston, Christensen, and CHP violated the Bane Act.

### F. Whether Plaintiff Adequately Alleges a Negligence Survival Claim Under Cal. Civil Procedure Code § 377.30 Against All Defendants

#### 1. *Legal Standard*

Where a cause of action such as negligence "survives the death of the person entitled to commence an action or proceeding," it "passes to the decedent's successor in interest." Cal. Civ. Proc. Code § 377.30. "To prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Nally v. Grace Cmty. Church*, 763 P.2d 948, 956 (Cal. 1988).

#### 2. *Application*

##### i.   The County Defendants

The County Defendants contend that Plaintiff's claims for negligence against Defendant County and the Supervisory Defendants are not viable. First, the County Defendants argue that California Government Code § 844.6 provides the County with immunity for injuries to prisoners. (ECF No. 63-1 at 24.) Second, they contend that the Supervisory Defendants can only be held liable if they personally directed or participated in the unlawful acts or omissions. *Id.*

Under the California Tort Claims Act, public entities are generally not liable for injuries sustained by prisoners, including pretrial detainees. Cal. Gov't Code § 844.6(a)(2); *id.* § 844. However, as Plaintiff highlights, § 844.6(a) contains an express exception to this rule for situations described in § 845.6. *Id.* § 844.6(a).

Section § 845.6 of the California Government Code states:

Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, *a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has*

> *reason to know that the prisoner is in need of immediate medical care and he*
> *fails to take reasonable action to summon such medical care.*

Cal. Gov't Code § 845.6 (emphasis added). This provision imposes "a limited duty" on public entities and employees to "summon" medical care when a prisoner is suffering from a "serious and obvious medical condition" requiring immediate attention. *See Watson v. California*, 26 Cal. Rptr. 2d 262, 265 (Cal. Ct. App. 1993); *Nelson v. California*, 188 Cal. Rptr. 479, 483 (Cal. Ct. App. 1982).

Plaintiff contends that the County Defendants, including the Supervisory Defendants, are liable under § 845.6 of the California Government Code for their failure to take reasonable action to summon medical care for Roselee and for "negligent supervision and training as to when to summon medical care." (ECF No. 66 at 30.)

In response, the County Defendants contend that Plaintiff's negligence claim is distinct from a claim under § 845.6 of the California Government Code for failure to summon medical care, and that "[i]f Plaintiff seeks to pursue liability under § 845.6, it must be expressly pled." (ECF No. 69 at 11.)

In alleging her seventh cause of action for negligence under the California survival statute (Cal. Civ. Proc. Code § 377.30), Plaintiff quotes California Government Code § 845.6 and alleges that "Defendants failed to provide adequate medical care for Roselee's serious psychiatric needs . . . This was a medical emergency requiring intervention." (FAC ¶¶ 420–21.) The Court finds these allegations sufficient for Plaintiff to assert liability under California Government Code § 845.6 and rejects the County Defendants' contention that Plaintiff must amend the FAC to allege a failure to summon medical care claim. *See, e.g.*, *Essex v. Cnty. of Imperial*, No. 3:24-CV-00763-L-VET, 2025 WL 525110, at *8 (S.D. Cal. Feb. 18, 2025) (quotations and citations omitted omitted) ("The notice pleading requirement of [Federal Rule of Civil Procedure] 8(a)(2) does not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted[] and does not require a plaintiff to cite statutes in support of his or her claims for relief[.]").

With respect to Plaintiff's claims against the Supervisory Defendants, "California Government Code § 845.6 permits claims against prison officials for negligent supervision and training as to when to summon medical care." *Villareal v. Cnty. of Monterey*, 254 F. Supp. 3d 1168, 1189 (N.D. Cal. 2017) (citations omitted). Plaintiff alleges that the Supervisory Defendants "are liable for their own negligent conduct pursuant to California [Gov't] Code § 845.6 . . . for negligent supervision and training as to when to summon medical care." FAC ¶ 431. Plaintiff further alleges that the Supervisory Defendants "failed to supervise and train regarding the monitoring of psychiatric patients, communication of an inmate's deteriorating condition between medical personnel, and transportation of inmates suffering from a life-threatening medical condition to a hospital," which proximately caused Roselee's decompensation and death. *Id.* ¶¶ 427, 438. As discussed above in Section (V)(C), Plaintiff alleges in detail that the Supervisory Defendants failed to properly train and supervise their subordinates on a range of issues, and that several prior inmate deaths in County jails put the Supervisory Defendants on notice of the deficient training and supervision. *See, e.g., id.* ¶¶ 340–44, 346, 349, 215. Accordingly, Plaintiff sufficiently pleads negligence claims against the Supervisory Defendants.

The FAC does not attempt to allege § 1983 claims against Banuelos and Maraia. *See id.* at 58–59. Accordingly, the Court does not issue a ruling on whether the FAC adequately alleges that Banuelos and Maraia exhibited deliberate indifference. However, the FAC brings negligence claims against "all Defendants," including Banuelos and Maraia. *Id.* at 78. The FAC alleges that Banuelos and Maraia

> were responsible for placing Roselee Bartolacci in administrative segregation at Las Colinas, [] allowed, condoned, ordered, or required her to remain in administrative segregation between April 6 and April 10, 2023, and [] monitored her while in administrative segregation but failed to intervene or place her in housing suitable for her mental health needs . . . [Banuelos and Maraia] interpreted Roselee's symptoms as intransigence and punished her by placing her in administrative segregation . . . [and] continued to punish Roselee by keeping her in administrative segregation until April 10, 2023 . . . . These defendants placed Roselee in segregation without contacting the Regional Center as required by policy.

*Id.* ¶¶ 26, 78.

The Court finds that these allegations of punitively placing Roselee into administrative segregation without (1) seeking medical intervention, (2) recommending hospitalization, or (3) contacting the Regional Center are sufficient to state a claim against Banuelos and Maraia under California Government Code § 845.6.

The Court's ruling does not apply to the claims against Hadley, Leonard, V. Millard, Wilson, and Axelsson because they have not yet entered appearances.

### ii.    Defendants Hurley, Beaston, Christensen, and CHP

Defendants Hurley, Beaston, Christensen, and CHP contend that Plaintiff's negligence claim is based on the same facts underlying the § 1983 claim. (*See* ECF No. 60-1 at 21; ECF No. 70 at 9–10.) These Defendants assert that, because Plaintiff fails to sufficiently allege a deliberate indifference claim, Plaintiff's negligence claim must also fail.

However, for the reasons outlined in Section (V)(A), the Court finds that Plaintiff adequately alleges that Hurley, Beaston, and Christensen acted with deliberate indifference to Roselee's serious medical needs. And as discussed in Section V(D), the Court finds that Plaintiff adequately alleges that CHP's deficient customs and policy of inaction constituted deliberate indifference. "Where a plaintiff alleges sufficient facts to state a § 1983 claim of deliberate indifference, it follows that they have also sufficiently pled a negligence cause of action." *Guy v. Bick*, No. 221CV00823WBSJDPPC, 2022 WL 1271374, at *3 (E.D. Cal. Apr. 28, 2022), *report and recommendation adopted*, No. 2:21-CV-00823-WBS-JDP, 2022 WL 3358116 (E.D. Cal. Aug. 15, 2022) (citing *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1081–82 (9th Cir. 2013)); *see also Cravotta v. Cnty. of Sacramento*, No. 2:22-CV-00167-DJC-AC, 2025 WL 621544, at *14 (E.D. Cal. Feb. 26, 2025).

Additionally, the CHP Defendants contend that CHP is not vicariously liable for its employees' actions because Plaintiff fails to state viable negligence claims against Hurley, Beaston, or Christensen. (ECF No. 70 at 10.) "[A]n employer is vicariously liable for the torts of its employees committed within the scope of the employment." *Lisa M. v. Henry*

66

*Mayo Newhall Mem'l Hosp.*, 907 P.2d 358, 360 (Cal. 1995). California courts find that an act occurs within the scope of employment if it is an "outgrowth" of the employment, "engendered by the employment," or a "generally foreseeable consequence of the activity." *Id.* at 362 (quotations and citations omitted). In other words, "the employer's liability extends to the risks inherent in or created by the enterprise." *Hinman v. Westinghouse Elec. Co.*, 471 P.2d 988, 990 (Cal. 1970). As discussed above in Section (V)(A), the Court finds that Plaintiff sufficiently alleges that Hurley, Beaston, and Christensen acted with deliberate indifference in their roles as healthcare providers employed by CHP to treat detainees in the Jail. Because the CHP employees' alleged failure to adequately treat and summon medical care for detainees is a risk inherent in their employment with CHP, Plaintiff sufficiently alleges that CHP is vicariously liable for its employees' negligence.

Plaintiff sufficiently alleges negligence claims against Hurley, Beaston, Christensen, and CHP.

### iii.    Defendants Anderson and NaphCare

As an initial matter, Defendants Anderson and NaphCare contend that Plaintiff's negligence claims against them are time-barred. California Code of Civil Procedure § 340.5 states in relevant part: "[i]n an action for injury or death against a health care provider based upon such person's alleged professional negligence, the time for the commencement of action shall be . . . one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the injury . . . ." Cal. Civ. Proc. Code § 340.5. In wrongful death actions, the one-year statute of limitations begins running when the decedent dies. *Larcher v. Wanless*, 18 Cal. 3d 646, 659 (Cal. 1976). Roselee was pronounced dead on May 29, 2023 (FAC ¶ 185), but Plaintiff did not file the initial Complaint until July 3, 2024 (ECF No. 1). Because Plaintiff did not commence the action within one year of Roselee's death, Anderson and NaphCare contend that § 340.5's statute of limitations bars Plaintiff's negligence claims.

However, California Code of Civil Procedure § 364 precludes plaintiffs from commencing negligence actions against healthcare providers "unless the defendant has

been given at least 90 days' prior notice of the intention to commence the action." Cal. Civ. Proc. Code § 364(a). Section 364(d) provides that, "if the notice is served within 90 days of the expiration of the applicable statute of limitations," the one-year statute of limitations is tolled for 90 days. *Woods v. Young*, 53 Cal. 3d 316, 326–28 (Cal. 1991). If Plaintiff had served notice of intent to sue on Anderson and NaphCare in the 90 days before the statute of limitations expired on May 29, 2024, the statute of limitations would have been tolled until August 27, 2024—90 days after the one-year anniversary of Roselee's death. *See Katz v. Child.'s Hosp. of Orange Cnty.*, 28 F.3d 1520, 1533–34 (9th Cir. 1994) (recognizing that filing a notice under § 364 tolled the statute of limitations for 90 days).

Here, the FAC does not contain allegations related to the statute of limitations set by § 340.5. However, a district court cannot dismiss a complaint "'unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim.'" *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010) (quoting *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995)). The Court finds that if Plaintiff had properly notified Anderson and NaphCare of her intent to sue within the 90 days before July 3, 2024, Plaintiff's negligence claims would be timely.[6] At this stage of the proceedings, the Court declines to dismiss the negligence claims against Anderson and NaphCare on timeliness grounds. *See Rhodes v. Placer Cnty.*, No. 2:09-cv-00489 MCE JN PS, 2011 WL 1302240, at *16–17 (E.D. Cal. Mar. 31, 2011) (allowing negligence claims to proceed when "[n]either plaintiff nor defendants have

---

[6] In the Declaration attached to Plaintiff's Opposition brief, Plaintiff's counsel states that she mailed notices of intent to sue to Anderson and NaphCare on April 5, 2024. (ECF No. 71-1 at 2.) Anderson and NaphCare contend that Plaintiff's Declaration does not provide enough evidence that Plaintiff's counsel mailed the notices correctly. (ECF No. 73 at 4, 8.) However, Anderson and NaphCare do not actually dispute that Plaintiff's counsel mailed the notices. *See id.* Because neither Plaintiff's Declaration nor the notices of intent to sue are addressed in or attached to the pleadings, the Court declines to consider them at the motion to dismiss stage. *See Khoja*, 899 F.3d at 998 (citation omitted) ("Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure."); *cf.* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute . . . .")

properly filled the factual gaps that would permit resolution of the [§ 364(d) notice] issue at the pleadings stage").

Anderson and NaphCare contend that the FAC fails to allege that specific conduct by either Anderson or NaphCare breached a legal duty, or that the breach caused Roselee's injury. (ECF No. 62 at 17.) Anderson and NaphCare further contend that they cannot be held liable under California Government Code § 845.6 because that provision only applies to "public entit[ies] and "public employee[s]." As discussed above in Section (V)(E)(2)(ii), Plaintiff's negligence claims fail, to the extent they allege that Anderson and NaphCare breached the duty of care created by § 845.6. *See Diamond*, 2016 WL 7034036, at *3 (citation omitted) (finding that § 845.6 liability does not extend to prison contractors).

However, Plaintiff also alleges that all Defendants owed a duty to Roselee to "act with ordinary care and prudence so as not to cause harm or injury to another." (FAC ¶ 418.) Plaintiff contends that the FAC sues Anderson and NaphCare under "an ordinary theory of negligence," not under § 845.6. (ECF No. 71 at 20.) As discussed in Section (V)(A)(2)(xiii), at this stage of the proceedings, Plaintiff sufficiently alleges a deliberate indifference claim against Anderson. Therefore, "it follows that [Plaintiff] ha[s] also sufficiently pled a negligence cause of action" against Anderson. *Guy*, 2022 WL 1271374, at *3.

NaphCare contends that because Anderson did not exhibit negligence, NaphCare cannot be held liable under a theory of vicarious liability. (ECF No. 73 at 8.) However, as discussed above in Section (V)(A)(2)(xiii), the Court finds that Plaintiff sufficiently alleges that Anderson acted with deliberate indifference in her role as a healthcare professional employed by NaphCare to provide psychiatric services in the Jail. Because Anderson's alleged failure to adequately treat and summon medical care for detainees is a risk inherent in her employment with NaphCare, Plaintiff sufficiently alleges that NaphCare is vicariously liable for Anderson's negligence. *See Hinman*, 471 P.2d at 990.

Accordingly, Plaintiff adequately states negligence claims against Anderson and NaphCare at this stage of the proceedings.

**VI.    CONCLUSION**

IT IS HEREBY ORDERED that CHP's Motion to Dismiss the FAC (ECF No. 60), NaphCare's Motion to Dismiss the FAC (ECF No. 62), and the County's Motion to Dismiss the FAC (ECF No. 63) are denied, as discussed above. The Court's ruling does not impact claims against the County Defendants who have yet to enter appearances: Hakan Axelsson, Rose Hadley, Palombo Leonard, Villa Millard, and Burgos Wilson.

IT IS FURTHER ORDERED that all Defendants who have entered appearances shall file an answer to the FAC pursuant to Federal Rule of Civil Procedure 12(a).

Dated:  February 10, 2026

Hon. William Q. Hayes
United States District Court